UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

GARDEN DISTRICT BOOK SHOP, INC.; OCTAVIA
BOOKS, L.L.C.; FUTURE CRAWFISH PAPER, L.L.C.;
AMERICAN BOOKSELLERS ASSOCIATION; AND
COMIC BOOK LEGAL DEFENSE FUND,

Plaintiffs,

-against-

JAMES D. CALDWELL, in his official capacity as
ATTORNEY GENERAL OF THE STATE OF
LOUISIANA; and DALE COX, DANIEL W. NEWELL,
JOHN F. BELTON, JERRY L. JONES, BRADLEY R.
BURGET, R. CHRISTOPHER NEVILS, PHILLIP
TERRELL, JR., VAN H. KYZAR, DON. M. BURKETT,
CHARLES A. RIDDLE III, TRENT BRIGNAC, JOHN F.
DEROSIER, KEITH A. STUTES, MARTIN BOFILL
DUHE, CAMILLE A. MORVANT II, RICHARD J.WARD,
JR., HILLAR MOORE, SAMUEL C. D'ACQUILLA,
SCOTT M. PERRILLOUX, WARREN MONTGOMERY,
RICKY BABIN, PAUL D. CONNICK, JR., CHARLES J.
BALLAY, JOHN "SCHUYLER" MARVIN, EARL B.
TAYLOR, J. REED WALTERS, JOEL T. CHAISSON, II,
ASA A. SKINNER, MICHAEL C. CASSIDY, JOSEPH L.
WAITZ, JR., H. TODD NESOM, PERRY M. NICOSIA,
JAMES P. LEMOINE, JAMES R. LESTAGE, BRIAN
FRAZIER, JENNIFER JONES, JULIE C. JONES,
BRIDGET A. DINVAUT, LEON A. CANNIZZARO, JR.,
and GARY EVANS, each in his or her official capacity
as a LOUISIANA DISTRICT ATTORNEY,

Defendants.

CIVIL ACTION
NUMBER

JUDGE_____

MAGISTRATE
JUDGE_____

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, by their undersigned attorneys, for their Complaint, allege:

## Nature of Action

1.      The state of Louisiana has enacted  a new criminal law that places severe burdens on plaintiff booksellers—and countless others who use the Internet—by requiring them to age-verify every Internet user before providing access to non-obscene material that could be deemed harmful to any minor. Despite imposing these burdens and creating the risk of widespread chill on digital speech, the new law will have virtually no effect on the ability of minors to access "harmful to minors" material on the Internet. The law thus imposes a content-based burden on constitutionally-protected expression without vindicating any state interest. And no federal court has found a state statute generally restricting online access to material harmful to minors to be constitutional.

2.      The new law,  H.B. 153 (Act 187 of the Laws of 2015, codified at R.S. 14:91:14) (the "Act"), provides that:

> Any person or entity in Louisiana that publishes material harmful to minors on the Internet shall, prior to permitting access to the material, require any person attempting to access the material to electronically acknowledge and attest that the person seeking to access the material is eighteen years of age or older.

R.S. 14:91:14(A)(1), and provides that it is a crime, punishable by a fine of "up to ten thousand dollars" to fail to so require the use of an "Age Attestation Button." R.S. 14:91:14(A)(2), (C).

3.      The Act violates the First, Fifth, and Fourteenth Amendments to, and the Commerce Clause of, the United States Constitution; and unconstitutionally burdens Plaintiffs' exercise of their rights thereunder. The Act is unconstitutional for myriad reasons, including the following:

4.      **First,** there is a broad range of material that has serious literary, artistic, political or scientific value for some 17-year olds which might be considered harmful to a

10-or 12-year old ("Older Minors Material"). The Act fails to distinguish between Older Minors Material and other harmful to minors material, requiring both to be placed behind an Age Attestation Button. Requiring persons who publish Older Minors Material on the Internet to place such material behind an Age Attestation Button violates the First and Fourteenth Amendments, by infringing the free speech rights of both older minors (who are denied access to Older Minors Material) and persons who create, publish, and sell such material.

5.      *Second*, many booksellers in Louisiana, including Plaintiffs Garden District Book Shop, Inc. ("Garden District Book Shop"), Octavia Books LLC ("Octavia Books"), and other Louisiana members of plaintiff American Booksellers Association ("ABA")  maintain websites on the Internet which offer millions of both traditional printed books ("Books") and electronic Books ("eBooks") for sale. None of the Books or eBooks offered by Plaintiffs Garden District Book Shop, Octavia Books, or by other Louisiana members of ABA, is obscene, but some might be deemed harmful to minors within the meaning of the Act (particularly if Older Minors Material is included within the Act's scope). Under the Act, it is possible that each plaintiff bookseller would be required to parse through every one of the millions of images in their online catalogs in order to determine whether it might be deemed harmful to minors, and then either put an Age Attestation Button in front of such text or image or in front of the entire website.  That task is not only extraordinarily burdensome, but for some booksellers it is impossible, because the catalogs are maintained by third party providers and not by the individual booksellers. And if a bookseller complied with the Act by placing an Age Attestation Button in front of the entire website, that would prevent all minors from purchasing any

3

book at all; a 15-year old could not purchase *Little House on the Prairie* as a gift for her 8-year-old sister.

6.     ***Third,*** requiring booksellers and other content providers of material on the Internet to place an Age Attestation Button either on individual materials, or on their entire websites, unconstitutionally labels the booksellers and other content providers as an "adult business," with all of the negative ramifications that carries.

7.     ***Fourth,*** many newspapers, magazines, comic books, and other publications, including Antigravity Magazine, published by Plaintiff Future Crawfish Paper, L.L.C. ("FCP"), and members (and/or their customers) of plaintiff Comic Book Legal Defense Fund ("CBLDF"), publish online editions, which may contain material harmful to minors, or may post images of their print editions online. Under the Act, depending upon how the harmful to minors test is applied, it is possible that each such publisher would be required to parse through every text or image in each issue, to determine whether it might be deemed harmful to minors, and then either put an Age Attestation Button in front of such text or image, or in front of the entire issue, or in front of the entire website.

8.     ***Fifth,*** while placing severe burdens on booksellers, publishers, and other content providers in Louisiana, the Act will not, in the slightest, accomplish its ostensible purpose of protecting minors. Most material published on the Internet (including most material harmful to minors published on the Internet) is published by persons and entities in other states, or in other countries, and not in Louisiana. Requiring Louisiana entities to use Age Attestation Buttons will do nothing whatsoever to prevent minors in

Louisiana from accessing material harmful to minors published on the Internet by non-Louisianans.

9.      **Sixth,** the Act uses a community standards-based test relying entirely on localized standards of decency, but does not specify whether the relevant community is that of the speech's publisher or its audience. If the former, the law impermissibly exports a particular Louisiana parish's community standard to every other location worldwide. If the latter, the Act would force a Louisiana publisher to assess a nebulous and unknowable community standard for an audience that could be located in any Louisiana parish, any state, or indeed any country in the world. The lack of specificity about which community standard applies, and how to apply it, is impermissibly vague.

10.      **Seventh**, the Act significantly burdens interstate commerce by, among other things, severely restricting the ability of Louisiana booksellers and content-providers to engage in interstate commerce, including preventing Louisiana booksellers and others from selling Older Minors Material to older minors in other states.

11.      **Eighth,** the Act's exemption of certain news organizations, while well-intentioned, is unconstitutional because, among other things, it draws impermissible distinctions among persons engaged in free speech—respecting the free speech rights of some, and infringing the rights of others, in some cases based on content, in violation of the First and Fourteenth Amendments.

12.      **Ninth,** the Internet is used not only for websites, but also for a broad range of electronic communication, including, *e.g.,* emails and some text messages sent to a specific person or to a group of specific persons. The Act, by its terms, applies to the entire Internet. If one adult sends an email or text message over the Internet to

another adult with explicit language or images that might be considered harmful to minors, the Act may require the use of an Age Attestation Button.  As absurd as it sounds, that would mean that if a married adult sent his or her spouse a sexually explicit email or text message, the sender would thereby violate the Act unless he or she put an Age Attestation Button in front of the message to his or her spouse.

13.     *Tenth,* the Act fails to provide a person of ordinary intelligence fair notice of what is required and what is prohibited, and thus is impermissibly vague, and violates the Due Process Clauses of the Fifth and Fourteenth Amendments.

14.     Louisiana enacted the Act in the face of numerous federal court decisions invalidating as unconstitutional similar federal and state laws which sought to restrict free speech on the Internet, including laws which sought to regulate or ban the publication of material harmful to minors on the Internet.

15.     The United States Supreme Court invalidated a federal law restricting Internet communications deemed harmful to minors on First Amendment grounds in *Reno v. ACLU*, 521 U.S. 844 (1997). The Third Circuit invalidated a second such federal law on First Amendment grounds in *ACLU v. Mukasey*, 534 F.3d 181 (3rd Cir. 2008), cert. denied, 555 U.S. 1137 (2009).

16.     In state after state, laws containing content-based restrictions on Internet communications deemed harmful to minors have been held unconstitutional. *American Booksellers Foundation v. Sullivan*, 799 F. Supp. 2d 1078 (D. Alaska 2011) (Alaska); *American Booksellers Foundation v. Coakley*, 2010 WL 4273802 (D. Mass. 2010) (Mass.); *PSINet, Inc. v. Chapman,* 362 F.3d 227 (4th Cir. 2004) (Virginia), *American Booksellers Foundation v. Dean,* 342 F.3d 96 (2d Cir. 2003) (Vermont), *Cyberspace*

*Communications, Inc. v. Engler,* 238 F.3d 420 (6th Cir. 2000) (Michigan), *ACLU v. Johnson*, 194 F.3d 1149 (10th Cir. 1999) (New Mexico), *ACLU v. Goddard,* Civ. 00-0505 (D. Ariz. Aug. 11, 2004) (Arizona), *Southeast Booksellers v. Ass'n v. McMaster*, 282 F. Supp. 2d 389 (D.S.C. 2003) (South Carolina), *American Library Association v. Pataki,* 969 F. Supp. 160 (S.D.N.Y. 1997) (New York). A state statute in Ohio was upheld only after the state's attorney general declined to defend the full breadth of the statute, so that it would apply only to person-to-person Internet communications, such as email and instant messages. *American Booksellers Foundation for Free Expression v. Strickland,* 601 F.3d 622 (6th Cir. 2010).

17.     Nevertheless, in June 2015, the Louisiana State Legislature enacted the Act, and the Governor signed the Act into law.

18.     Counsel for plaintiffs wrote to Defendant Attorney General and Defendant District Attorney Hillar C. Moore III (who is President of the Louisiana District Attorneys Association) requesting a limiting construction to ensure the Act is in conformity with the weight of the above federal court opinions. The Attorney General and District Attorney Moore failed to respond.

19.     Plaintiffs (including members of the named plaintiffs and others on whose behalf they bring this action and whose constitutional rights they seek to vindicate, "Plaintiffs") are persons and entities in Louisiana which use the Internet for communication, both as senders and receivers of First Amendment-protected materials, including material which may be deemed harmful to minors and thus subject to the Act's requirement of an Age Attestation Button. Plaintiffs publish such material on the Internet,

use the Internet to offer such books and other materials, and use the Internet to access and purchase such books, publications, text, and images.

20.     The Act places Plaintiffs in the untenable position of abiding by the Act and having their constitutional rights infringed, or violating the Act and risking prosecution.

21.     Plaintiffs seek to have the Act declared unconstitutional and void, because it violates the First, Fifth and Fourteenth Amendments to, and Commerce Clause of, the United States Constitution, and seek to have defendants enjoined from enforcing the Act—both preliminarily, pending the hearing and determination of this action and permanently.

## JURISDICTION AND VENUE

22.     This case arises under the United States Constitution and the laws of the United States and presents a federal question within this Court's jurisdiction under Article III of the Constitution and 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3). It seeks remedies under 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. §§ 1983 and 1988, and Fed. R. Civ. P. 65.

23.     Venue is proper in this district under 28 U.S.C. § 1391(b).

## THE PARTIES

24.     Plaintiff Garden District Book Shop is a Louisiana corporation which owns and operates a bookstore located at 2727 Prytania Street, New Orleans, Louisiana, in the Garden District of New Orleans, and also sells Books and eBooks through its website, on the Internet, http://www.gardendistrictbookshop.com/. Garden Street Book Shop has served Louisianans for over 35 years. In its physical store, Garden District Book Shop offers a large collection of regional titles—new and used; design, art and

8

gardening books; fiction and non-fiction; children's; and signed first editions and limited editions by many regionally and nationally acclaimed authors.  On its website, Garden District Book Shop offers millions of Books and eBooks for sale.

25.    Plaintiff Octavia Books is a Louisiana limited liability company which owns and operates a bookstore at 513 Octavia Street in New Orleans, Louisiana, and also sells Books and eBooks through its website on the Internet, http://www.octaviabooks.com. It also has a presence on social media, including Facebook and Twitter. Octavia Books has served Louisianans for over 15 years.  In its physical shop, Octavia Books offers a large collection of regional titles—design, art and gardening books; fiction and non-fiction; children's; and signed first editions and limited editions by many regionally and nationally acclaimed authors.  It also offers programs directed at children both in the store and in schools.  On its website, Octavia Books offers millions of Books and eBooks for sale, which can either be shipped to the customer or picked up in the store.

26.    To sell Books and eBooks on its website on the Internet, Garden District Book Shop and Octavia Books (the "Louisiana booksellers") each use third-party providers (under the IndieCommerce and Kobo programs described below) which not only maintain a Book and eBook inventory of millions of book titles, but also prepare and provide the listings of the Books and eBooks which appear on each Louisiana bookseller's website.

27.    The Books offered for sale online are accompanied by images of the covers (as are some of the eBooks), some of which contain images of nudity, some of which could be deemed to be material harmful to minors under the Act. None of the

Books or eBooks is obscene, and none of the images which appear is obscene. A user of the Internet can view these images, and purchase these Books and eBooks, without leaving the Louisiana bookseller's website. The third-party providers offer this same Book and eBook inventory, and these same web listings, to other booksellers, both in Louisiana and in other states. Neither Garden District Book Shop nor Octavia Books selects the Books or eBooks to be listed, nor prepares the listings on the web pages. However, the bookstores feature these Books and eBooks as being offered by them, and readers purchase the Books and eBooks from the individual booksellers. If a reader purchases an eBook from any of these Louisiana booksellers, the eBook is delivered to the reader, electronically, over the Internet.

28.     It would be impossible for any of these Louisiana booksellers to place an Age Attestation Button in front of each image of a Book cover or an eBook cover that might be deemed harmful to minors, or to place an Age Attestation Button in front of each eBook if its contents might be deemed harmful to minors (whether or not the cover was shown on the Internet, and whether or not the cover by itself might be deemed harmful to minors), for two reasons. First, doing so would be unduly burdensome; it would entail reviewing millions of such images and eBook contents. Second, none of these Louisiana booksellers has the right or ability to edit the web pages prepared by the third party provider, and incorporated into Plaintiffs' Louisiana websites. The only ways that any of these Louisiana booksellers could comply with the Act would be to place an Age Attestation Button in front of all Books and eBooks offered on its website, or stop selling Books and eBooks using the third-party provider and, instead, incur the expense of developing and maintaining its own system for web sales.

29.     Garden District Book Shop and Octavia Books each sues to vindicate its own constitutional rights and those of its owners, officers, employees, and current and prospective customers and readers, including older minors.

30.     FCP is a Louisiana limited liability company with its principal place of business in Gretna, Louisiana, which publishes an alternative magazine, Antigravity Magazine. Antigravity Magazine, which has been published for over eleven years, is a free, monthly publication, published on newsprint, and distributed in over 180 locations all over the New Orleans metro region, from Kenner to the Westbank, and all points in between. It has a print run of 10,000 copies every month. Antigravity Magazine specializes in original content, with a particular focus on New Orleans, covering a broad range of news and cultural information, including interviews, music reporting, reviews, previews of local film festivals, opinion pieces, comics and large-scale photography. For example, its September 2015 issue includes articles ranging from race relations in the French Quarter of New Orleans, to the economy and infrastructure of New Orleans, to reviews of books, visual art exhibits, and music. Antigravity Magazine is also published online on its website, on the Internet, http://www.antigravitymagazine.com. That website includes text and images, and also includes a downloadable pdf version of the current print magazine, as well as pdf versions of past issues of the print magazine. Antigravity Magazine includes content with a broad appeal not only to adults but also to older minors. None of the content of Antigravity Magazine is obscene, but some might be deemed "harmful to minors" as defined by the Act, particularly if that definition does not exclude Older Minors Material.

31.     Because Antigravity Magazine makes its full print edition available online in pdf form, FCP does not know how to comply with the Act if a print edition contains individual writings or images (that may or may not appear online as discrete "digital image[s]" within the meaning of the Act) that might be deemed harmful to minors under the Act.  If FCP excises such text and images from the pdf images of the pages of the print publication, it would deprive all Antigravity Magazine readers, including adults and older minors, of the opportunity to read and view the full Antigravity Magazine in the form in which it was published. And if FCP could only post such excised material behind an Age Attestation button, that would deprive older minors of access to material that is entirely suitable for them.

32.     FCP recognizes that the Act contains an exemption for "news gathering organization[s]," but cannot tell, because of the vagueness of the exemption's language, whether that exemption would apply to Antigravity Magazine.

33.     FCP sues to vindicate its own constitutional rights and those of its owners, officers, employees, and current and prospective customers and readers, including older minors.

34.     Plaintiff American Booksellers Association is a not-for-profit trade association comprised of more than 1,600 locally owned and operated independent bookstores nationwide, including in Louisiana. ABA's members are not "adult" bookstores. Through its division, the American Booksellers for Free Expression ("ABFE"), the ABA is the bookseller's voice in the fight against censorship. One of ABA's missions is to inform and educate booksellers, other members of the book

industry, and the public about the dangers of censorship and to promote and protect the free expression of ideas, particularly freedom in the choice of reading materials.

35.     ABA sponsors two programs, each operated by a third party provider, to enable its member booksellers to sell Books and eBooks on the Internet.  The IndieCommerce program enables each bookseller which joins the program to offer for sale, on its own website, over 5,000,000 Books. The Kobo program enables each bookseller which joins the program to offer for sale, on its own website, over 4,000,000 eBooks. For both programs, the inventory is selected by, and maintained by, the third party provider, and neither by ABA nor by any individual bookseller. The third party provider also prepares the text and images which appear on the websites (except that, for a limited number of Books, particularly from small publishers, ABA provides such material). Neither the ABA nor any individual bookseller can vary those listings, for Books or eBooks, or the manner in which they appear. The same inventory is offered to all booksellers, nationwide, which join the program. None of these Books or eBooks is obscene, and none of the images which appear is obscene. However, the images and text which appear, under the IndieCommerce and Kobo programs, for some of these listings of Books and eBooks could be deemed to be material harmful to minors under the Act, particularly if Older Minors Material is included within such definition. In addition, when ABA's bookseller members sell eBooks online through the Kobo program, the eBooks are delivered electronically, and thus their content—which may include both text and images, some of which could be deemed harmful to minors—is sent over the Internet.

36.    ABA sues on its own behalf, on behalf of its member booksellers in Louisiana, and sues to vindicate its own constitutional rights, its members' constitutional rights, and those of their owners, officers, employees, and current and prospective customers and readers, including older minors.

37.    Plaintiff Comic Book Legal Defense Fund is a non-profit corporation dedicated to defending the First Amendment rights of the comic book industry. CBLDF represents over 1,500 comic books authors, artists, retailers, distributors, publishers, librarians, and readers, some of whom are minors, located in Louisiana, throughout the country and the world. Some of the comic books created, published, distributed, and offered for sale on the Internet by CBLDF's members in Louisiana, which include manga (a form of comic book which originated in Japan, but is now widely distributed in other parts of the world, including the United States, in which the drawings sometimes include sexually-explicit images), though constitutionally protected speech, could be deemed to be harmful to minors under the Act. Many such comic books are sold online, and images from such comic books appear online. The First Amendment rights of CBLDF's Louisiana members will be adversely affected unless the Act is enjoined. CBLDF sues on its own behalf, on behalf of its Louisiana members, and to vindicate its own constitutional rights, its members' constitutional rights, and those of their owners, officers, employees, and current and prospective customers, including older minors.

38.    Defendant James D. Caldwell is the Attorney General of the State of Louisiana and is sued in his official capacity as such. He is the legal officer of the State of Louisiana. Attorney General Caldwell, when "necessary for the assertion or protection of any right or interest of the state . . .shall have authority . . . upon written request of a

district attorney, to advise and assist in the prosecution of any criminal case, and . . . for cause, when authorized by the court which would have original jurisdiction and subject to judicial review, (a) to institute, prosecute, or intervene in any criminal action or proceeding, or (b) to supersede any attorney representing the state in any civil or criminal action." Louisiana Const. Art IV, § 8.

39.    Defendants Dale Cox (1st Judicial District), Daniel W. Newell (2d Judicial District), John F. Belton (3d Judicial District), Jerry L. Jones (4th Judicial District), John M. "Mack" Lancaster (5th Judicial District), James E. Paxton (6th Judicial District), Bradley R. Burget (7th Judicial District), R. Chris Nevils (8th Judicial District), Phillip Terrell Jr. (9th Judicial District), Van H. Kyzar (10th Judicial District), Don. M. Burkett (11th Judicial District), Charles A. Riddle III (12th Judicial District), Trent Brignac (13th Judicial District), John F. DeRosier (14th Judicial District), Keith A. Stutes (15th Judicial District), Martin Bofill Duhe (16th Judicial District), Camille A. Morvant II (17th Judicial District), Richard J. Ward, Jr. (18th Judicial District), Hillar Moore (19th Judicial District), Samuel C. D'Acquilla (20th Judicial District), Scott M. Perrilloux (21st Judicial District), Warren Montgomery (22nd Judicial District), Ricky Babin (23d Judicial District), Paul D. Connick, Jr. (24th Judicial District), Charles J. Ballay (25th Judicial District), John "Schuyler" Marvin (26th Judicial District), Earl B. Taylor (27th Judicial District), J. Reed Walters (28th Judicial District), Joel T. Chaisson, II (29th Judicial District), Asa A. Skinner (30th Judicial District), Michael C. Cassidy (31st Judicial District), Joseph L. Waitz, Jr. (32nd Judicial District), H. Todd Nesom (33rd Judicial District), Perry M. Nicosia (34th Judicial District), James P. Lemoine (35th Judicial District), James R. Lestage (36th Judicial District), Brian Frazier (37th Judicial District), Jennifer A. Jones

(38th Judicial District), Julie C. Jones (39th Judicial District), Bridget A. Dinvaut (40th Judicial District), Leon A. Cannizzaro, Jr. (41st Judicial District), and Gary Evans (42nd Judicial District), is each a Louisiana District Attorney for the Judicial District listed in parentheses after his or her name, and together are all of the District Attorneys for all of the parishes in Louisiana and are sued in their official capacities as such.

40.     The District Attorneys are sued in their official capacities as the parties responsible for enforcing state criminal laws in the parishes. *See* Louisiana Const. Art. 5, Sec. 826 ("Except as otherwise provided by this constitution, a district attorney, or his designated assistant, shall have charge of every criminal prosecution by the state in his district.").

## FACTS

## I.     Communication over the Internet

41.     The Internet is a decentralized, global medium of communication that links people, institutions, corporations and governments around the world. It is a giant computer network that interconnects innumerable smaller groups of linked computer networks and individual computers. The Internet connects billions of users.

42.     It is estimated that there are over three billion Internet users worldwide, over 45% of the world population. http://www.internetworldstats.com/stats.htm (last visited November 3, 2015). See also Internet Society Global Internet Report 2015 http://www.internetsociety.org/globalinternetreport/assets/download/IS_web.pdf (last visited November 3, 2015).

43.     In the United States, it is estimated that there are over 260 million Internet users, over 87% of the U.S. population. http://www.internetworldstats.com/stats14.htm (last visited November 3, 2015).

44.     In Louisiana, it is estimated that there are over three million Internet users, more than 67% of the state's population.

http://www.internetworldstats.com/unitedstates.htm (last visited November 3, 2015).

45.     Because the Internet merely links together numerous individual computers and computer networks, no single entity or group of entities controls the material made available on the Internet or limits the ability of others to access such materials. Rather, the range of digital information available to Internet users—which includes text, images, sound and video—is individually created, maintained, controlled and located on millions of separate individual computers around the world.

46.     The Internet presents extremely low entry barriers to anyone who wishes to provide or distribute information or gain access to it. Unlike television, cable, radio, newspapers, magazines or books, the Internet provides the average citizen and business, whether large or small, with an affordable means for communicating with, accessing and posting content to a worldwide audience, whether by creating a website or simply by sending an email, Twitter tweet or other communication to one or more persons.

47.     The information made available on the Internet is as diverse as human thought. Content on the Internet is provided by the billions of Internet users worldwide, both individuals and businesses, and the content ranges from academic writings, to humor, to art, to literature, to medical information, to music, to news, to movie clips to gossip, and to human sexuality. For example, on the Internet one can view the full text of the Bible, all of the works of Shakespeare, and numerous other classic or current works of literature. One can browse through paintings from museums around the world,

view in detail images of the ceiling of the Sistine Chapel, or hear selections from the latest hip hop music albums. At any one time, the Internet serves as the communication medium for literally millions of global conversations, political debates, and social dialogues.

48.     Although the majority of the information on the Internet does not depict or describe nudity or sexual activity, such material is widely available on the Internet.

49.     "The Internet" is a broad term that encompasses a wide spectrum of online communications targeted at varied known and unknown audiences, including web-based email, online instant messaging systems, restricted chat forums, social media platforms, and publicly-available websites.

50.     The Act applies equally to all forms on Internet publication.

## II.     The Act

51.     In June 2015, the Louisiana State Legislature enacted, and Governor Bobby Jindal signed into law, H.B. 153, enacted as Act No. 187 of the Acts of 2015, codified at R.S. 14:91.14 (as defined above, the "Act"). The Act provides:

**§ 91.14. Unlawful distribution of material harmful to minors through the Internet**

A.     (1)     Any person or entity in Louisiana that publishes material harmful to minors on the Internet shall, prior to permitting access to the material, require any person attempting to access the material to electronically acknowledge and attest that the person seeking to access the material is eighteen years of age or older.

(2)     The failure to comply with the provisions of Paragraph (1) of this subsection shall constitute the unlawful distribution of material harmful to minors through the Internet.

(3)     If a person or entity in Louisiana publishes material harmful to minors on the Internet and complies with the provisions of Paragraph (1) of this Subsection, the person or entity shall not be held liable under the provisions of this Section if the person seeking to access the material

18

is under the age of eighteen and falsely acknowledges and attests that he is eighteen years of age or older.

(4)     No Internet service provider, interactive computer service provider as defined by 47 U.S.C. 230(f), or radio or television broadcast licensee of the Federal

(5)     This Section shall not apply to any bona fide news or public interest broadcast, website, video, report, or event and shall not be construed to affect the rights of any news-gathering organization.

B.     For purposes of this Section:

(1)     "Descriptions or depictions of illicit sex or sexual immorality" includes the depiction, display, description, exhibition, or representation of any of the following:

(a)     Ultimate sexual acts, normal or perverted, actual, simulated, or animated, whether between human beings, animals, or an animal and a human being.

(b)     Masturbation, excretory functions, or exhibition, actual, simulated, or animated, of the genitals, pubic hair, anus, vulva, or female breast nipples.

(c)     Sadomasochistic abuse, meaning actual, simulated, or animated, flagellation or torture by or upon a person who is nude or clad in undergarments or in a costume which reveals the pubic hair, anus, vulva, genitals, or female breast nipples, or the condition of being fettered, bound, or otherwise physically restrained, on the part of one so clothed.

(d)     Actual, simulated, or animated, touching, caressing, or fondling of, or other similar physical contact with, a pubic area, anus, female breast nipple, covered or exposed, whether alone or between human, animals, or a human and an animal, of the same or opposite sex, in an act of apparent sexual stimulation or gratification.

(e)     Actual, simulated, or animated, stimulation of the human genital organs by any device whether or not the device is designed, manufactured, and marketed for that purpose.

(2)     "Material harmful to minors" is defined as any digital image, photograph, or video which exploits, is devoted to or principally consists of, descriptions or depictions of illicit sex or sexual immorality for commercial gain, and when the trier of fact determines that each of the following applies:

(a)     The material incites or appeals to or is designed to incite or appeal to the prurient, shameful, or morbid interest of minors.

(b)     The material is offensive to the average adult applying contemporary community standards with respect to what is suitable for minors.

(c)     The material taken as a whole lacks serious literary, artistic, political, or scientific value for minors.

(3)     "News-gathering organization" means all of the following:

(a)     A newspaper, or news publication, printed or electronic, of current news and intelligence of varied, broad, and general public interest, having been published for a minimum of one year and that can provide documentation of membership in a statewide or national press association, as represented by an employee thereof who can provide documentation of his employment with the newspaper, wire service, or news publication.

(b)     A radio broadcast station, television broadcast station, cable television operator, or wire service as represented by an employee thereof who can provide documentation of his employment.

C.     Whoever violates the provisions of this Section shall be fined up to ten thousand dollars. A violation of The Act is punishable by a fine of not more than $10,000, or both.

52.     The Act became effective August 1, 2015.

## III.    The Act's Impact on Internet Speech

53.     The Act is an unconstitutional, content-based restriction on free speech, which impairs the ability of adults, older minors, and minors, to access and share constitutionally-protected speech over the Internet.

### A. The Scope of the Restriction on Material Harmful to Minors.

54.     The impact of the Act and its constitutionality depends, to a significant extent, on the meaning of "harmful to minors" under Louisiana law.

55.     In *Ginsberg v. New York,* 390 U.S. 629 (1968), the United States Supreme Court established a variable obscenity test for minors, variable as to each of its three

components—whether the material appeals to the prurient shameful, or morbid interest of minors in sex; whether the material is offensive to the average adult applying contemporary community standards with respect to what is suitable for minors; and whether material taken as a whole lacks serious literary, artistic, political, or scientific value for minors. With respect to at least the second and third components of this test— what is suitable for minors under contemporary community standards, and whether the material has serious value for minors—the variability relates to the age and maturity of the minor. There is a broad range of material that has serious literary, artistic, political or scientific value for a legitimate minority of normal 16- and 17-year olds which might be considered "harmful" to a 10-or 12-year old. For example, materials about sexual relations, the risk of sexually-transmitted diseases, sexual health, and the enjoyment of sex certainly have serious value to many 16- and 17-year olds in Louisiana (where 16-year old minors may marry with parental consent).

56.    Under the law of most jurisdictions, the variability of age and maturity relating to each of the components of "harmful to minors" is recognized and it can be applied by a clerk in a bricks and mortar bookstore.

57.    However, in the context of the Internet, applying such a variable standard is difficult, if not impossible, and raises constitutional concerns. Thus, a number of states, including Virginia, Tennessee, and Georgia,  in order to avoid constitutional invalidity, have defined harmful to minors so that it only covers materials which lack serious value for a reasonable 17-year-old—borderline obscenity.

58.    The Virginia Attorney General and the Virginia Supreme Court addressed this precise issue in *Commonwealth of Virginia v. American Booksellers Ass'n, Inc.,* 236

Va. 168, 372 S.E.2d 618 (1988). The Virginia Supreme Court saved Virginia's "harmful

to minors" on the Internet statute from a constitutional challenge by embracing the

opinion of the Virginia Attorney General on the definition of "harmful to minors."

Answering certified questions from the United States Supreme Court, *Commonwealth of*

*Virginia v. American Booksellers Ass'n., Inc.,* 484 U. S. 383, 398 (1988), the Virginia

Supreme Court held:

> The [Virginia] attorney general responds that the focus of the inquiry is not
> upon the youngest members of the class, not upon the most sensitive
> members of the class, and not upon the majority of the class. A book will
> pass statutory muster, she contends, if it has serious value for a legitimate
> minority of juveniles, and in this context, a legitimate minority may consist
> of older, normal (not deviant) adolescents. We agree with the attorney
> general . … We conclude that if a work is found to have a serious literary,
> artistic, political or scientific value for a legitimate minority of normal, older
> adolescents, then it cannot be said to lack such value for the entire class
> of juveniles taken as a whole.

236 Va. at 176, 372 S.E.2d at 623-24. Based on that definition, the United States Court

of Appeals for the Fourth Circuit held the Virginia statute constitutional. *American*

*Booksellers Ass'n. Inc. v. Commonwealth of Virginia*, 882 F.2d 125, 127-28 (4th Cir.

1989)

      59.    The Tennessee Attorney General and the Tennessee Supreme Court

similarly construed a similar Tennessee statute and saved the statute from a

constitutional challenge. The Tennessee Supreme Court held:

> The Tennessee statute … is readily susceptible to the narrowing
> construction advanced by the State and adopted by other courts
> considering similar statutes. Accordingly, we hold that the … statute
> applies only to those materials which lack serious literary, artistic, political,
> or scientific value for a reasonable 17–year–old minor.

*Davis Kidd Booksellers, Inc. v. McWherter,* 866 S.W. 2d 520, 528 (Tenn. Sup. Ct. 1993).

The Tennessee Supreme Court thus concluded:

> Such a construction significantly reduces the scope of materials covered and produces only a minimal burden on adult access to constitutionally protected expression. The statute as construed is, therefore, not overbroad and fully complies with the First Amendment of the United States Constitution and Article I, § 19 of the Tennessee Constitution.

866 S.W. 2d at 522. *See also American Booksellers v. Webb*, 919 F.2d 1493,1504-05

(11th Cir. 1990), cert. denied, 500 U.S. 942 (1991) ("*Pope [v. Illinois*, 481 U.S. 497

(1987)] "teaches that if any reasonable minor, including a seventeen-year-old, would

find serious value, the material is not 'harmful to minors.'").

60.     Thus, whether or not the Act is constitutional turns, in significant part, on

the definition and application of "harmful to minors." It is unclear, from the Act itself,

whether the Act includes Older Minors Material within the scope of harmful to minors

material which requires an Age Attestation Button. If the Act includes such material

within its definition of harmful to minors, then the Act is unconstitutional for the reasons

set forth throughout this Complaint.

61.     On August 31, 2015, the undersigned counsel raised this issue by letter to

(a) Hon. James D. "Buddy" Caldwell, the defendant Attorney General and to (b) Hon.

Hillar C. Moore III, President, Louisiana District Attorneys Association, who is one of the

defendant District Attorneys. The letter asked that Attorney General Caldwell and the

District Attorneys:

> (1) agree that H.B. 153 should be construed so that material is not "harmful to minors" if it has serious literary, artistic, political or scientific value for a legitimate minority of normal, older adolescents, *i.e.* 17-year old minors, and therefore (2) disavow any prosecution under H.B. 153 inconsistent with that construction of the statute. *Susan B. Anthony List v. Driehaus,* --- U.S. ---, 134 S.Ct. 2334, 2343 (2014) (pre-enforcement constitutional challenge was proper where "Government … declined to disavow prosecution," citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 15 (2010)); *Blum v. Holder,* 744 F.3d 790, 800 (1st Cir. 2014) (pre-enforcement constitutional challenge to federal criminal statute dismissed

because "the United States disavows" broader interpretation of statute under which plaintiffs feared prosecution).

Counsel received no response to the letter.

62.     The Act unconstitutionally infringes the free speech rights of adults, older minors, and younger minors, under the First and Fourteenth Amendments, and Plaintiffs reasonably fear prosecution under the Act for engaging in constitutionally-protected free speech.

63.     Materials that are "harmful to minors" are defined in the Act using a community standards-based approach. The Act does not specify whether the relevant community is that of the speech's publisher or its audience.

64.     If the Act requires a publisher to use standards from the community in which the speech is published, the law impermissibly exports a particular Louisiana parish's community standard to every other parish, state, and country from which an Internet audience might be comprised. The Act thus forces a Louisiana publisher to assess a nebulous and non-existent community standard and impose the most restrictive standard on access to its material for an Internet audience located anywhere in the United States and, indeed, the world.

65.     If on the other hand, the Act refers to community standards in the location where the speech is accessed, it creates an impossible burden on publishers. The Act would require a Louisiana publisher to assess a nebulous and unknowable community standard for an audience that could be located in any Louisiana parish, any state, or indeed any country in the world.

### B.  The Impact on Louisiana Booksellers

66.     Many booksellers in Louisiana, including Garden District Book Shop, Octavia Books, and other members of ABA, maintain websites on the Internet which offer millions of both Books and eBooks for sale (using a third party provider and/or from their own inventory).

67.     For traditional printed Books, these booksellers publish images of the covers of such books on their websites on the Internet. Some of those images published on the Internet may be deemed material harmful to minors (particularly if Older Minors Material is included within the Act's scope), even though the books are non-obscene books, fully protected by the First Amendment and the Fourteenth Amendment for sale to adults and older minors.

68.     To comply with the Act, it would be necessary for such booksellers either (a) to review each such Book, and place an Age Attestation Button in front of each cover which might be deemed material harmful to minors, (b) to place an Age Attestation Button in front of their entire website, or (c) to restrict website displays and sales to a small enough inventory of Books so that the bookseller could review all images of each cover. The first is an overwhelming burden (and, indeed, is impossible for bookstores which use a third party provider, and therefore do not themselves maintain or control the selection of Books or the pages containing the images of the book covers). The second unconstitutionally deprives all minors of access to all Books and other material on the websites—even material suitable for young children. And the third approach would require Louisiana booksellers to engage in massive self-censorship.

25

69.     For eBooks, the Act presents even greater burdens. eBooks may contain both text and images. For some eBooks, images of the covers appear on the booksellers' websites on the Internet; for other eBooks, a generic cover appears, merely giving the author's name and the title of the eBook. If a reader purchases an eBook, the eBook is electronically delivered to the reader over the Internet; it is not clear whether such electronic delivery comes within the Act's phrase, "publishes material … on the Internet." Some of these eBooks published on the Internet may be deemed material harmful to minors, even though the books are non-obscene books, fully protected by the First Amendment and the Fourteenth Amendment for sale to adults and older minors.

70.     If a Louisiana bookseller makes eBooks available for sale on its website, not only the cover of the eBook but the content (text and images) of the entire eBook is transmitted using the Internet. Thus, even if the cover of the eBook was innocuous (and, by itself, could not be deemed harmful to minors), if the eBook's text or images taken as a whole might be deemed harmful to minors, offering the eBook for sale on a Louisiana bookseller's website could be deemed a violation of the Act. To comply with the Act, it would be necessary for such booksellers either (a) to review not only the covers but the contents of each eBook, and place an Age Attestation Button in front of each eBook, if the cover or contents might be deemed material harmful to minors, (b) to place an Age Attestation Button in front of their entire website, or (c) to restrict website displays and sales to a small enough inventory of books so that the bookseller could review all images and text of each eBook. The first is an even greater burden for eBooks than for Books (and, indeed, is impossible for bookstores which use a third party provider), because not only the covers but the contents of every eBook must be reviewed. The

second and third approaches, as applied to eBooks, present the same unconstitutional burdens as they do for Books.

71.     Requiring booksellers and other content providers of material on the Internet to place an Age Attestation Button either on individual materials, or on their entire websites, unconstitutionally compels such booksellers and other providers to engage in speech with which they disagree—by labeling Books and eBooks as unsuitable for persons under 18 years of age. Such a requirement also wrongly suggests that the bookseller or other content provider is an "adult business," with all the negative ramifications that carries.

### C. The Impact on Publishers and Vendors of Newspapers, Magazines, and Comic Books

72.     Many newspapers, magazines, and other publications, including Antigravity Magazine and members of CBLDF, maintain websites, post text or images online, publish online editions, post images of their print editions, or publish material which may be depicted or sold on websites maintained by others, which may contain material that could be considered harmful to minors under the Act.

73.     The requirements of the Act are not clear. Under the Act, it is possible that each such publication must parse through every text or image in each issue, to determine whether it might be deemed harmful to minors, and then either put an Age Attestation Button in front of such text or image, or in front of the entire issue. And it is unclear how that can be accomplished if the publication posts images of a print publication online, such that individual text or images cannot be placed behind an Age Attestation Button.

### D.  The Impact on Older Minors

74.     There is a broad range of material that has serious literary, artistic, political or scientific value for a legitimate minority of normal 17-year olds which might be considered harmful to a 10-or 12-year old. For example, materials about sexual relations, the risk of sexually-transmitted diseases, sexual health, and the enjoyment of sex, and respected works of literature and art that may include provocative or sexually oriented language or images certainly have serious value to many 16- and 17-year olds in Louisiana (where 16-year old minors may marry with parental consent).

75.     The Act fails to explicitly exclude such Older Minors Material from the material harmful to minors which must be placed behind an Age Attestation Button. Requiring persons who publish Older Minors Material on the Internet to place such material behind an Age Attestation Button violates the First and Fourteenth Amendments, by infringing the constitutional rights of both older minors (who are denied access to constitutionally-protected material posted by persons in Louisiana, unless the older minors attest falsely about their age), and persons who create, publish and sell such material (who are restricted in such creation, publication and sale).

76.     The Act not only violates the constitutional rights of the approximately 125,000 older minors—that is, 16- and 17-year olds—in Louisiana,[1] but violates the rights of older minors in other states, all of whom will be prevented from viewing or purchasing constitutionally-protected material from Louisianans.

---

[1] Louisiana's population is estimated, by the United States Census, to be 4,649,676. The Census also estimates that 17.3% of Louisiana's population is between 5 and 17 years old, inclusive. Assuming an equal distribution among that age group, there are approximately 123,753 Louisianans who are 16 or 17 years old. United States Census, http://quickfacts.census.gov/qfd/states/22000.html (last visited November 3, 2015).

### E.  The Impact on All Minors

77.     One of the ways that Louisiana booksellers, newspapers, magazines, comic books, and other content providers can comply with the Act is to place an Age Attestation Button on their entire website. In fact, that is the only way that Louisiana booksellers can comply with the Act, while continuing to offer a large inventory of Books and eBooks, without engaging in the burdensome, indeed impossible, task of reviewing every Book and eBook on their websites, and parsing through each text or image in a publication, and placing Age Attestation Buttons in front of each which might be deemed harmful to minors.

78.     Placing an Age Attestation Button on an entire website would mean that no minor could view the website, or purchase any Book, eBook, or comic book —not even a children's book—from the website. The Act would thus deprive all minors of the constitutional rights to Books, eBooks, comic books, and other material which is not harmful to minors, unless they were to falsely respond to the Age Attestation Button, which may constitute a crime under Louisiana law, R.S. 14.125.

## IV.   The Vagueness of the Act

79.     Because many of the terms in the Act are vague and overbroad, the Act further chills the speech of content providers on the Internet. The Act is riddled with vague words and phrases, including the following.

80.     As noted above, the core definition of the Act—material harmful to minors—is vague because it is not clear whether such material is intended to include Older Minors Material, and thus it is not clear whether Older Minors Material must be placed behind an Age Attestation Button.

81.     Also impermissibly vague as applied to the Internet is the term "taken as a whole" in the definition of "harmful to minors." What is a "whole" is unclear in the context of the Internet. Should one consider only a specific article or text, or an individual image, on a website? Or should one consider the web page on which that text or image appears? Or the entire website? When a cover of a Book appears on a website, but the contents of the Book does not, in considering the material "as a whole," does one consider just the cover? Or does one consider the entire Book?

82.     Further, the reference to "contemporary community standards" is vague and potentially overbroad, due to the borderless nature of the Internet. The Act's community standards-based approach does not specify whether the relevant community is that of the speech's publisher or its audience. Louisiana is a diverse state, and the "contemporary community standards" vary widely among the parishes. But, of course, when a Louisiana content provider publishes material on a website on the Internet, the same material is available in every parish of Louisiana (as well as in other states and other countries around the world). A content provider in Louisiana has no way of knowing what community standard would apply to an audience that may include out-of-state or even international minors.

83.     It is unclear what the phrase "publishes material … on the Internet" means. If a Louisiana bookseller offers an eBook for sale on the Internet, but the bookseller's website contains only the name and author of the book (and not any text or images from the book), does the electronic delivery of the eBook's contents to a specific purchaser constitute "publication" on the Internet? The Internet is used not only for websites, but also for a broad range of electronic communication, including, *e.g.,* emails and some

text messages sent to a specific person or to a group of specific persons. If one adult sends an email or text message to another adult, which is transmitted over the Internet, by doing so, does the sender thereby "publish material on the Internet"? If so, that would mean that if a married adult sent his or her spouse an email or text message with explicit language or images that might be considered "harmful to minors," the sender would thereby violate the Act unless he or she put an Age Attestation Button in front of the message to his or her spouse

## V.   The Act's Burden on Interstate and Foreign Commerce

84.   The Act burdens interstate commerce by impinging on communication, protected by the First Amendment, between Louisianans and non-Louisianans in several ways.

85.   When a Louisianan publishes material on a publicly-available website on the Internet, he or she publishes the material not only to Louisianans, but to the entire world. Thus, for example, when a Louisiana bookseller offers Books and eBooks for sale on its website, the website can be viewed in other states and around the world, and readers in other states (and around the world, unless shipping restrictions are imposed) can purchase Books and eBooks from the website. Requiring a Louisiana bookseller to screen works with an Age Attestation Button means that the bookseller cannot offer to sell such works to minors (including older minors) in other states and other countries, even if such works would not be deemed harmful to minors (whatever definition is used for that phrase) in the community where the would-be purchaser lives. Conversely, an older minor in another state or country is denied the right to purchase constitutionally-protected material from Louisiana booksellers.

86.     Indeed, even if (as absurd as it sounds) the Louisianan wanted to communicate only to persons outside of the State of Louisiana—for example, by stating that no works on the site would be shipped to any address in Louisiana—the Act would still apply, because the Act requires an Age Attestation Button simply because it is a Louisianan who is publishing the material, without regard to where the material will be viewed or read.

## VI.    The "News-Gathering Organization" Exemption

87.     The Act includes exemption of certain news organizations which, while well-meant, is unconstitutional because, among other things, it draws distinctions among various media speakers.

88.      The Act distinguishes between  newspapers that have been published for a minimum of one year and which are members of a press association *and* which are of "varied, broad, and general public interest" (exempt from the Act) and newspapers that do not meet all  of those criteria. The Act therefore discriminates against newer publications, news publications which have not joined professional associations, and specialized publications of literature, science, photography, or art, directed to a specialized readership, no matter how long they have been published and no matter to what associations they belong (subject to the Act). Finally, the Act also fully exempts all cable television operators, even if they just began operations, making further impermissible distinctions among media providers.

89.     This vague exemption seeks to preserve the free speech rights of some while trampling on the free speech rights of others. In so doing, it violates (a) the free speech and freedom of the press provisions of the First and Fourteenth Amendments,

(b) the due process clause of the Fifth Amendment, and (c) the equal protection clause of the Fourteenth Amendment.

## VII.  The Ineffectiveness of the Act and the Effectiveness of Alternative Means

90.     While placing overwhelming burdens on booksellers, publishers, and other content providers, the Act will almost certainly accomplish nothing at all to protect minors.

91.     The Louisiana State Legislature properly recognized that the Act could not require persons outside of Louisiana who publish materials on the Internet to use an Age Attestation Button, and therefore only imposed such a requirement on "[a]ny person or entity in Louisiana." R.S. 14:91.14(A)(1). But most material published on the Internet (including most material harmful to minors published on the Internet) is published by persons and entities in other states, or in other countries, and not in Louisiana. Requiring Louisiana entities to use Age Attestation Buttons will do nothing whatsoever to prevent minors in Louisiana from accessing material harmful to minors which has been published on the Internet by non-Louisianans.

92.     Indeed, if the same Book or eBook, with a cover or contents which might be deemed material harmful to minors, is offered for sale on the Internet by both a Louisiana bookseller (in compliance with the Act, with an Age Attestation Button) and a non-Louisiana bookseller (not subject to the Act), a minor (whether in or outside Louisiana) could view the images online and buy the Book or eBook from the non-Louisiana bookseller, but could not buy it from the Louisiana bookseller unless he or she attested falsely, with possible criminal ramifications. The Act thus irrationally discriminates against individuals and businesses in Louisiana.

93.     At the same time, there are alternative means available for Louisiana to address the goal of the Act—to prevent minors from accessing (or make it more difficult for minors to access) material harmful to minors.

94.     Many computers—straight out of the box—include a "parental controls" feature in their operating system. Almost all browsers also have parental control options. If a computer does not already have such a feature, it is easy to download one, for free, from many online services. These features enable parents to block access to sexually explicit materials on the Web, to prevent minors from giving personal information to strangers by e-mail or in chat rooms, and to maintain a log of all online activity on a home computer. Parents can also use screening software that blocks messages containing certain words, as well as tracking and monitoring software. Perhaps most effectively, a parent can restrict and observe a child's use of the Internet by placing a computer in a family room.

95.     As the U.S. Supreme Court has stated, parental filtering programs are less restrictive and certainly more effective than the Act. *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2002). In that case, a credit card was required for verification, and the Court noted that it was still less effective due to the high rate of false certification—a rate sure to increase when the sole requirement is a one-click self-attestation.

## VIII.   The Need for Injunctive Relief

96.     Both the passage of the Act, and the fact that the Attorney General and the District Attorneys have not disavowed unconstitutional prosecutions under the Act, have placed Plaintiffs in reasonable fear that, if they continue to exercise their constitutional rights, they will be prosecuted under the Act.

97.     Plaintiffs have no adequate remedy at law.

**CAUSES OF ACTION**

**COUNT I**

**Violation of Free Speech Rights Under the First and Fourteenth
Amendments of the United States Constitution**

98.     Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

99.     The Act violates the rights of Plaintiffs under the First and Fourteenth Amendments of the United States Constitution on its face and as applied because it unconstitutionally interferes with their ability to communicate constitutionally protected speech.

100.    The Act violates the rights of Plaintiffs under the First and Fourteenth Amendments to the United States Constitution because it is not the least restrictive means of accomplishing any compelling governmental purpose.

101.    The Act violates the rights of plaintiffs, their members, and their users under First and Fourteenth Amendments to the United States Constitution because it is substantially overbroad.

**COUNT II**

**Violation of the Commerce Clause
of the United States Constitution**

102.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

103.    The Act violates the rights of Plaintiffs under the Commerce Clause because it constitutes an unreasonable and undue burden on interstate and foreign commerce.

35

## COUNT III

### Violation of the Due Process Clauses
### of the Fifth and Fourteenth Amendments
### of the United States Constitution

104.   Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

105.   The Act violates the rights of Plaintiffs under the Due Process Clauses of the Fifth and Fourteenth Amendments because it is impermissibly vague and fails to provide a person of ordinary intelligence fair notice of what is prohibited.

## COUNT IV

### Violation of the Equal Protection
### Provisions of the United States Constitution

106.   Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

107.   The Act violates the equal protection provisions of the Fourteenth Amendment, through the exemption for news-gathering organizations, which attempts to protect the free speech rights of some while trampling on the free speech rights of others.

### PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs respectfully request that the Court:

A.   Declare that R.S: 14.91.14 violates the First, Fifth and Fourteenth Amendments and the Commerce Clause of the United States Constitution,

B.   Preliminarily and permanently enjoin defendants, their officers, agents, servants, employees, and attorneys, and those persons in

active concert or participation with them who receive actual notice

of the injunction, from enforcing R.S: 14.91.14,

C.      Award plaintiffs their reasonable costs and fees pursuant to 42

U.S.C. § 1988, and

D.      Grant plaintiffs such other and further relief as the Court deems just

and proper.


Dated: November 4, 2015


By attorneys:

Dentons US LLP
Michael A. Bamberger
(*pro hac vice* motion forthcoming)
Richard M. Zuckerman
(*pro hac vice* motion forthcoming)
1221 Avenue of the Americas
New York, NY 10020
(212) 768-6700
Fax: (212) 768-6800
Michael.Bamberger@dentons.com
Richard.Zuckerman@dentons.com

Esha Bhandari
(*pro hac vice* motion forthcoming)
Lee Rowland
(*pro hac vice* motion forthcoming)
American Civil Liberties Union Foundation
125 Broad St, 18th Floor
New York, NY 10004
(212) 549-2500
Fax: (212) 549-2654
ebhandari@aclu.org
lrowland@aclu.org


*s/ Stephen A. Dixon*
Stephen A. Dixon  La. No. 18185
ACLU Foundation of Louisiana
Cooperating Attorney
1330 Highland Park Dr.
Baton Rouge, LA 70808
(225) 588-5407
Fax: (504) 613-6511
southla@laaclu.org

*s/ Candice C. Sirmon*
Candice C. Sirmon, T.A., La. No. 30728
ACLU Foundation of Louisiana
P.O. Box 56157
New Orleans, LA 70156
(504) 522-0628
Fax: (504) 613-6511
Email: csirmon@laaclu.org