Michael A. Bamberger
(admitted *pro hac vice*)
Richard M. Zuckerman
(admitted *pro hac vice*)
Dentons US LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 768-6700
Fax: (212) 768-6800
Michael.Bamberger@dentons.com
Richard.Zuckerman@dentons.com

Esha Bhandari
(admitted *pro hac vice*)
Lee Rowland
(admitted *pro hac vice*)
American Civil Liberties Union
  Foundation
125 Broad St, 18th Floor
New York, NY 10004
(212) 549-2500
Fax: (212) 549-2654
ebhandari@aclu.org
lrowland@aclu.org

Stephen A. Dixon  La. No. 18185
ACLU Foundation of Louisiana
Cooperating Attorney
1330 Highland Park Dr.
Baton Rouge, LA 70808
(225) 588-5407
Fax: (504) 613-6511
southla@laaclu.org

Candice C. Sirmon, T.A., La. No. 30728
ACLU Foundation of Louisiana
P.O. Box 56157
New Orleans, LA 70156
(504) 522-0628
Fax: (504) 613-6511
csirmon@laaclu.org

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| GARDEN DISTRICT BOOK SHOP, INC.; OCTAVIA BOOKS, L.L.C.; FUTURE CRAWFISH PAPER, L.L.C.; AMERICAN BOOKSELLERS ASSOCIATION; AND COMIC BOOK LEGAL DEFENSE FUND,<br><br>Plaintiffs,<br><br>-v-<br><br>JAMES D. CALDWELL, in his official capacity as ATTORNEY GENERAL OF THE STATE OF LOUISIANA, et al.,<br><br>Defendants. | Case No. 3:15-CV-738-BAJ-SCR<br><br>**Memorandum of Law in Support of Motion for Preliminary Injunction**<br><br>*Oral Argument Requested* |

# TABLE OF CONTENTS

Introduction.................................................................................................................1

Statement of Facts......................................................................................................1

    A.    The Act...........................................................................................1

    B.    The Plaintiffs..................................................................................2

    C.    The Impact of the Act ....................................................................5

Argument ...................................................................................................................7

    A.    Standards Governing the Issuance of a Preliminary Injunction.............................7

    B.    Plaintiffs are likely to prevail on their First Amendment claims because the Act is a content-based regulation of speech that cannot survive strict scrutiny..................................................................................8

        1.    The Act impermissibly burdens constitutionally-protected speech by Louisiana publishers. ............................................................9

        2.    The Act fails to exempt material suitable for older minors and is therefore overbroad..................................................................11

        3.    The Act is not narrowly tailored because there are alternatives that are less burdensome on speech and more effective to serve the Act's purpose. .........................................................................12

    C.    Plaintiffs are likely to prevail on their Due Process claims that the Act is impermissibly vague. .........................................................15

    D.    Plaintiffs are likely to prevail on their Commerce Clause claims. ........................17

        1.    The Act impermissibly regulates the interstate activities of Louisiana publishers and out-of-state readers............................................17

        2.    The Act creates inconsistent regulation of the Internet. ...........................18

        3.    The Act's burdens clearly exceed any local benefits................................18

    E.    Plaintiffs are likely to prevail on their Equal Protection Clause claims. ...............19

    F.    Plaintiffs face irreparable injury, the public interest favors an injunction, and the balance of hardships tips heavily in Plaintiffs' favor...............................20

Conclusion ...............................................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. Goddard,* No. 00 Civ. 505, 2004 WL 3770439 (D. Ariz. July 22, 2004) ...................... 10

*ACLU v. Gonzales*, 478 F. Supp. 2d 775 (E.D. Pa. 2007) ...................................................... 13, 14

*ACLU v. Johnson*, 194 F.3d 1149 (10th Cir. 1999) ........................................................ 10, 18, 19

*ACLU v. Mukasey*, 534 F.3d 181 (3d Cir. 2008) ............................................................ 10, 13, 15

*Am. Booksellers Ass'n v. Virginia*, 882 F.2d 125 (4th Cir. 1989) ................................................ 12

*Am. Booksellers Found. for Free Expression v. Strickland,* 601 F.3d 622 (6th Cir. 2010) .......... 11

*Am. Booksellers Found. v. Coakley*, No. 10 Civ. 11165, 2010 WL 4273802 (D. Mass. Oct. 26, 2010) ........................................................................................................................................... 10

*Am. Booksellers Found. v. Dean,* 342 F.3d 96 (2d Cir. 2003) ............................................... 10, 14

*Am. Booksellers Found. v. Sullivan*, 799 F. Supp. 2d 1078 (D. Alaska 2011) ............................ 10

*Am. Booksellers v. Webb*, 919 F.2d 1493 (11th Cir. 1990) ........................................................ 12

*Am. Libraries Ass'n. v. Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997) ....................................... 18, 19

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) .......................................................................... 8, 13, 14

*Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012) ............................ 18

*Booksellers Ass'n v. McMaster*, 282 F. Supp. 2d 389 (D.S.C. 2003) ................................... 10, 14

*Byrum v. Landreth*, 566 F.3d 442 (5th Cir. 2009) ...................................................................... 7

*Commonwealth v. American Booksellers Association,* 372 S.E.2d 618 (Va. 1988) .................... 12

*Cyberspace Commc'ns, Inc. v. Engler,* 55 F. Supp. 2d 737 (E.D. Mich. 1999), *aff'd*, 238 F.3d 420 (6th Cir. 2000) ................................................................................................................... 11

*Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520 (Tenn. 1993) .............................. 12

*Doe v. Duncanville Indep. Sch. Dist.*, 994 F.2d 160 (5th Cir. 1993) .......................................... 20

*Doe v. Jindal*, 853 F. Supp. 2d 596 (M.D. La. 2012) ................................................................ 10

*Elrod v. Burns*, 427 U.S. 347 (1976) ...................................................................................... 20

*Fla. Businessmen for Free Enter. v. City of Hollywood*, 648 F.2d 956 (5th Cir. Unit B June 10, 1981) ......................................................................................................................................... 20

*Ginsberg v. United States*, 390 U.S. 629 (1968) ................................................... 11, 12

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ...................................................... 15

*Healy v. Beer Inst.*, 491 U.S. 324 (1989) ...................................................................... 18

*Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967) ....................................................... 15

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) ......................................................... 19

*Pope v. Illinois*, 481 U.S. 497 (1987) .......................................................................... 12

*PSINet, Inc. v. Chapman,* 362 F.3d 227 (4th Cir. 2004) ............................................... 10

*Reno v. ACLU*, 521 U.S. 844 (1997) .................................................................... passim

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ...................... 19

*SEIU, Local 5 v. City of Houston*, 595 F.3d 588 (5th Cir. 2010) ................................. 17

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105 (1991) ........ 10

*Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653 (2011) ..................................................... 19

*St. Joseph Abbey v. Castille*, 700 F.3d 154 (5th Cir. 2012) .......................................... 19

*United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000) ......................... 7, 8, 13

*United States v. Stevens*, 559 U.S. 460 (2010) ....................................................... 8, 18

**Statutes**

La. Stat. Ann. § 14:91.14 .................................................................................... passim

**Other Authorities**

Black's Law Dictionary (10th ed. 2014) ...................................................................... 16

Get Started with Hangouts, Support.Google.Com, https://support.google.com/hangouts
/answer/2944865?hl=en ........................................................................................... 16

Messenger Mobile App Basics, Facebook.Com, https://www.facebook.com/
help/151024075021791/ ......................................................................................... 16

<u>**Memorandum of Law**</u>

**Introduction**

The state of Louisiana has enacted an overbroad, content-based criminal law that places unconstitutional burdens on Plaintiff booksellers and magazines—and countless others who use the Internet—by requiring them to age-verify every Internet user before providing access to non-obscene material that could be deemed harmful to any minor. La. Stat. Ann. § 14:91.14. Despite imposing these burdens, the Act will have virtually no effect on the ability of minors to access "harmful to minors" material on the Internet, because they can continue to view such material that has been published from outside of Louisiana. The law thus creates a content-based burden on constitutionally-protected speech without vindicating any state interest, in violation of the First Amendment. Additionally, the law is impermissibly vague in violation of the Due Process Clause; irrationally applies only to certain speakers in violation of the Equal Protection Clause; and burdens interstate commerce in violation of the Commerce Clause. The Act imposes ongoing, irreparable harm on Plaintiffs, who are forced to choose between forgoing their constitutional rights and facing the threat of prosecution under the Act.

**Statement of Facts**

**A.      The Act**

Louisiana's House Bill 153 created a new crime, titled the "[u]nlawful distribution of material harmful to minors through the Internet," which provides:

> Any person or entity in Louisiana that publishes material harmful to minors on the Internet shall, prior to permitting access to the material, require any person attempting to access the material to electronically acknowledge and attest that the person seeking to access the material is eighteen years of age or older.

La. Stat. Ann. § 14:91.14(A)(1). Any violation is punishable by a fine of up to $10,000. *Id.* § 14:91.14(C). "[M]aterial harmful to minors" is defined as "any digital image, photograph, or

1

video" that depicts "illicit sex or sexual immorality for commercial gain," and which meets all three of the following requirements: it "incites or appeals to or is designed to incite or appeal to the prurient, shameful, or morbid interest of minors," it "is offensive to the average adult applying contemporary community standards with respect to what is suitable for minors," and "the material taken as a whole lacks serious literary, artistic, political, or scientific value for minors." *Id*. § 14:91.14(B)(2). The Act defines "illicit sex or sexual immorality for commercial gain" expansively. For example, a "description" of "simulated" "touching" of the fully-clothed "pubic area" "in an act of apparent sexual stimulation," is included, as is a "description" or "depiction" of "female breast nipples," "genitals," or "pubic hair." Thus, the phrase, "she was topless," could be, according to the Act, "illicit sex or sexual immorality for commercial gain."

The Act's age-attestation requirement does not apply to Internet service providers or "any bona fide news or public interest broadcast, website, video, report, or event," and "shall not be construed to affect the rights of any news-gathering organization." *Id*. § 14:91.14(A)(4) & (5). The Act also exempts from liability anyone who allows access to harmful-to-minors material to someone who falsely claims to be eighteen or older. *Id*. § 14:91.14(A)(3).

## B.      The Plaintiffs

Plaintiffs are Louisiana-based booksellers and a magazine, as well as associations representing member booksellers, comic book retailers, and minors in Louisiana (collectively, "Plaintiffs"), all of whom use the Internet for communication, both as senders and receivers of First Amendment-protected materials, including material which may be deemed harmful to minors under the Act. Plaintiffs use the Internet to publish such material, offer such books and other materials, and access, view, and purchase such books, publications, text, and images.

**Booksellers.** Plaintiffs Garden District Book Shop, Inc. ("Garden District"), Octavia Books, L.L.C. ("Octavia Books"), and other Louisiana members of Plaintiff American

Booksellers Association ("ABA") maintain websites on the Internet which offer millions of both traditional printed books ("books") and electronic books ("eBooks") for sale. Declaration of Britton Trice ("Trice Dec.") ¶¶ 6–7; Declaration of Christopher Finan ("Finan Dec.") ¶¶ 7–8; Declaration of Judith Lafitte ("Lafitte Dec.") ¶¶ 5–6. The ABA sponsors two programs, each operated by a third-party provider, to enable its member booksellers to sell books and eBooks on the Internet. The IndieCommerce program enables each bookseller in the program to offer for sale, on its own website, over 5 million books. The Kobo program enables each bookseller in the program to offer for sale, on its own website, over 4 million eBooks. Finan Dec. ¶ 8. For both programs, inventory is selected and managed by the third-party providers, and cannot be customized by either the ABA or its bookseller members (with the exception of individual bookstores requesting the addition—but not the deletion—of titles to the inventory). Finan Dec. ¶ 8; Lafitte Dec. ¶ 7; Trice Dec. ¶ 9. The third-party providers also prepare the text and images which appear on the websites when a user searches for a particular book title, which may include images of the book covers, or a "Google Preview" which provides digital images of select pages from the book. Finan Dec. ¶ 8; Lafitte Dec. ¶ 7; Trice Dec. ¶¶ 7–9. Neither the ABA nor any individual bookseller can vary the images that appear with the book listings, even though a viewer does not leave the individual bookseller's website to view the listings, and even though it is the individual bookseller which offers each of the books for sale. Finan Dec. ¶ 8; Lafitte Dec. ¶ 7; Trice Dec. ¶¶ 8–9. Garden District and Octavia Books each use the IndieCommerce and Kobo third-party inventory of books and eBooks and thereby offer millions of books and eBooks for sale through their websites. Trice Dec. ¶ 6; Lafitte Dec. ¶ 5. Both Garden District and Octavia Books rely on their websites to generate business, both through Internet sales and promoting events that bring customers to their physical shops. Trice Dec. ¶¶ 4–5; Lafitte Dec. ¶ 8.

Of the millions of books available in the IndieCommerce and Kobo programs, some of the listings contain images or text which, while not obscene, could be deemed harmful to minors under the Act, such as nudity. Finan Dec. ¶ 12; Lafitte Dec. ¶ 10. Many of the book listings contain images or text which, while perfectly appropriate for, or even targeted at, 16- and 17-year olds ("older minors"), might be deemed harmful to younger minors, and therefore "harmful to minors" under the Act. Lafitte Dec. ¶ 11 (listing as examples books on art, history, and teenage reproductive health); Trice Dec. ¶ 11 (listing as examples "young adult" books or books on teenage sexual development). Furthermore, when Plaintiff booksellers sell eBooks through the Kobo program, the eBooks are delivered electronically, and thus their entire content—which may include both text and images, some of which could be deemed harmful to minors—is sent over the Internet. Finan Dec. ¶ 16; Lafitte Dec. ¶ 15; Trice Dec. ¶ 8.

**Other publications**. Plaintiff Future Crawfish Paper, L.L.C. ("FCP"), which publishes Antigravity magazine ("Antigravity"), as well as Louisiana members of Plaintiff Comic Book Legal Defense Fund ("CBLDF") create, publish, sell, and promote newspapers, magazines, comic books, and other publications that are published on the Internet. Antigravity's website includes text and images from the magazine, as well as downloadable PDF versions of current and past issues of the print magazine, with the entirety of each issue constituting a single digital file. Declaration of Dan Fox ("Fox Dec.") ¶¶ 6, 14. Although none of Antigravity's content is obscene, some of its material could be deemed "harmful to minors" under the Act, such as illustrations which depict sexual themes or nudity. These illustrations are often satirical and have serious social, political, historic, artistic, or other value for many minors, especially older minors. *Id.* ¶ 10. CBLDF's Louisiana members include comic book artists, retailers, and minor and adult readers who publish and view comic books in various genres, including young adult fiction,

4

teenage fiction, and materials addressed to older audiences, often picturing nudity and sexually frank plots. Declaration of Charles Brownstein ("Brownstein Dec.") ¶¶ 4, 7. Some of this material may be deemed harmful to minors under the Act, even though it has serious value for older minors. *Id.* ¶ 11. FCP and Louisiana CBLDF members rely on their websites to distribute their material; in FCP's case, the website generates readership and demographic information that enables it to sell advertising to support the publication. *Id.* ¶¶ 8–9; Fox Dec. ¶ 8.

## C.     The Impact of the Act

The Act burdens the distribution of First Amendment-protected non-obscene material by burdening and chilling the activities of Internet publishers in Louisiana, as well as by prohibiting older minors from accessing material they have a constitutional right to receive.

**Restrictions on Older Minors' Access to Material**. There is a broad range of material that has serious literary, artistic, political, or scientific value for some 16- or 17-year olds which might be considered harmful to, for example, a 10-or 12-year old ("Older Minors Material"). *See* Brownstein Dec. ¶ 11; Fox Dec. ¶ 10; Lafitte Dec. ¶ 11; Trice Dec. ¶ 11. The Act fails to distinguish Older Minors Material from material that may be deemed harmful to all minors, requiring both to be placed behind an age-attestation screen, thereby preventing older minors from accessing material of serious value to them without falsely attesting to their age.

**Burden on Louisiana Publishers.** In order to comply with the Act, Louisiana booksellers and other publishers must review every single image on their websites to determine which of them must be placed behind an age-attestation screen because they might be deemed harmful to minors. For Plaintiff Louisiana booksellers, such a task is an insurmountable burden, because they are small businesses that do not have the resources to review the millions of books and eBooks they offer for sale through third-party inventories, including both the cover images that appear on the listings and the entire contents of every single eBook. Lafitte Dec. ¶ 15; Trice

5

Dec. ¶¶ 13–14.  Furthermore, none of these Louisiana booksellers has the right or ability to edit the book listings prepared by the third-party providers. Finan Dec. ¶ 8; Lafitte Dec. ¶ 7; Trice Dec. ¶¶ 8–9.[1] Booksellers could comply with the Act only by terminating contracts with the third-party providers and severely reducing their inventory to only those books they can individually review, or placing an age-attestation screen in front of their entire websites, thereby preventing them from distributing *any* books or eBooks to minors, even those that could not be deemed harmful to a minor of any age. Lafitte Dec. ¶¶ 14–17; Trice Dec. ¶ 15. The latter would prevent a Louisiana bookseller from selling a copy of *Little House on the Prairie* to a 13-year old, for example. Similarly, it would be a nearly impossible burden for Plaintiff FCP to review all back issues of Antigravity published on its website, because it does not have the resources to do so. Fox Dec. ¶ 14. And even if it could do so, there is no technical way to separate out images within any one issue of the magazine, so if even one image could be deemed harmful to minors, the entire issue would have to be placed behind an age-attestation screen. *Id.* All Plaintiffs are therefore placed in the position of engaging in massive self-censorship, restricting their inventories to only those books and magazine issues they can individually review, or of placing their entire websites beyond the reach of minors. The latter approach would falsely brand Louisiana publishers as "adult" websites, with all the negative ramifications that follow.  Fox Dec. ¶ 14; Lafitte Dec. ¶ 18; Trice Dec. ¶ 16.

**Fear of Prosecution Under the Act.** Plaintiffs share a reasonable fear of being prosecuted under the Act for engaging in constitutionally protected publication and distribution

---

[1] In addition, Plaintiffs Garden District, Octavia Books, and FCP all use some combination of the third-party social media sites Facebook, Instagram, and Twitter, which they cannot modify or control for purposes of adding age-attestation screens. They would therefore have to refrain from posting anything on these social media sites that could be deemed harmful to any minor under the Act. Fox Dec. ¶¶ 8, 15; Lafitte Dec. ¶ 20; Trice Dec. ¶ 18.

of material on the Internet. Fox Dec. ¶¶ 9–16; Lafitte Dec. ¶¶ 9–21; Trice Dec. ¶¶ 10–19. Plaintiffs' counsel wrote to Defendants Attorney General and Hon. Hillar C. Moore III, President of the Louisiana District Attorneys Association, on August 31, 2015, requesting a limiting construction of the Act that would resolve some of its constitutional problems. Plaintiffs' counsel never received a response. Declaration of Michael A. Bamberger ¶¶ 2–4. Both the text of the Act and Defendants' refusal to disavow unconstitutional prosecutions have placed Plaintiffs in reasonable fear of prosecution for engaging in constitutionally protected speech on the Internet.

Argument

A.   **Standards Governing the Issuance of a Preliminary Injunction**

A preliminary injunction should be granted when a plaintiff has shown "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury . . . , (3) that the threatened injury . . . outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009). Because the Act imposes content-based restrictions on Plaintiffs' speech, Defendants bear the ultimate burden of proving the Act constitutional. *See, e.g.*, *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813, 816–17 (2000). "Thus, when considering the likelihood of success, the [question is] whether there is a sufficient likelihood the State will ultimately fail to prove its regulation constitutional." *Byrum*, 566 F.3d at 446.

Plaintiffs are entitled to a preliminary injunction. Plaintiffs have a strong likelihood of success on the merits because the Act restricts constitutionally-protected speech in a manner that is ineffective, overbroad, vague, and fails to vindicate any state interest. They also demonstrate serious hardships by challenging the Act's content-based restriction on their right to access and share constitutionally-protected speech over the Internet. Furthermore, because it subjects Plaintiffs to the untenable choice between self-censorship and criminal prosecution, the Act

7

threatens the public interest, imposes irreparable injury, and tips the balance of the equities heavily in favor of granting an injunction.

**B.      Plaintiffs are likely to prevail on their First Amendment claims because the Act is a content-based regulation of speech that cannot survive strict scrutiny.**

The Act is unconstitutional as a content-based regulation of protected non-obscene speech that is not narrowly tailored to its stated purpose—protecting minors from seeing material harmful to them. *See Ashcroft v. ACLU*, 542 U.S. 656, 670 (2004) (holding that a law designed to protect minors from viewing harmful materials on the Internet was a content-based restriction that did not survive strict scrutiny); *Reno v. ACLU*, 521 U.S. 844, 868 (1997) (noting that a statute regulating minors' access to "indecent" and "patently offensive" material on the Internet was "a content-based blanket restriction on speech"). The Act imposes a content-based restriction similar to those in *Reno* and *Ashcroft* on Internet material that is "harmful to minors," which must be placed behind an age-attestation screen.

As a content-based prohibition of protected, non-obscene speech, the Act is "'presumptively invalid,' and the Government bears the burden to rebut that presumption." *United States v. Stevens*, 559 U.S. 460, 468 (2010) (quoting *Playboy*, 529 U.S. at 817). To survive, the Act must satisfy strict scrutiny. *Playboy*, 529 U.S. at 813. Thus, it must be narrowly tailored to promote a compelling government interest that cannot be served through a less restrictive alternative. *Id.*; *see also Ashcroft*, 542 U.S. at 670 (applying strict scrutiny to harmful-to-minors ban). The Act cannot withstand such scrutiny because it is overbroad, fails to vindicate any state interest in protecting minors, and is substantially more burdensome than effective alternatives.

8

1.     **The Act impermissibly burdens constitutionally-protected speech by Louisiana publishers.**

The Act imposes burdens on anyone in Louisiana who wishes to distribute constitutionally-protected materials on the Internet. Given that it requires age attestation for a swath of content that is not obscene but may be harmful to minors, it sweeps within its ambit a substantial amount of content that is routinely published on websites or in books and eBooks sold online, and which adults have a First Amendment right to distribute and receive. *See Reno*, 521 U.S. at 874–75 (noting that "sexual expression which is indecent but not obscene is protected by the First Amendment" and that the government cannot pursue its interest in protecting minors through an "unnecessarily broad suppression of speech addressed to adults" (alteration omitted)).

As their declarations attest, in order to comply with the Act, Plaintiff booksellers and other publishers will either have to (a) sort through vast inventories to determine which content is "harmful to minors" and separately create age-attestation screens in front of that content; (b) require age attestation for all of their content; or (c) limit their inventory so that it can be parsed for harmful-to-minors material in a practical way. The first option is virtually impossible both because of Plaintiffs' use of third-party inventories and social media sites and because they lack resources to review the amount of material on their websites. The second option of requiring age attestation for all of their Internet content would prevent Plaintiffs from distributing *any* material to minors, including material that is clearly appropriate for minors, such as children's books. It would also incorrectly suggest that Plaintiffs' sites are "adult" or pornographic sites, thus potentially deterring even adult visitors. The third option—for Plaintiffs to severely restrict what they publish online to avoid running afoul of anything potentially "harmful"—would amount to massive self-censorship, and result in an extraordinarily broad suppression of speech (including

speech perfectly appropriate for minors). The costs that these burdens impose on Plaintiffs' businesses—whether from the expense of compliance or loss of revenue—are of constitutional magnitude. *See, e.g.*, *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115 (1991) ("A statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech.").

For these reasons, the Act sweeps too broadly in burdening or suppressing adult speech. Numerous courts have invalidated laws restricting Internet communications on First Amendment grounds for this reason. *See Reno*, 521 U.S. 876–77 (holding the federal Communications Decency Act facially overbroad in part because of burdens on adult speech, including the imposition of costs on Internet speakers that "must inevitably curtail a significant amount of adult communication"); *ACLU v. Mukasey*, 534 F.3d 181, 196–98 (3d Cir. 2008) (considering impact of Child Online Protection Act's age-verification requirements on adult speech— including the risks of adult visitors being deterred and Internet publishers self-censoring—in finding a First Amendment violation); *Doe v. Jindal*, 853 F. Supp. 2d 596, 603–05 (M.D. La. 2012) (invalidating Louisiana statute that barred access to social networking sites for sex offenders as unconstitutionally overbroad). In state after state, laws containing content-based restrictions on Internet communications deemed harmful to minors have been held unconstitutional or likely so because of their burden on protected speech.[2] The Act suffers from the same constitutional infirmity.

---

[2] *See, e.g.*, *PSINet, Inc. v. Chapman,* 362 F.3d 227 (4th Cir. 2004) (Virginia); *Am. Booksellers Found. v. Dean,* 342 F.3d 96 (2d Cir. 2003) (Vermont); *ACLU v. Johnson*, 194 F.3d 1149 (10th Cir. 1999) (New Mexico); *Am. Booksellers Found. v. Sullivan*, 799 F. Supp. 2d 1078 (D. Alaska 2011) (Alaska); *Am. Booksellers Found. v. Coakley*, No. 10 Civ. 11165, 2010 WL 4273802 (D. Mass. Oct. 26, 2010) (mem.) (Massachusetts); *ACLU v. Goddard,* No. 00 Civ. 505, 2004 WL 3770439 (D. Ariz. July 22, 2004) (mem.) (Arizona); *Se. Booksellers Ass'n v. McMaster*, 282 F. Supp. 2d 389 (D.S.C. 2003) (South Carolina); *Cyberspace Commc'ns, Inc. v. Engler,* 55 F. Supp.

2.      **The Act fails to exempt material suitable for older minors and is therefore overbroad.**

There is a broad range of material that has serious literary, artistic, political, or scientific value for some 16- or 17-year-olds, but which might be considered harmful to a 10- or 12-year old ("Older Minors Material").[3] The Act, on its face, fails to distinguish between Older Minors Material and other material harmful to minors, requiring both to be placed behind an age-attestation screen. *See* La. Stat. Ann. § 14:91.14(B)(2). The Act thus prohibits older minors from accessing material that may have serious value to them without falsely attesting to their age, and is therefore unconstitutionally overbroad.[4]

The Act defines "harmful to minors" by adapting the general test for obscenity under First Amendment doctrine to reflect "prevailing standards in the adult community as a whole with respect to what is suitable material for minors." *Ginsberg v. United States*, 390 U.S. 629, 639 (1968); *see also* La. Stat. Ann. § 14:91.14(B)(2) ("material harmful to minors" is that which "incites or appeals to or is designed to incite or appeal to the prurient, shameful, or morbid interest *of minors*," "is offensive to the average adult applying contemporary community standards with respect to what is suitable *for minors*," and "lacks serious literary, artistic, political, or scientific value *for minors*" (emphases added)). But the Supreme Court has strongly

---

2d 737 (E.D. Mich. 1999) (Michigan), *aff'd*, 238 F.3d 420 (6th Cir. 2000) (per curiam) (mem.). A state statute in Ohio was upheld only after the state's attorney general declined to defend its full breadth, so that it would apply only to person-to-person Internet communications, such as email, and not generally accessible communications. *Am. Booksellers Found. for Free Expression v. Strickland,* 601 F.3d 622 (6th Cir. 2010).

    [3] For example, materials about sexual and reproductive health have serious value to many 16- and 17-year olds in Louisiana (where 16-year-old minors may marry with parental consent). *See* Brownstein Dec. ¶ 11; Fox Dec. ¶ 10; Lafitte Dec. ¶ 11; Trice Dec. ¶ 11(providing examples of material on Plaintiff websites that have serious value to older minors but could be deemed harmful to minors under the Act).

    [4] Indeed, it applies to all older minors in the United States who want to view content on Louisiana websites.

suggested that such "junior obscenity" regulations are unlikely to survive First Amendment scrutiny if they do not exempt older minors. *See Reno*, 521 U.S. at 865-66 (distinguishing the "junior obscenity" statute upheld in *Ginsberg* from the unconstitutional regulation before the Court on the basis that, among other things, the former exempted 17-year-olds, whereas the latter did not); *see also Am. Booksellers v. Webb*, 919 F.2d 1493, 1505 (11th Cir. 1990) ("*Pope* [*v. Illinois*, 481 U.S. 497 (1987)] teaches that if any reasonable minor, including a seventeen-year-old, would find serious value, the material is not 'harmful to minors.'").

A number of courts, in considering this precise issue, have determined that, to pass constitutional muster, restrictions on harmful-to-minors material must be defined to limit only materials which lack serious value for a reasonable 17-year-old. In *Commonwealth v. American Booksellers Association,* 372 S.E.2d 618 (Va. 1988), the Virginia Supreme Court saved a Virginia "harmful to minors" statute from a constitutional challenge through a limiting construction. The Court held that "if a work is found to have a serious literary, artistic, political or scientific value for a legitimate minority of normal, older adolescents, then it cannot be said to lack such value for the entire class of juveniles taken as a whole." *Id.* at 624. Based on that definition, the Fourth Circuit held the Virginia statute constitutional. *Am. Booksellers Ass'n v. Virginia*, 882 F.2d 125, 127 –28 (4th Cir. 1989). The Tennessee Supreme Court construed a similar statute to avoid constitutional overbreadth by holding that "harmful to minors" covered only "those materials which lack serious . . . value for a reasonable 17-year-old." *Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 522 (Tenn. 1993). The Louisiana Act, in failing to exempt Older Minors Material from age attestation, is therefore unconstitutionally overbroad.

   **3.      The Act is not narrowly tailored because there are alternatives that are less burdensome on speech and more effective to serve the Act's purpose.**

Because the Act will not prevent Louisiana minors from accessing harmful-to-minors material, and because an alternative exists that is at once more effective and less restrictive, Defendants cannot carry their burden of proving the content-based restrictions in the Act survive strict scrutiny. *See Playboy*, 529 U.S. at 813.

In *Ashcroft v. ACLU*, the Supreme Court addressed a statutory age-verification requirement that was substantially *more* effective than the one in the Act, and nevertheless found it unconstitutional, because it was less effective and more burdensome than the proffered alternative: private content-filtering technology, activated on the computer by the minor's parents.[5] The federal Child Online Protection Act ("COPA") criminalized the communication, without age verification, of "harmful" material to children under the age of seventeen. *See* 542 U.S. at 661–63. Unlike Louisiana's age-attestation requirement, COPA's screening requirement applied to all material published in the United States. *Id.* at 667–68. Nevertheless, the Court noted that a substantial amount of content from overseas would not be covered by COPA, and found that filtering technology installed on private computers, which could block "harmful" content regardless of origin, was therefore more effective. *Id.* The Court also concluded that filters are less burdensome on speech because "[t]hey impose selective restrictions on speech at the receiving end, not universal restrictions at the source," and "the use of filters does not condemn as criminal any category of speech, and so the potential chilling effect is eliminated, or

---

[5] As the district court explained in the case after remand:

> Internet content filters . . . are computer applications which, *inter alia*, attempt to block certain categories of material from view that a Web browser or other Internet application is capable of displaying or downloading, including sexually explicit material. Filters categorize and block Web sites or pages based on their content. By classifying a site or page, and refusing to display it on the user's computer screen, filters can be used to prevent children from seeing material that might be considered unsuitable.

*ACLU v. Gonzales*, 478 F. Supp. 2d 775, 789 (E.D. Pa. 2007), *aff'd sub nom.*, *ACLU v. Mukasey*, 534 F.3d 181 (3d Cir. 2008).

at least much diminished." *Id.* at 667. After remand and a bench trial, the district court added that filtering technology can be calibrated to a particular child's age and sensitivity by the child's parents, and that filters, unlike age screening, are "difficult for children to circumvent." *Gonzales*, 478 F. Supp. 2d at 791, 795, 804.

For precisely these reasons, the Act cannot survive strict scrutiny in the face of the less restrictive and more effective alternative of private filtering. Indeed, this conclusion flows *a fortiori* from *Ashcroft*: whereas COPA was ineffective for failing to block the "40% of harmful-to-minors content [that] comes from overseas," *Ashcroft*, 542 U.S. at 667, the Act blocks only material that is published from Louisiana, leaving the vast majority of the Internet unrestricted. And while filtering technology improves with time, *see Gonzales*, 478 F. Supp. 2d at 795 ("[T]he development of new technologies, has . . . caused [filtering] products to improve over time."), government-mandated age screening, by contrast, remains constrained by the jurisdiction of the State, which is ill-suited to the "boundary-less" nature of the Internet. *Am. Booksellers Found. v. Dean,* 342 F.3d 96, 103 (2d Cir. 2003). Finally, as noted above, age screening is unconstitutional when, as in the Act, older and younger minors are lumped together; filtering, by contrast, can be calibrated to granular age categories, and is thus a superior alternative—both constitutionally and practically.

For these reasons, there is no possibility Defendants can show the Act survives strict scrutiny. *Cf. Se. Booksellers Ass'n v. McMaster*, 282 F. Supp. 2d 389, 785 (D.S.C. 2003) (invalidating "harmful to minors" Internet law under strict scrutiny "because the State has failed to prove that [the ban] is more effective at achieving the State's interest in protecting minors than Plaintiffs' proffered less restrictive alternative of filtering" and holding that "this conclusion is dictated by *Ashcroft*").

**C.**    **Plaintiffs are likely to prevail on their Due Process claims that the Act is impermissibly vague.**

The Act's constitutional infirmities are exacerbated by its vagueness, which violates the Due Process Clause. *See Mukasey,* 534 F.3d at 205 (holding COPA's online "harmful to minors" provisions unconstitutionally vague). "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The requirement of clarity is stringent when a criminal law interferes with speech, because of the acute risk of self-censorship. *See Keyishian v. Bd. of Regents*, 385 U.S. 589, 604 (1967) (stating "government may regulate in the [First Amendment] area only with narrow specificity"); *see also Reno*, 521 U.S. at 872 (noting "severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful" speech).

The Act's definition of "harmful to minors" is rife with ambiguous and undefined terms. First, it is not clear what "contemporary community standards" are to be used in determining whether material is "offensive to the average adult." Plaintiffs cannot tell whether the relevant community is that of the publisher or audience. Because the wrong interpretation carries criminal consequences, they must undertake the impossible task of anticipating which standard is more restrictive, and tailoring their age screening accordingly. A Louisiana publisher must therefore anticipate community standards anywhere in the world where its website might be accessed.[6]

Furthermore, in the context of the Internet, it is not clear what it means for material "taken as a whole" to lack serious value for minors. *Mukasey,* 534 F.3d at 205 (the phrase "as a whole" is unconstitutionally vague for Internet communication). If a bookstore posts an image of text from a book, the Act does not specify whether the image must be viewed in isolation, or as

---

[6] Even if the vagueness problems are resolved, the community standards provision risks overbreadth. *See, e.g., Mukasey*, 534 F.3d at 206 (upholding finding of overbreadth in provision that would impose standards of most restrictive community on Internet speech).

part of the book as a whole, or the website on which it appears as a whole, before determining its value to minors. Louisiana publishers must therefore limit the content accessible to minors to comply with the broadest possible reading of the phrase "taken as a whole," or risk prosecution.

Plaintiffs are also unsure what it means to "publish material . . . on the Internet." The Act does not define the terms "publish" or "Internet." Thus, even private digital communication between consenting adults—such as web-based private messaging services[7]—could be covered by the age-attestation requirement. *See, e.g.*, *Publish*, Black's Law Dictionary (10th ed. 2014) (listing definitions of "publish" that include non-public communication). Under the Act, spouses in Louisiana—whether minors or adults—who send each other private messages that would be deemed "harmful to minors" could therefore be subject to criminal penalties for failing to use age-attestation screens. Furthermore, posting information on social media websites such as Facebook or Twitter could be deemed "publish[ing]" material on the Internet, encompassing not just Plaintiffs' social media activity, but that of every individual in Louisiana. As absurd as these results may sound, the language of the Act plainly supports them, thereby creating an intolerable risk that constitutionally-protected speech will be chilled.

The exemption for "news gathering organization[s]," even if well-intentioned, further exacerbates the vagueness of the Act. To qualify for the exemption, such organizations must meet several requirements (discussed below), including that they publish "current news and intelligence of varied, broad, and general public interest." La. Stat. Ann. § 14:91.14(B)(3)(a). Virtually none of the terms in this phrase is self-defining or has an established legal meaning.

---

[7] Common web-based messaging systems such as Google Hangouts and Facebook Messenger allow for private one-on-one and group communication via the Internet. *See* Get Started with Hangouts, SUPPORT.GOOGLE.COM, https://support.google.com/hangouts/answer/2944865?hl=en, (last visited Dec. 4, 2015); Messenger Mobile App Basics, FACEBOOK.COM, https://www.facebook.com/help/151024075021791/ (last visited Dec. 4, 2015).

*Cf., e.g.*, *SEIU, Local 5 v. City of Houston*, 595 F.3d 588, 605 (5th Cir. 2010) (finding due process violation in statute that fails to define terms that determine scope of speech restriction). It is therefore impossible, for example, for Plaintiff Antigravity, with its circulation of 10,000 copies per month and its thematic focus on news and culture in New Orleans, *see* Fox Dec. ¶¶ 4, 5, 13, to know whether it qualifies as a "news gathering organization." Given its ill-defined contours, this exemption will provide little comfort to online publishers.

**D.     Plaintiffs are likely to prevail on their Commerce Clause claims.**

The Act violates the Commerce Clause because it regulates extraterritorially; because it regulates inherently interstate activity, creating inconsistency; and because its burdens on interstate commerce clearly outweigh its illusory local benefits.

**1.     The Act impermissibly regulates the interstate activities of Louisiana publishers and out-of-state readers.**

The Act burdens interstate commerce by impinging on communication, protected by the First Amendment, between Louisianans and non-Louisianans. When a Louisianan publishes material on a publicly-available website on the Internet, the material is available not only to Louisianans, but to the entire world. Thus, for example, when a Louisiana bookseller offers books and eBooks for sale on its website, the website can be viewed in other states and around the world, and readers in other states (and around the world, unless shipping restrictions are imposed) can purchase books and eBooks from the website. Requiring a Louisiana bookseller to place works behind an age-attestation screen means that the bookseller cannot sell such works to minors (including older minors) in other states and other countries, even if such works would not be deemed harmful to minors (however that phrase may be defined) in the community where the would-be purchaser lives. Conversely, an older minor in another state or country is denied the right to purchase constitutionally-protected material from Louisiana booksellers. If the

Louisianan wanted to communicate only to persons outside of the State of Louisiana—for example, by stating that no works on the site would be shipped to any address in Louisiana—the Act would still apply, because the Act requires age attestation simply because it is a Louisianan who is publishing the material, without regard to the viewer's location.

The Act thus impermissibly "has the practical effect of . . . control[ling] conduct beyond the boundaries of the State," *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989), and the "practical effect of exporting that state's domestic policies" to every other state, *Am. Libraries Ass'n. v. Pataki*, 969 F. Supp. 160, 174 (S.D.N.Y. 1997).

> **2.     The Act creates inconsistent regulation of the Internet.**

The Act also runs afoul of the Commerce Clause because it violates the long-established rule barring states from enacting differing standards for instrumentalities of national commerce where uniformity is required. *See id.* at 181–82 ("The Internet, like the rail and highway traffic . . . requires a cohesive national scheme of regulation so that users are reasonably able to determine their obligations. Regulation on a local level, by contrast, will leave users lost in a welter of inconsistent laws . . . ."); *see also ACLU v. Johnson*, 194 F.3d 1149, 1162 (10th Cir. 1999) ("[C]ertain types of commerce have been recognized as requiring national regulation. The Internet is surely such a medium." (citation omitted)); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1286 (W.D. Wash. 2012) (same). If the Act is permitted to stand, and if other states enact their own statutes with different provisions on what constitutes "material harmful to minors," publishers of Internet content will have to navigate a thicket of differing standards, implementing differing age screening for every state. *Cf. Stevens*, 559 U.S. at 476 ("Those seeking to comply with the law . . . face a bewildering maze of regulations from at least 56 separate jurisdictions."). The Commerce Clause prevents this result.

> **3.     The Act's burdens clearly exceed any local benefits.**

Finally, even if the Act were not a direct regulation of interstate commerce, it still runs afoul of the Commerce Clause because it imposes burdens on interstate commerce that are "clearly excessive" in relation to its local benefits. *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Louisiana's interest in protecting Louisiana minors is not served by the Act, which has no effect on minors' ability to access Internet content published by non-Louisianans—that is, the vast majority of Internet material. *Cf. Johnson*, 194 F.3d at 1161-62 (invalidating statute under *Pike* because of its inability to reach communications originating outside New Mexico); *Pataki*, 969 F. Supp. at 177–81 (same result for similar New York statute). The burdens on interstate commerce imposed by the Act are not justified by its illusory local benefits.

**E.      Plaintiffs are likely to prevail on their Equal Protection Clause claims.**

The Act exempts from the age-attestation requirement any "newspaper, or news publication, printed or electronic, of current news and intelligence of varied, broad, and general public interest, having been published for a minimum of one year and that can provide documentation of membership in a statewide or national press association" La. Stat. Ann. § 14:91.14(B)(3)(a). It thus fails to exempt newspapers published for less than a year, organizations that are not members of a press association, and publications with content for a narrowly-defined audience. By irrationally favoring certain speakers, the exemption violates the First Amendment and the Fourteenth Amendment's Equal Protection Clause. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) ("[G]overnment regulation may not favor one speaker over another."); *St. Joseph Abbey v. Castille*, 700 F.3d 154, 162 (5th Cir. 2012) (state statutes that discriminate irrationally violate Equal Protection Clause); *see also, e.g.*, *Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653, 2663 (2011) (striking down law restricting sale and disclosure of pharmacy records revealing the prescribing practice of individual doctors because law "on its face burden[ed] disfavored speech by disfavored speakers").

**F.      Plaintiffs face irreparable injury, the public interest favors an injunction, and the balance of hardships tips heavily in Plaintiffs' favor.**

In First Amendment cases, a court's decision on the "remaining injunction factors" typically "follows from the initial determination that [Plaintiffs] likely will succeed at trial." *Doe v. Duncanville Indep. Sch. Dist.*, 994 F.2d 160, 166 (5th Cir. 1993) (per curiam). Thus, when plaintiffs have demonstrated a likelihood of success on First Amendment claims, the Fifth Circuit also finds grounds for irreparable injury. *See Fla. Businessmen for Free Enter. v. City of Hollywood*, 648 F.2d 956, 958 (5th Cir. Unit B June 10, 1981) (finding irreparable injury based on likelihood of success on First Amendment claim); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Injunctions to protect First Amendment rights, moreover, are squarely in the public interest. *See, e.g.*, *Fla. Businessmen*, 648 F.2d at 959 ("The public interest does not support . . . attempting to enforce an ordinance that may well be held unconstitutional." ). And finally, when balancing hardships, the prospect of First Amendment injury tilts the scale heavily in favor of an injunction—especially where, as here, a statute to be enjoined serves no purpose whatsoever. *Fla. Businessmen*, 648 F.2d at 959 ("Given appellants' substantial likelihood of success on the merits . . . , the harm . . . from delaying enforcement is slight.").

The Act forces Plaintiffs to choose between a rock and a hard place—that is, between prosecution and self-censorship. The equities strongly favor issuing a preliminary injunction.

### Conclusion

For the above reasons, Plaintiffs respectfully ask this Court to enjoin enforcement of the Act pending the final determination of this action.

Dated: December 7, 2015                                        Respectfully submitted,

20

Michael A. Bamberger
(admitted *pro hac vice*)
Richard M. Zuckerman
(admitted *pro hac vice*)
Dentons US LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 768-6700
Fax: (212) 768-6800
Michael.Bamberger@dentons.com
Richard.Zuckerman@dentons.com

Stephen A. Dixon  La. No. 18185
ACLU Foundation of Louisiana Cooperating
Attorney
1330 Highland Park Dr.
Baton Rouge, LA 70808
(225) 588-5407
Fax: (504) 613-6511
southla@laaclu.org

Esha Bhandari
(admitted *pro hac vice*)
Lee Rowland
(admitted *pro hac vice*)
American Civil Liberties Union Foundation
125 Broad St, 18th Floor
New York, NY 10004
(212) 549-2500
Fax: (212) 549-2654
ebhandari@aclu.org
lrowland@aclu.org

*/s/ Candice C. Sirmon*
Candice C. Sirmon, T.A., La. No. 30728
ACLU Foundation of Louisiana
P.O. Box 56157
New Orleans, LA 70156
(504) 522-0628
Fax: (504) 613-6511
csirmon@laaclu.org

## CERTIFICATE OF SERVICE

I do hereby certify that on December 7, 2015, I electronically filed the foregoing, including all accompanying declarations, with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants. Counsel for the Plaintiffs will send the electronically filed copies of the foregoing, including all accompanying declarations, to the Defendants who are not CM/ECF participants or represented by CM/ECF participants. The following listed Defendants were served by properly addressed and postage prepaid regular mail, using the U.S. Postal Service, on this date.

*/s/ Candice C. Sirmon*
Candice C. Sirmon, T.A., La. No. 30728
ACLU Foundation of Louisiana
P.O. Box 56157
New Orleans, LA 70156
(504) 522-0628
Fax: (504) 613-6511
csirmon@laaclu.org

| | |
|---|---|
| Tommy J. Johnson<br>o.b.o. D.A. Dale Cox<br>1st Judicial District<br>501 Texas Street<br>Shreveport, LA  71101-5400 | D.A. Danny Newell<br>2nd Judicial District<br>511 West Main St.<br>Homer, LA  71040 |
| D.A. John F. Belton<br>3rd Judicial District<br>100 West Texas Avenue<br>2nd Floor<br>Ruston, Louisiana 71270-4474 | D.A. Jerry L. Jones<br>4th Judicial District<br>400 Saint John Street<br>Suite 302<br>Monroe, LA 71201 |
| D.A. John M. "Mack" Lancaster<br>5th Judicial District<br>P.O. Box 805<br>Oak Grove, LA 71263-0805 | D.A. James E. Paxton<br>6th Judicial District<br>P.O. Box 317<br>St. Joseph, LA 71366-0317 |

| | |
|---|---|
| D.A. Bradley R. Burget<br>7th Judicial District<br>4001 Carter Street, Room 9<br>Vidalia, LA  71373-3021 | D.A. R. Chris Nevils<br>8th Judicial District<br>P.O. Box 1374<br>Winnfield, LA 71483-1374 |
| D.A. Phillip Terrell, Jr.<br>9th Judicial District<br>P.O. Box 1472<br>Alexandria, LA 71309-1472 | D.A. Van H. Kyzar<br>10th Judicial District<br>P.O. Box 838<br>Natchitoches, LA 71458-0838 |
| D.A. Don M. Burkett<br>11th Judicial District<br>P.O. Box 1557<br>Many, LA 71449-1557 | D.A. Charles A. Riddle, III<br>12th Judicial District<br>P.O. Box 1200<br>Marksville, LA 71351-1200 |
| D.A. Trent Brignac<br>13th Judicial District<br>P.O. Box 780<br>Ville Platte, LA 70586-0780 | D.A. John DeRosier<br>14th Judicial District<br>P.O. Box 3206<br>Lake Charles, LA 70602-3206 |
| D.A. M. Bofill (Bo) Duhe´<br>16th Judicial District<br>300 Iberia Street, Suite 200<br>New Iberia, LA 70560-4583 | D.A. Richard J. Ward, Jr.<br>18th Judicial District<br>P.O. Box 880<br>Plaquemine, LA 70765-0880 |
| D.A. Hillar C. Moore, III<br>19th Judicial District<br>222 St. Louis Street<br>Baton Rouge, LA 70802-5878 | D.A. Samuel C. D'Aquilla<br>20th Judicial District<br>P.O. Box 8428<br>Clinton, LA 70722-8428 |
| D.A. Scott M. Perrilloux<br>21st Judicial District<br>P.O. Box 639<br>Amite, LA 70422-0639 | D.A. Warren Montgomery<br>22nd Judicial District<br>701 N. Columbia Street<br>Covington, LA 70433-2709 |
| D.A. Ricky Babin<br>23rd Judicial District<br>P.O. Drawer 750<br>Donaldsonville, LA 70346-0750 | D.A. Paul D. Connick Jr.<br>24th Judicial District<br>200 Derbigny St.<br>Gretna, LA 70053 |
| D.A. Charles J. Ballay<br>25th Judicial District<br>102 Avenue G<br>Belle Chase, LA 70037-2710 | D.A. John "Schuyler" Marvin<br>26th Judicial District<br>P.O. Box 69<br>Benton, LA 71006-0069 |
| D.A. Earl B. Taylor<br>27th Judicial District<br>P.O. Box 1968<br>Opelousas, LA 70571-1968 | D.A. J. Reed Walters<br>28th Judicial District<br>P.O. Box 1940<br>Jena, LA 71342-1940 |
| D.A. Joel T. Chaisson, II<br>29th Judicial District<br>P.O. Box 680 | D.A. Asa A. Skinner<br>30th Judicial District<br>P.O. Box 1188 |

| | |
|---|---|
| Hahnville, LA 70057-0680 | Leesville, LA 71496-1188 |
| D.A. Michael C. Cassidy<br>31st Judicial District<br>P.O. Box 1388<br>Jennings, LA 70546-1388 | D.A. Joseph L. Waitz, Jr.<br>32nd Judicial District<br>P.O. Box 3600<br>Houma, LA 70361-3600 |
| D.A. H. Todd Nesom<br>33rd Judicial District<br>P.O. Box 839<br>Oberlin, LA 70655-0839 | D.A. Perry M. Nicosia<br>34th Judicial District<br>P.O. Box 947<br>Chalmette, LA 70044-0947 |
| D.A. James "Jay" P. Lemoine<br>35th Judicial District<br>P.O. Box 309<br>Colfax, LA 71417-0309 | D.A. James R. Lestage<br>36th Judicial District<br>P.O. Box 99<br>DeRidder, LA 70634-0099 |
| D.A. Brian Frazier<br>37th Judicial District<br>P.O. Box 839<br>Columbia, LA 71418-0839 | D.A. Jennifer A. Jones<br>38th Judicial District<br>P.O. Box 280<br>Cameron, LA 70631-0280 |
| D.A. Julie C. Jones<br>39th Judicial District<br>P.O. Box 606<br>Coushatta, LA 71019-0606 | D.A. Bridget A. Dinvaut<br>40th Judicial District<br>P.O. Box 399<br>LaPlace, LA 70069-0399 |
| Fred Herman<br>o.b.o. D.A. Leon A. Cannizzaro, Jr.<br>Law Offices of Fred Herman<br>1010 Common Street, Suite 3000<br>New Orleans, LA 70112 | D.A. Gary Evans<br>42nd Judicial District<br>P.O. Box 432<br>Mansfield, LA 71052-0432 |