**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| **GARDEN DISTRICT BOOK SHOP, INC., ET AL.** | **CIVIL ACTION** |
| | **NUMBER: 3:15-CV-00738** |
| **VERSUS** | **JUDGE BRIAN A. JACKSON** |
| **JAMES D. CALDWELL, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF LA, ET AL.** | **MAGISTRATE JUDGE STEPHEN C. RIEDLINGER** |

**********************************************************************************

<u>**MEMORANDUM IN OPPOSITION TO PLAINTIFFS'**</u>
<u>**MOTION FOR PRELIMINARY INJUNCTION**</u>

NOW INTO COURT, through undersigned counsel, come James D. "Buddy" Caldwell, in

his official capacity as Attorney General of the State of Louisiana, Dale Cox (1st Judicial District),

Daniel W. Newell (2nd Judicial District), John F. Belton (3rd Judicial District), Jerry L. Jones (4th

Judicial District), John M. "Mack" Lancaster (5th Judicial District), James E. Paxton (6th Judicial

District), Bradley R. Burget (7th Judicial District), R. Chris Nevils (8th Judicial District), Phillip

Terrell, Jr. (9th Judicial District), Van H. Kyzar (10th Judicial District), Don M. Burkett (11th

Judicial District), Charles A. Riddle III (12th Judicial District), Trent Brignac (13th Judicial District),

John F. DeRosier (14th Judicial District), Keith A. Stutes (15th Judicial District), Martin Bofill Duhe

(16th Judicial District), Camille A. Morvant, II (17th Judicial District), Richard J. Ward, Jr. (18th

Judicial District), Hillar C. Moore, III (19th Judicial District), Samuel C. D'Quilla (20th Judicial

District), Scott M. Perrilloux (21st Judicial District), Warren Montgomery (22nd Judicial District),

Ricky Babin (23rd Judicial District), Paul D. Connick, Jr. (24th Judicial District), Charles J. Ballay (25th Judicial District), John "Schuyler" Marvin (26th Judicial District), Earl B. Taylor (27th Judicial District), J. Reed Walters (28th Judicial District), Joel T. Chaisson, II (29th Judicial District), Asa A. Skinner (30th Judicial District), Michael C. Cassidy (31st Judicial District), Joseph L. Waitz, Jr. (32nd Judicial District), H. Todd Nesom (33rd Judicial District), Perry M. Nicosia (34th Judicial District), James P. Lemoine (35th Judicial District), James R. Lestage (36th Judicial District), Brian Frazier (37th Judicial District), Jennifer A. Jones (38th Judicial District), Julie C. Jones (39th Judicial District), Bridget A. Dinvaut (40th Judicial District), Leon A. Cannizzaro, Jr. (41st Judicial District), and Gray Evans (42nd Judicial District), each a Louisiana District Attorney for the Judicial District listed above, sued in their official capacity, (hereinafter the "Defendants" or "the State"), who oppose the Plaintiffs' Motion for Preliminary Injunction for the reasons explained more completely below.[1]

## I.   **BACKGROUND**

The Plaintiffs, Garden District Book Shop, Inc., Octavia Books, L.L.C., Future Crawfish Paper, L.L.C., American Booksellers Association, and the Comic Book Legal Defense Fund, assert a constitutional challenge to La. R.S. 14:91:14 (Act 187, H.B. 153 of the 2015 Regular Legislative Session). Alleging the Act violates the First, Fifth and Fourteenth Amendments to the U.S. Constitution, as well as the Commerce Clause, the Plaintiffs seek injunctive and declaratory relief, as well as an award of costs and fees.

On December 7, 2015, the Plaintiffs filed a Motion for Preliminary Injunction which, as of this writing, has not yet been set to be heard. The Plaintiffs have urged numerous grounds upon

---

[1] Defendants appear solely for the purpose of opposing the preliminary injunction and do not waive any defenses.

which a new statute, La. R.S. 14:91.14, is allegedly unconstitutional. The undersigned attorneys are unaware of any pending or planned prosecution under the statute, nor have Plaintiffs claimed that they have been prosecuted or actually threatened to be prosecuted under the statute. For the reasons set forth below, the State opposes the Plaintiffs' motion and urges that they are unlikely to succeed on their constitutional claims.

## II.    APPLICABLE LAW AND ARGUMENT

In 2008, the United States Supreme Court stated the traditional four-part standard for preliminary relief:

> A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.

*Winter v. Natural Res. Def., Council, Inc.*, 555 U.S. 7, 20 (2008) (citing *Munaf v. Geren,* 553 U.S. 674, 689-690 (2008); *Amoco Production Co. v. Gambell,* 480 U.S. 531, 542 (1987); *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 311-312, (1982)).    Likelihood of success on the merits and irreparable harm are the most important factors of the four-part test. *Nken v. Holder*, 556 U.S. 418, 434 (2009) ("first two factors of the traditional standard are the most critical" for granting stay, which substantially overlaps with preliminary injunction standards); *Woodfox v. Cain*, 789 F.3d 565, 569 (2015) (likelihood of success is the most important factor when seeking a stay).

A preliminary injunction is an extraordinary remedy never awarded as of right.  *Munaf*, 553 U.S. at 689-690.  In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Production Co.,* 480 U.S. at 542. "In exercising their sound discretion, courts of equity should pay

3

particular regard for the public consequences in employing the extraordinary remedy of injunction." *Romero–Barcelo,* 456 U.S. at 312; *See also Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 500 (1941).

## A.     PLAINTIFFS ARE NOT LIKELY TO PREVAIL ON THE MERITS

### 1.     <u>La. R.S. 14:91.14 is Not Overbroad (Doc. 19-1 at 15-16).</u>

One of the Plaintiffs' main arguments is an allegation that La. R.S. 14:91.14 is unconstitutionally overbroad. In order to succeed, the Plaintiffs must overcome a heavy burden: "[t]he overbreadth *claimant bears the burden* of demonstrating, 'from the text of [the law] and from actual fact,' that substantial overbreadth exists." *Virginia v. Hicks*, 539 U.S. 113, 122 (2003) (citation omitted and emphasis added). The United States Supreme Court recognized several ways to mount a successful overbreadth challenge: (1) "that no set of circumstances exist under which [the statute] could be valid,"[2] (2) "that the statute lacks 'any plainly legitimate sweep,'"[3] or (3) that a "substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. at 472-73 (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449, n. 6 (2008). "[A] statute's overbreadth [must] be *substantial,* not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *United States v. Williams*, 553 U.S. 285, 292 (2008) (citations omitted and emphasis in original). Therefore, even if the Plaintiffs could somehow show that the statute can be applied unconstitutionally, that alone does not require the statute to be struck as a matter of

---

[2] *United States v. Stevens*, 559 U.S. 460, 472 (2010) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).
[3] *Id*. (quoting *Washington v. Glucksberg,* 521 U.S. 702, 740, n. 7 (1997) (Stevens, J., concurring in judgments)).

overbreadth. The number of invalid applications would have to be substantial, and there is no claim that such a substantial number exists. This is a high burden because the use of the overbreadth doctrine is "strong medicine" to be used "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973).

"In a facial challenge to the overbreadth... of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982) (footnotes omitted). At the outset, the United States Supreme Court has consistently "held that obscene material is not protected by the First Amendment as a limitation on the state police power by virtue of the Fourteenth Amendment." *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 54 (1973) (citations omitted); *see also Brown v. Entm't Merchants Ass'n*, -- U.S. --, 131 S.Ct. 2729, 2735 (2011) ("obscenity is not protected expression") (citation omitted). The law at issue, La. R.S. 14:91.14, only applies to material that meets the United States Supreme Court's standard for obscenity for some persons:

> The Supreme Court established its enduring test for obscenity in *Miller v. California,* 413 U.S. 15, 24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). "The basic guidelines for the trier of fact must be: (a) whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Id.* (internal quotation marks and citations omitted).

*United States v. Richards*, 755 F.3d 269, 274 (5th Cir. 2014), *cert. denied*, 135 S.Ct. 1547 (2015); *see also* La. R.S. 14:91.14(B)(2).

To be sure, the language in Louisiana's statute is limited to material that would constitute obscenity for minors, but statutes using nearly identical language to that which Louisiana has

employed have been upheld under similar circumstances. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 386-87 (1988), *certified question answered sub nom. Com. v. Am. Booksellers Ass'n, Inc.*, 372 S.E.2d 618, 624-25 (1988), *cert. denied*, 494 U.S. 1056 (1990).

In evaluating an overbreadth challenge, this Court must evaluate each proposed hypothetical example through a case-by-case analysis of the proffered fact situation. *See J & B Entertainment, Inc.*, 152 F.3d at 367 (citing *Broadrick,* 413 U.S. at 615-16). The Plaintiffs argue that Louisiana's statute is unconstitutionally overbroad because it fails to differentiate a younger minor from an older minor. *See* Doc. 19-1 at 16.[4] The Plaintiffs are not likely to succeed because the State will argue, in the alternative, that La. R.S. 14:91.14 is susceptible to a limiting construction that the Plaintiffs agree would be constitutional. *See* Doc. 19-7 at 4-5.

The Plaintiffs are unlikely to succeed on the merits on the overbreadth claim because they concede that the statute is readily susceptible to a limiting construction that would render the statute constitutional. *Broadrick*, 413 U.S. at 613; *Richards*, 755 F.3d at 274-75 ("Where one construction of a statute would raise 'serious constitutional doubts,' it is 'incumbent upon [courts] to read the statute to eliminate those doubts so long as such a reading is not plainly contrary to the intent of Congress.'") (quoting *United States v. X–Citement Video, Inc.*, 513 U.S. 64, 78 (1994)). In *State v. Interiano*, the Louisiana Supreme Court held that when a statute's constitutionality is challenged and the legislation can be affirmed under one construction but not under another, then the court *must* construe the statute to preserve its constitutionality. 2003-1760 (La. 02/13/04), 868 So.2d 9, 13. As the Plaintiffs point out, other courts have applied similar limiting constructions. *See* Doc. 19-1 at 16

---

[4] The State is referring to the pagination provided by this Court's ECF system, not the Plaintiffs' own pagination.

(and the cases cited therein).[5] Presuming for the sake of argument that the Plaintiffs can prove that there is a substantial amount of material that they have published in Louisiana that would be considered obscene for younger persons, but not for adults and seventeen-year-olds, then the Plaintiffs' proposed limiting construction would save the statute. Because the Plaintiffs argue that this limiting construction is constitutional, and because the statute could be construed in the manner proposed, the State will presume that the Plaintiffs' sliding scale for obscenity is required by the First Amendment for the purposes of this opposition. Therefore, this claim is not likely to succeed.

## 2. **La. R.S. 14:91.14 Passes Strict Scrutiny (Doc. 19-1 at 13-14, 16-18).**

The Plaintiffs also argue that La. R.S. 14:91.14 must survive strict scrutiny as a content-based restriction upon expression. The State notes that strict scrutiny was applied to a somewhat similar statute in the past and strict scrutiny is likely to be applied here. *See Ashcroft v. Am. Civil Liberties Union (Ashcroft II)*, 542 U.S. 656, 670 (2004). This analysis is wrong; restrictions upon commercial speech involving the Internet should be dealt with using intermediate scrutiny. *See Ford Motor Co. v. Texas Dep't of Transp.*, 264 F.3d 493, 505-07 (5th Cir. 2001); *M.S. News Co. v. Casado*, 721 F.2d 1281, 1291-92 (10th Cir. 1983) ("Commercial enterprises have the economic incentive to make sales and are therefore more likely to press the display and dissemination of material harmful to minors. Hence, making a distinction between commercial and non-commercial enterprises is sufficiently grounded in a legitimate state interest.") The State notes that this statute qualifies as commercial speech as it only applies to material harmful to minors that is published for "commercial gain." *See*

---

[5] "Although the Supreme Court has not decided what effect *Miller* will have on the *Ginsberg* formulation of a variable obscenity standard, we join other courts in finding that the post-*Ginsberg* definition of adult obscenity announced in *Miller* (as modified for determining that which is obscene to minors) does not restrict the scope of materials that a state may regulate." *Am. Booksellers v. Webb*, 919 F.2d 1493, 1503 (11th Cir. 1990) (citing *American Booksellers Ass'n v.*

La. R.S. 14:91.14(B)(2).

In this case, the statute requires that the material at issue be obscene to minors (or, under the Plaintiffs' construction, some minors). The statute does not cover any material that is not obscene to a large class of persons. *See* La. R.S. 14:91.14(B)(2). "By any measure, [the statute] restricts a narrow slice of [protected] speech." *Williams-Yulee v. Florida Bar*, -- U.S. --, 135 S.Ct. 1656, 1670 (2015). The Plaintiffs have pointed to no material covered by the statute that they agree "lacks serious literary, artistic, political, or scientific value" for a seventeen-year-old that would, at the stroke of a person's eighteenth birthday, have some serious value. Although the State carries the burden in a strict scrutiny analysis, it cannot prove that which does not exist. The undersigned can proffer no examples of material that it would consider obscene for a seventeen-year-old but not obscene to an eighteen-year-old. The material existing within these exceedingly narrow circumstances is the only *protected* speech affected by the statute.

There is a compelling interest in regulating material that is obscene for a seventeen-year old:

> The Government may, however, regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest. We have recognized that there is a compelling interest in protecting the physical and psychological well-being of minors. This interest extends to shielding minors from the influence of literature that is not obscene by adult standards. *Ginsberg v. New York,* 390 U.S. 629, 639–640, 88 S.Ct. 1274, 1280–81, 20 L.Ed.2d 195 (1968); *New York v. Ferber,* 458 U.S. 747, 756–757, 102 S.Ct. 3348, 3354–55, 73 L.Ed.2d 1113 (1982). The Government may serve this legitimate interest, but to withstand constitutional scrutiny, it must do so by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms.

---

*Virginia,* 882 F.2d 125, 127 n. 2 (4th Cir.1989); and *M.S. News Co.,* 721 F.2d at 1286–87).

*Sable Communications of California, Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989) (citations and internal quotations marks omitted).

The limiting construction offered by the Plaintiffs necessarily lessens the State's possible interference "with First Amendment freedoms" to a vanishingly small amount of protected, *low-value speech*, if any such speech exists at all. The material at issue "ordinarily lack[s] literary, political, or scientific value… [but is] not entirely outside the protection of the First Amendment." *F.C.C. v. Pacifica Foundation*, 438 U.S. 726, 746 (1978). The qualitative value of the speech at issue is important because, in a strict scrutiny analysis, "[c]ontext matters." *Grutter v. Bollinger*, 539 U.S. 306, 327 (2003) (citation omitted) (applying strict scrutiny to a race-based governmental action under the Equal Protection Clause). This Court must similarly evaluate First Amendment restrictions in context. *See, e.g., F.C.C.*, 438 U.S. at 747 ("one occasion's lyric is another's vulgarity.") (Citation omitted).[6] Because the protected speech at issue ordinarily lacks literary, political, or scientific value, the rigidity with which strict scrutiny is applied should be weaker than in a situation involving high-value speech:

> Because many, perhaps most, activities of human beings living together in communities take place through speech, and because speech-related risks and offsetting justifications differ depending upon context, this Court has distinguished for First Amendment purposes among different contexts in which speech takes place. Thus, the First Amendment imposes tight constraints upon government efforts to restrict, *e.g.,* 'core' political speech, while imposing looser constraints when the government seeks to restrict, *e.g.,* commercial speech, the speech of its own employees, or the regulation-related speech of a firm subject to a traditional

---

[6] *C.f. id*. at 749-50 ("Bookstores and motion picture theaters, for example, may be prohibited from making indecent material available to children. We held in *Ginsberg*… that the government's interest in the 'well-being of its youth' and in supporting 'parents' claim to authority in their own household' justified the regulation of otherwise protected expression… *The ease with which children may obtain access to broadcast material, coupled with the concerns recognized in Ginsberg, amply justify special treatment of indecent broadcasting*.") (Emphasis added, citations and footnote omitted).

regulatory program.

*Sorrell v. IMS Health Inc.*, -- U.S. -- 131 S.Ct. 2653, 2673-74 (2011) (citations omitted).

In order for Louisiana's statute to fall short of the narrow tailoring test, it must fail to choose "the least restrictive means to further the articulated interest." *Id*. 492 U.S. at 126. This alternative must be "offered" to the State. *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 816 (2000). This test is not wholly unforgiving though; the "First Amendment requires that [the statute] be narrowly tailored, not that it be 'perfectly tailored.'" *Williams-Yulee*, 135 S.Ct. at 1671 (citing *Burson v. Freeman*, 504 U.S. 191, 209 (1992)); *see also Denver Area Educ. Telecommunications Consortium, Inc. v. F.C.C.*, 518 U.S. 727, 757 (1996) (a legislature "must have a degree of leeway in tailoring means to ends") (citation omitted). Therefore, the statute *cannot* fail the narrow tailoring test unless the Plaintiffs have "offered" an alternative restriction to the State, *Playboy Entertainment Group, Inc.*, 529 U.S. at 816, that is (1) constitutional, (2) "less restrictive" and (3) "would be at least as effective in achieving the legitimate purpose" being served. *See Serv. Employees Int'l Union, Local 5 v. City of Houston*, 595 F.3d 588, 596 (5th Cir. 2010) (quoting *Reno v. ACLU*, 521 U.S. 844, 874 (1997)). The Plaintiffs are unlikely to succeed on this claim because they have not offered such a restriction.

The United States Supreme Court has already unequivocally stated that the burden imposed under a similar (but more restrictive) statute is minimal, particularly when considering the State's compelling interest in protecting the psychological well-being of minors:

> In addition, [the federal statute] does not, as Justice KENNEDY suggests, " 'foreclose an entire medium of expression.' " *Post,* at 1719 (quoting *City of Ladue v. Gilleo,* 512 U.S. 43, 55, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994)). While Justice KENNEDY and Justice STEVENS repeatedly imply that [the federal statute]

banishes from the Web material deemed harmful to minors by reference to community standards, see, *e.g., post,* at 1719 (opinion concurring in judgment); *post,* at 1725–1726, 1727–1728 (dissenting opinion), the statute does no such thing. *It only requires that such material be placed behind adult identification screens.*

*Ashcroft v. Am. Civil Liberties Union (Ashcroft I)*, 535 U.S. 564, 583, n. 14 (2002) (plurality) (emphasis added); *see also id.* at 584 (plurality) (rejecting the argument that the statute was unconstitutional "because it will require Web publishers to shield some material behind age verification screens that could be displayed openly in many communities across the Nation...") (Citation omitted).

The Plaintiffs argue that private content-filtering technology, activated on the computer by the minor's parents, meets this criteria. *See* Doc. 19-1 at 17-18. The State disagrees and will present evidence to the contrary. *See* Exhibits 1 and 2. The Plaintiffs rely upon *Ashcroft II*, a 5-4 decision. *See, generally*, 542 U.S. at 656. Under those facts, the Court merely held that the District Court did not abuse its discretion in finding that parental content-filtering was likely to be the least restrictive means. *Id.* at 663 ("On this record, the Government has not shown that the less restrictive alternatives proposed by respondents should be disregarded. Those alternatives, indeed, may be more effective than the provisions of [the statute]. The District Court did not abuse its discretion when it entered the preliminary injunction.") The federal statute in the *Ashcroft* cases was much more restrictive than the statute here.[7] For example, Louisiana's statute does not require the use of a credit

---

[7] The statute created an affirmative defense to the criminalization of communicating material that would be obscene for minors if a defendant demonstrated that he or she "has restricted access by minors to material that is harmful to minors— (A) by requiring use of a credit card, debit account, adult access code, or adult personal identification number; (B) by accepting a digital certificate that verifies age; or (C) by any other reasonable measures that are feasible under available technology." *Ashcroft II*, 542 U.S. at 662 (citing 47 U.S.C. § 231(c)(1)) (internal quotation marks omitted).

card or a digital certificate. *See id.*[8]

  Therefore, the federal statute at issue in the *Ashcroft* cases is not comparable to Louisiana's statute in all respects because the burden put upon the speaker by the Louisiana statute is greatly lessened. Even presuming for the sake of argument that a content filter is more effective than an attestation screen, it is not less restrictive because parental-control content filters either do not gauge the literary, artistic, political, or scientific value of any particular work or cannot adequately review the content actually being uploaded to the Internet from Louisiana. In fact, using content filters would actually restrict *much* more speech than Louisiana's statute requires. *See* La. R.S. 14:91.14(B)(2)(c). A content filter based upon an algorithm cannot distinguish breasts from an anatomy textbook and breasts in a pornographic film. In other words, a machine cannot gauge literary, artistic, political, or scientific value. Content filters based upon the decisions of human programmers also restrict much more speech than is necessary. For example, a content filter might have considered Playboy's content wholly off-limits, but, according to USA Today, many of its works have literary, artistic, political, or scientific value:

> Along with the voluptuous centerfolds, the magazine has long featured revealing, in-depth interviews with famous people and fiction and non-fiction from the world's finest writers. The magazine began running its signature *Playboy* Interview feature in 1962, when *Roots* author Alex Haley sat down with jazz immortal Miles Davis… [and, in the author's view, one of Playboy's greatest hits was "The Man in the Bomb Suit," by Mark Boal in 2005.] The profile of Sgt. Jeffrey Sarver and his team of bomb-squad technicians in the U.S. Army became the inspiration for the movie The Hurt Locker. The 2008 film went on to win six Academy Awards. [Another hit was

---

[8] *Compare PSINet, Inc. v. Chapman*, 362 F.3d 227, 236-37 (4th Cir. 2004) (Louisiana's statute is also much less burdensome than a similar Virginia statute: "The District Court explained that the stigma associated with the content of these Internet sites may deter adults from visiting them if they cannot do so without the assurance of anonymity. The Court pointed out that many adults may be unwilling to provide their credit card number online, and would therefore not visit the site. Such a restriction would also serve as a complete block to adults who wish to access adult material but do not own a credit card."); *Am. Civil Liberties Union v. Mukasey*, 534 F.3d 181, 192 (3rd Cir. 2008) (same).

"Fahrenheit 451" by Ray Bradbury.] The dystopian tale was published as a book in 1953. But it wasn't until *Playboy* serialized it a year later… that Bradbury's best-known novel became the science fiction classic that it is now.

USA Today, Roger Yu, *Yes, people DID buy 'Playboy' for the articles*, http://www.usatoday.com/story/money/2015/10/13/yes-people-did-buy-playboy-articles/73890020/ (Oct. 13, 2015).

Further, content filters cannot categorize everything uploaded to the Internet in Louisiana. The individual uploader, on the other hand, is in the best position to categorize what he or she is putting on the Internet for commercial gain. In short, the State is principally arguing that the Plaintiffs' proffered alternative is much more restrictive than the requirements of the statute.

Further, the technological world has changed dramatically since *Ashcroft* was decided in 2004, and the Supreme Court cautioned readers about the effects of the passage of time in that case:

[This] factual record does not reflect current technological reality—a serious flaw in any case involving the Internet. The technology of the Internet evolves at a rapid pace. Yet the factfindings of the District Court were entered in February 1999, over five years ago. Since then, certain facts about the Internet are known to have changed.

*Aschcroft II*, 542 U.S. at 671 (Citation omitted). With every year that passes, minors have access to more and more devices with Internet capability and parents have less and less control over them. The age of the family (or school) computer being the sole method of reaching the Internet is over. *See, e.g.,* Forbes, Alex Konrad, *Applebee's Will Install 100,000 Intel-Backed Tablets Next Year In Record Rollout*, http://www.forbes.com/sites/alexkonrad/2013/12/03/applebees-intel-tablet-rollout/ (Dec. 3, 2013) ("From the classroom to coffee shops, tablets are popping up everywhere. Now a new deal will put 100,000 of the devices on tabletops across Applebee's restaurants in the United States, a record rollout for a business that continues the trend to add entertainment to your dining

13

experience… Applebee's serves over one million customers each day.") Parents cannot require that their local coffee shop or restaurant use content filtering at their business.

The Plaintiffs' proffered alternative assumes, of course, that most parents even understand how to turn content filters on (and off) for the various devices present in their homes. Although Louisiana could enact programs to promote their use, that promotion cannot combat the ubiquity of Internet-capable devices outside the home.

The Plaintiffs also argue (Doc. 19-1 at 18) that Louisiana's law is ineffective because it does not block material that was not published in Louisiana. This argument must be dismissed out-of-hand because the Plaintiffs in this case cannot succeed by requiring Louisiana to adopt restrictions that are unconstitutional. If Louisiana's law attempted to effectively block all obscene-to-minors material on the Internet, the statute would be struck down. To borrow the Tenth Circuit's conclusion, "an attempt to regulate interstate conduct occurring outside [Louisiana's] borders, and is accordingly a per se violation of the Commerce Clause." *Am. Civil Liberties Union v. Johnson*, 194 F.3d 1149 (10th Cir. 1999) (footnote omitted); *see also Denver Area Educ. Telecommunications Consortium, Inc. v. F.C.C.*, 518 U.S. 727, 757 (1996) (the Louisiana Legislature "need not deal with every problem at once") (citing *Semler v. Oregon Bd. of Dental Examiners*, 294 U.S. 608, 610 (1935) ("the legislature need not 'strike at all evils at the same time'")). This statute cannot be declared unconstitutional because it has not adopted unconstitutional breadth.

Moreover, venue and jurisdiction are synonymous for the purposes of Louisiana criminal law. *State v. Roblow*, 623 So.2d 51, 55 (La. App. 1st Cir. 1993); *See State v. Frank*, 355 So.2d 912, 914, 917 (La. 1978); *see also* La. C.Cr.P. art. 615. In order for a crime to be prosecuted in Louisiana state

14

court, an element of the crime must occur in Louisiana. *See* La. C.Cr.P. art. 611(A). Louisiana cannot criminalize actions in South Dakota or South Africa. Therefore, material uploaded to the Internet outside of Louisiana would not be subject to La. R.S. 14:91.14.

Again, Louisiana's statute "only requires that such material be placed behind adult identification screens." *Ashcroft I*, 535 U.S. at 583, n. 14 (plurality). Further, the nature of the Internet has changed such that parental content filtering is not a less restrictive *and* more effective alternative. Therefore, this claim is not likely to succeed.

### 3. The Plaintiffs' Miscellaneous Arguments are Meritless.

The Plaintiffs do not cleanly categorize some of their arguments in their motion, but, for the sake of completeness, they are addressed here. Many assertions are based upon misapprehensions about the reach of the statute. For example, the Plaintiffs argue (Doc. 19-1 at 13) that they will have to sort through vast inventories of content and determine what matter would be obscene for a seventeen-year-old. This argument does not offer a less restrictive alternative and, therefore, it is not purely a strict scrutiny argument. In any event, the Plaintiffs' complaint about the burden allegedly created by the statute might be accurate if the statute prohibited *maintaining* such material on their websites, but the statute does not prohibit the mere display of such material. The statue only prohibits a "person or entity in Louisiana that publishes material harmful to minors on the Internet…" La. R.S. 14:91.14(A)(1). The verb at issue–to publish on the Internet–is most naturally read as synonymous with the verb–*to upload* onto the Internet. Further, the statute only became effective on June 23, 2015. *See* La. Legis. 2015 Reg. Sess. Act 187 (H.B. 153). So, the statute would only cover material uploaded onto the Internet by a person or entity in Louisiana after that date. Nor would the statute

apply to persons or entities outside of Louisiana uploading the material onto the Plaintiffs' websites.

Further, reading the affidavits submitted by the Plaintiffs, it appears that the material uploaded onto the Internet is principally performed by third parties, *which are not alleged to be physically located within Louisiana. See* Doc. 19-1 at 7. Many of the affiants disclaim the ability to control the content published by their third-party providers. *See* Doc. 19-1 at 7. These issues are of no moment because, in the State's view, the statute criminalizes the act of a person, physically located in Louisiana, pressing a button that uploads obscene material for commercial gain.[9] Moreover, the affiants have not specifically identified a single work that is covered by the statute they allege lacks serious literary, artistic, political, or scientific value for a seventeen-year-old. *See, e.g.,* Doc. 19-3 at 4-5 ("This material, although not pornographic or obscene, and although of legitimate value to many minors, may qualify as harmful to minors under the Act.") The described material would not be covered by the statute if it has a legitimate value to many minors and is not obscene, even if the work contains nudity. *Jenkins v. Georgia*, 418 U.S. 153, 161 (1974) ("nudity alone is not enough to make material legally obscene under the *Miller* standards.") (Italics added). The State disagrees with the Plaintiffs' implication on page 8 that nudity, alone, is obscene to a seventeen-year-old. *See, e.g.*, The Galleria dell'Accademia, Jean de Boulogne, *Rape of the Sabines*, http://www.accademia.org/explore-museum/artworks/rape-sabines/ (last visited Dec. 14, 2015). In any event, the state of nudity, by itself, is not protected by the First Amendment. *J & B Entm't, Inc. v. City of Jackson, Miss.*, 152 F.3d 362, 366 (5th Cir. 1998) ("Nude infants and women breast feeding in a park are not protected by the First Amendment because they are not engaged in expressing any

---

[9] Again, if there are two competing and plausible definitions of the word "publish" and only one is constitutional, this Court *must* choose the constitutional interpretation. *See Richards*, 755 F.3d at 274-75.

idea.") Citations and footnote omitted).

With respect to material that the Plaintiffs physically upload onto the Internet, they may simply upload the material onto the Internet separately and put that material behind a hyperlink that requires the user to attest to his or her age prior to accessing the material. Presuming that to be true, the assertion that the Plaintiffs could not upload material using software (such as Kobo and IndieCommerce) that does not allow them to create a basic attestation screen is the smallest of burdens. *See* Doc. 19-1 at 7. With respect to books or artwork, the Plaintiffs could simply upload the material in a PDF format and, using Adobe, password-protect the uploaded PDF. Then, the Plaintiffs' websites could simply list the password on their website and post a phrase like the following: "By entering the provided password, you are acknowledging and attesting that you are eighteen years of age or older."

Finally, the Plaintiffs argue that some of the Plaintiffs use third-party social media sites (specifically Facebook, Instagram, and Twitter) and cannot put age-attestation screens on them. *See* Doc. 19-1 at 10, n. 1.[10] These third-party sites, however, have their own rules which prohibit pornography *even if it is not obscene*. *See* Facebook, https://www.facebook.com/legal/terms (Last Accessed Dec. 14, 2015) ("You will not post content that… [is] pornographic… or contains nudity…"); *see* Twitter, Developer Agreement & Policy, Twitter Developer Agreement (Effective May 18, 2015) ("Do not… [p]ublish pornographic or obscene images to user profile images and background images."); *see* Instagram, Terms of Service, http://instagram.com/legal/terms/ (Effective

---

[10] While federal and state actors struggle with the difference between what would be pornographic for a seventeen-year-old but protected for an eighteen-year-old, private parties need not make such fine distinctions because a private person cannot violate another person's First Amendment rights. *See* U.S. Const. Amend. I ("Congress shall make no law…");

Jan. 19, 2013) ("You may not post… nude, partially nude… unlawful… pornographic or sexually suggestive photos or other content via the Service.") Therefore, this argument is irrelevant because material covered by the statute cannot be posted on these sites anyway because it would violate their terms of service. Further, the Plaintiffs can simply write "by pressing this link, you are acknowledging and attesting that you are eighteen or older" next to a link to the materials at issue. Whatever insignificant burden this creates, it does not render the statute unconstitutional. To the extent that these miscellaneous arguments constitute claims, they are not likely to succeed.

4.   **La. R.S. 14:91.14 is not Vague, nor does it violate Equal Protection (Doc. 19-1 at 19-21, 23).**

At different points, the Plaintiffs argue that certain terms of the *Miller* test are vague (such as "average," and "taken as a whole") but, as *Richards* demonstrates, this test can be constitutionally applied. The United States Supreme Court's own definition of obscenity is not unconstitutionally vague precisely because those words have "settled legal meanings." *See Williams*, 553 U.S. at 306 (citations omitted). In fact, the Fifth Circuit has squarely rejected a vagueness attack upon terms in the *Miller* test. *J & B Entm't, Inc.*, 152 F.3d at 367-68 (holding that the words "serious literary, artistic, scientific, or political value" are not vague because the language was not pulled "from thin air" "and are the subject of a plethora of opinions handed down by state and federal courts throughout this nation in the quarter century since *Miller* was decided.") (Citations omitted).[11]

---

*The Civil Rights Cases*, 109 U.S. 3, 11 (1883); *Near v. State of Minnesota ex rel. Olson*, 283 U.S. 697, 723-24 (1931).

[11] As an aside, the United States Supreme Court has held that a "statute prohibiting [the] mailing of obscene materials does not require proof that defendant knew the materials at issue met the legal definition of 'obscenity.'" *Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 524-25 (1994) (citing *Hamling v. United States*, 418 U.S. 87 (1974)).

The first phrase that the Plaintiffs take issue with is "contemporary community standards" in La. R.S. 14:91.14(B)(2)(b). Again, because this phrase has a settled legal meaning, the Plaintiffs are not likely to succeed. Also, the United States Supreme Court held that the somewhat similar federal statute's "reliance on community standards to identify 'material that is harmful to minors' does not by itself render the statute substantially overbroad for purposes of the First Amendment." *Ashcroft I*, 535 U.S. at 585 (emphasis deleted). Again, because the State's construction would seek to criminalize the act of uploading obscene material while present in Louisiana, the community at issue is ascertainable. *See* La. C.Cr.P. art. 611(A). For example, if a person uploaded obscene material on his cell phone while walking in Lafourche Parish, the community at issue would be that of Lafourche Parish. *See also Ashcroft I*, 535 U.S. at 580-81 (plurality) ("The fact that distributors of allegedly obscene materials may be subjected to varying community standards in the various federal judicial districts into which they transmit the materials does not render a federal statute unconstitutional.") (Citation omitted); *United States v. Rudzavice*, 548 F. Supp. 2d 332, 335 (N.D. Tex. 2008), *aff'd*, 586 F.3d 310 (5th Cir. 2009) ("It follows [from *Ashcroft I*], *a fortiori,* that a publisher is also responsible for abiding by the community standards prevailing in the community from which it sends its material.")

With respect to the phrase "average adult" in La. R.S. 14:91.14(B)(2)(b), the United States Supreme Court noted:

> [T]he primary concern with requiring a jury to apply the standard of 'the average person, applying contemporary community standards' is to be certain that, so far as material is not aimed at a deviant group, it will be judged by its impact on an average person, rather than a particularly susceptible or sensitive person—or indeed a totally insensitive one.'

*Hamling*, 418 U.S. at 129-30 (citations omitted).

The State notes that the Plaintiffs' argument that the phrase "average adult" is vague is ironic because the Fifth Circuit has held that "a statute is void for vagueness if it does not put the *average* reasonable person on notice of what conduct is prohibited." *United States v. Fox*, 248 F.3d 394, 406 (5th Cir. 2001), *cert. granted*, *judgment vacated on other grounds*, 535 U.S. 1014 (2002) (emphasis added). The average reasonable person is able to understand the phrase "average adult."

The phrase "taken as a whole" also has a settled legal meaning and is not vague. *See* La. R.S. 14:91.14(B)(2)(c). It means that the entire work should be considered in context. This means that a single phrase, such as "she was topless" cannot be looked at in isolation. If the phrase comes from a book, the entire book must be considered. *Compare Playboy Entertainment Group., Inc.*, 529 U.S. at 828-29 (Stevens, Concurring) ("[A]dvertising a bareheaded dancer as 'topless' might be deceptive, but it would not make her performance obscene."); *with* Doc. 19-1 at 6 (the phrase, 'she was topless,' could [violate the statute.]") Again, context matters, and the phrase "taken as a whole" allows the factfinder to consider the material at issue in the context of the greater piece. *See Ashcroft II*, 542 U.S. at 681, Breyer, J. Dissenting (Arguing that the statute at issue should not be struck because, among other things, "[o]ther qualifying phrases, such as 'taking the material as a whole'… and 'for commercial purposes'… limit the statute's scope still more, requiring, for example, that individual images be considered in context. In sum, the Act's definitions limit the statute's scope to commercial pornography.") (Citations omitted). Also, note that the majority in *Ashcroft II* did not take issue with the phrase "as a whole." *Id*. at 660-73. If there was a question in an individual case regarding whether a single website or whether multiple websites should be considered together, the doctrine of lenity would generally require the factfinder to consider the allegedly obscene material within the

greater set of multiple websites. *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 437 (1978) ("ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity") (citation omitted).

The Plaintiffs also argue that the words "publish" and "Internet" are vague. *See* La. R.S. 14:91.14(A)(1). Again, the State asserts that the phrase "[a]ny person… in Louisiana that publishes material harmful to minors on the Internet…" means any person physically located in Louisiana that uploads material that would be obscene to a seventeen-year-old to the Internet. The Plaintiffs do not explain how the word "Internet" is vague so the Defendants cannot respond. *See* Doc. 19-1 at 20.

The Plaintiffs also argue that they are unsure whether the act would cover a communication between only two people. Although the statute could theoretically cover a communication between only two persons, these would not be purely private conversations because the statute only covers communications *made for commercial gain*. *See* La. R.S. 14:91.1(B)(2). In any event, if a person were trying to sell material that would be considered obscene for a seventeen-year-old on a private messaging system, like Google Hangouts or Facebook Messenger, then the publisher would simply have to ask the other person to acknowledge and attest that he or she is eighteen or older before permitting access to that material. *See* Doc. 19-1 at 20, n. 7. No separate screen is required.

Although the Plaintiffs also argue that the statute encompasses the social media activity "of every individual in Louisiana," this argument is overwrought. *See* Doc. 19-1 at 20. The statute only applies to commercial speech that would be obscene for a seventeen-year-old. The social media activity of every individual in Louisiana is not at issue.

21

Finally, the Plaintiffs attack the news-gathering exemption on both vagueness and Equal Protection Clause grounds. *See* Doc. 19-1 at 20-21, 23; *see also* La. R.S. 14:91.14(B)(3). Although the Plaintiffs take the Louisiana Legislature to task for this definitional section, the import of the paragraph is merely to provide a defense in a civil action should a person assert that the statute creates a private right of action and sue a news-gathering organization for an alleged violation. The portion of the statute using the term "news-gathering organization" states: "This Section shall not apply to any bona fide news or public interest broadcast, website, video, report, or event and shall not be construed *to affect the rights* of any news-gathering organization." La. R.S. 14:91.14(A)(5) (emphasis added). The statute does not exempt any "news-gathering organization" from *criminal* liability. If the Louisiana Legislature had meant to do that, it would have used the words found earlier in that same sentence: that the statute "shall not apply" to any news-gathering organization. Other statutes that have both civil and criminal implications use similar language. *See, e.g.*, La. R.S. 14:90.1(B)(2)(a). Therefore, these constitutional challenges are inappropriate as this language does not define the reach of the criminal prohibitions associated with the statute. If the Louisiana Legislature had meant to exempt news-gathering organizations from criminal liability, there would have been no need for the first half of paragraph (A)(5) of the statute: "This Section shall not apply to any bona fide news or public interest broadcast, website, video, report, or event…" *See Shane v. Parish of Jefferson*, 2014-2225 (La. 12/08/15), -- So.3d --, 2015 WL 8225830, at *6 ("[C]ourts are bound, if possible, to give effect to all parts of a statute and to construe no sentence, clause, or word as meaningless and surplusage if a construction giving force to, and preserving, all words can legitimately be found.") (Citations omitted). The proffered reading of the statute by the Plaintiffs on this point is absurd: it would make no sense to give a news-gathering organization carte blanche to

violate La. R.S. 14:91.14. Because no person is asserting (or threatening to assert) a civil suit against one of the Plaintiffs, these Plaintiffs have no standing to raise these challenges here. *See Women's Health Clinic v. State*, 2002-0016 (La. App. 1st Cir. 05/10/02), 825 So.2d 1208, 1210, *writ denied*, 2002-2002 (La. 11/01/02), 828 So.2d 586 (discussing *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001)). The Plaintiffs are unlikely to succeed on these claims too.

### 5. La. R.S. 14:91.14 does not violate the Commerce Clause (Doc. 19-1 at 21-23).

Again, the statute criminalizes uploading certain material on the Internet by a person or entity in Louisiana. A crime that takes place partly in one state and partly in another can be prosecuted in either state without violating the Constitution. *See, generally, Heath v. Alabama,* 474 U.S. 82 (1985).

This law presents no Commerce Clause problem: "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, (1970) (citation omitted). Again, the State's interest in regulating material uploaded in Louisiana and considered to be obscene for minors is not only legitimate, but compelling. *See Sable Communications of California, Inc.*, 492 U.S. at 126. Significantly, the law does not regulate speakers who are not located in Louisiana. *See* La. R.S. 14:91.14(A)(1). There are no compliance costs imposed upon speakers outside of Louisiana. Users of the material must simply acknowledge and attest that they are eighteen-years-old or older. That minimal burden is narrowly tailored in light of the State's compelling interest and, therefore, the burden upon the small amount of protected speech at issue must be considered "incidental" under *Pike*.

23

The Fifth Circuit does not invalidate a state's restriction under the Commerce Clause simply

because the restriction involves the Internet. *See, generally*, *Ford Motor Co.*, 264 F.3d at 493-512.

Contrary to *Ford Motor Co.*, the Plaintiffs rely upon a line of cases that

> proceeds from the assumption that "[t]he nature of the Internet makes it impossible to restrict the effects" of Internet regulation to the regulating state. *Am. Libraries Ass'n v. Pataki,* 969 F.Supp. 160, 177 (S.D.N.Y.1997). Under this view, practically any state law that affects the Internet is unconstitutional, because "the Commerce Clause precludes a state from enacting legislation that has the practical effect of exporting that state's domestic policies." *Am. Libraries,* 969 F.Supp. at 174.
>
> .    .    .
>
> The *American Libraries* approach has been persuasively and widely criticized as resting "on an impoverished understanding of the architecture of the Internet," "misread[ing] dormant Commerce Clause jurisprudence," and "misunderstand[ing] the economics of state regulation of transborder transactions." Goldsmith & Sykes, *supra,* at 787. *See also* Note, Laura Vanderstappen, *Internet Pharmacies and the Specter of the Dormant Commerce Clause,* 22 Wash. U.J.L. & Pol'yY 619; *Recent Development—The Dormant Commerce Clause and the Internet,* 17 Harv. J.L. & Tech.. 296 (2003) (criticizing *Am. Booksellers,* 342 F.3d 96). More importantly, numerous other cases (many addressing practically identical subjects) have either rejected outright *American Libraries'* fundamental premise, or distinguished *American Libraries* as overbroad. *See* **Ford Motor Co. v. Texas Dep't of Transp., 264 F.3d 493, 502–03 (5th Cir.2001)**; *Hatch v. Superior Court,* 80 Cal.App.4th 170, 193–94, 94 Cal.Rptr.2d 453 (2000); *Cashatt v. State,* 873 So.2d 430, 436 (Fla.Ct.App.2004); *People v. Foley,* 94 N.Y.2d 668, 674, 709 N.Y.S.2d 467, 731 N.E.2d 123 (2000); *State v. Backlund,* 672 N.W.2d 431, 436–37 (N.D.2003); *State v. Snyder,* 155 Ohio App.3d 453, 467–68, 801 N.E.2d 876 (2003).

*Rousso v. State*, 204 P.3d 243, 252 (Wash. Ct. App. 2009) *aff'd*, 239 P.3d 1084 (Wash. 2010) (bold

emphasis added).

Even if this law could somehow be construed as requiring out-of-state businesses to modify

their websites (and it should not), the statute should still be upheld. *See, e.g., Nat'l Fed'n of the Blind*

*v. Target Corp.*, 452 F. Supp. 2d 946, 961 (N.D. Cal. 2006) ("[E]ven if Target chooses to change its

entire website in order to comply with California law, this does not mean that California is regulating

out-of-state conduct. Courts have held that when a defendant chooses to manufacture one product for a nationwide market, rather than target its products to comply with state laws, [Target's] choice does not implicate the commerce clause.") (Citations omitted).

Finally, the Fifth Circuit has disagreed with *American Libraries*, noting that the need for nationwide uniformity does not prevent a state from enacting any laws that incidentally regulate the Internet outside of the state. *Ford Motor Co.*, 264 F.3d at 504-05. The Court concluded that the "In the absence of Congressional legislation… incidental regulation of internet activities does not violate the Commerce Clause." *Id.* at 505. The State knows of no federal law that is constitutional (and thus, enforceable) and on point. For all these reasons, the Plaintiffs are not likely to succeed on this claim. The law at issue merely seeks to regulate one particular action on the Internet occurring within state boundaries.  It does not directly regulate the Internet as a whole.

## B.     THERE IS NO THREAT OF IRREPARABLE INJURY IF THE INJUNCTION IS NOT GRANTED

There has been no threat of prosecution made to any of the Plaintiffs by any of the Defendants in this case.  Not only is there no threat of irreparable injury, the case presents no present case or controversy as described more completely below.

A basic tenant of constitutional law is that Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const., Art. III, § 2. *Susan B. Anthony List* v. *Driehaus*, 134 S.Ct. 2334, 2341 (2014). "To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Id.*,

2341 (internal quotation marks and citations omitted). Pre-enforcement review is permitted under circumstances that render the threatened enforcement sufficiently imminent. *Id. at* 2342. Additionally, in the First Amendment context, "[l]itigants ... are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence  may cause others not before the court to refrain from constitutionally protected speech or expression.'" *Broadrick*, 413 U.S. at 612. Reasonable self-censorship has been determined to be an injury sufficient to confer standing. *Am. Booksellers Ass'n, Inc.*, 484 U.S. at 392; *See also Rangra* v. *Brown*, 584 F.3d 206, 208 (5th Cir. 2009).

But "the premise of *Marbury v. Madison* requires us to insist that an anticipatory challenge to [a] statute's constitutionality grow out of a 'real substantial controversy between parties... a dispute definite and concrete.'" *Int'l Soc. for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 817 (5th Cir. 1979) (citing *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979). Therefore, even in a First Amendment context, a plaintiff is permitted to challenge a statute prior to its enforcement by meeting a three-part test:

1. alleging the intent to engage in a course of conduct arguably affected with a constitutional interest,
2. that is proscribed by a statute, and
3. there exists a *credible* threat of prosecution thereunder.

*Susan B. Anthony List* 134 S.Ct. at 2342, (emphasis added). In order for an alleged fear to be considered credible, the prospective plaintiff must have a serious interest in disobeying the statute. *Eaves*, 601 F.2d at 818. When a plaintiff merely asserts a fear of prosecution that is abstract or hypothetical, a court should dismiss the case for lack of ripeness. The Federal Circuit has noted "[t]o invoke the court's declaratory judgment jurisdiction, a plaintiff must show 'more than the nervous

26

state of mind of a possible infringer,' but does not have to show that the patentee is 'poised on the courthouse steps.'" *Vanguard Research, Inc.* v. *PEAT, Inc.*, 304 F.3d 1249, 1254-55 (Fed. Cir. 2002) (citations omitted).

While the Plaintiffs arguably engage in a course of conduct protected by the First Amendment, the conduct they intend to engage in, as described in their declarations, is not proscribed by La. R.S. 14:91.14.

The Plaintiffs assert a fear that the following works may be considered harmful to minors: a coming-of-age graphic novel, *Blankets*, by Craig Thompson (Top Shelf Productions 2003) or books on sexual health and reproduction (Doc. 19-2 at 5), *The Nude Figure: A Visual Reference for the Artist* by Mark Edward Smith (Watson-Guptill 1998) (Doc. 19-3 at 4), a historical biography, *Goddess of Love Incarnate: The Life of Stripteuse Lili St. Cyr,* by Leslie Zemeckis (Doc. 19-4 at 5), satirical illustrations by artist Kate Lacour, published within issues of Antigravity Magazine (Doc. 19-5 at 3), and Neil Gaiman's *The Sandman*, a critically lauded comic book series that contains frank portrayals of sexual themes and nudity (Doc. 19-6 at 4). However, it is well settled that "sex and obscenity are not synonymous. Obscene material is material which deals with sex in a manner appealing to prurient interest. The portrayal of sex, e.g., in art, literature and scientific works, is not itself sufficient reason to deny material the constitutional protection of freedom of speech and press." *Roth*, 354 U.S. at 487. Plaintiffs have not specifically identified a single work that is covered by the statute that arguably lacks serious artistic, political, or scientific value for a seventeen-year-old. *Compare Am. Booksellers Ass'n, Inc.*, 372 S.E.2d at 624 ("The 16 books in question run the gamut, as the Supreme Court aptly put it, from classic literature to pot-boiler novels. Having examined them

27

all, we conclude that although they vary widely in merit, none of them lacks 'serious literary, artistic, political or scientific value' for a legitimate minority of older, normal adolescents.") The described material would not be covered by the statute if it has a legitimate value to many minors and is not obscene, even if the work contains nudity.

The Plaintiffs additional reasons to fear prosecution under La. R.S. 14:91.14 further lack credibility. They claim that they do not know whether a single image or the cover of a book is sufficient to subject them to liability. *See* Doc. 19-2 at 4, Doc 19-4 at 4, and Doc. 19-5 at 4, But yet La. R.S. 14:91.14(2)(B)(c) explicitly rejects this absurd contention stating the "material *taken as a whole* lacks serious literary, artistic, political, or scientific value for minors."

Because the Plaintiffs fail the second prong of the aforementioned test they must fail the third. According to their various declarations, the statute does not proscribe the conduct that any the Plaintiffs intend to engage in whatsoever. To the contrary, the declarations submitted by the Plaintiffs detail conduct that is inarguably not proscribed by La. R.S. 14:91.14. The third-parties uploading all (or nearly) all of the material are not even alleged to be located in Louisiana. Therefore, they do not have a serious interest in disobeying the statute and the fear of prosecution alleged is not credible, but rather wholly abstract and hypothetical. *Compare Susan B. Anthony List*, 134 S.Ct. 2334 at 2344 and *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 543 (5th Cir. 2008) (finding a credible threat of enforcement where some plaintiffs had been noticed for violations and charged under the respective statutes.) These Plaintiffs, therefore, cannot be permitted to challenge La. R.S. 14:91.14 prior to its enforcement.

Based on the foregoing, there is no threat of irreparable injury if the injunction is not granted.

28

C.     **THE BALANCE OF EQUITY DOES NOT TIP IN FAVOR OF THE PLAINTIFFS, AND AN INJUNCTION WILL DISSERVE THE PUBLIC INTEREST**

The injunction will disserve the public interest, and the balance of equity does not tip in favor of the Plaintiffs. The State has a compelling interest in protecting minors from the harmful distribution of material on the internet, and the statute's prohibition is the least restrictive and effective method of protecting the interests of the public and particularly minor children. Enjoining enforcement of the statute will completely frustrate the compelling public interest of citizens of Louisiana as expressed by their Legislature. Since the Plaintiffs face no imminent threat, the threatened injury to the Plaintiffs does not overcome the State's interest in protecting minors.

**WHEREFORE,** the Defendants pray that this motion be denied at the Plaintiffs' costs.

Respectfully submitted:

JAMES D. "BUDDY" CALDWELL
ATTORNEY GENERAL
By:
    /s/ Colin Clark
Angelique Duhon Freel (La. Bar Roll No. 28561)
Colin Clark (La. Bar Roll No. 33775)
Andrea Barient (La. Bar Roll No. 35643)
Jeffrey M. Wale (La. Bar Roll No. 36070)
Assistant Attorneys General
**Louisiana Department of Justice**
1885 North 3rd Street
P. O. Box 94005
Baton Rouge, Louisiana 70804-9005
Telephone:  (225) 326-6200
Fax:  (225) 326-6297
Email:        freela@ag.state.la.us
                    clarkc@ag.state.la.us
                    barienta@ag.state.la.us
                    walej@ag.state.la.us
Counsel for Defendant, James D. "Buddy"
Caldwell, in his official capacity as Attorney General

**CERTIFICATE OF SERVICE**

I do hereby certify that, on this 15th day of December 2015, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system which gives notice of filing to all counsel of record. Counsel of record not registered in the CM/ECF systems were served via other means. Counsel of record who will receive the filing using the CM/ECF system include:

Micahel A. Bamberger, Richard M. Zuckerman, Esha Bhandari, Lee Rowland,

Stephen A. Dixon, Candice C. Sirmon, Andrea Barient, Jeffrey Wale, Colin Clark

Baton Rouge, Louisiana this 15th day of December, 2015.

/s/_____Colin Clark_____
                Colin Clark