IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| GARDEN DISTRICT BOOK SHOP, INC.; OCTAVIA BOOKS, L.L.C.; FUTURE CRAWFISH PAPER, L.L.C.; AMERICAN BOOKSELLERS ASSOCIATION; AND COMIC BOOK LEGAL DEFENSE FUND,<br>　　　　　　　　Plaintiffs,<br>-v-<br>JAMES E. STEWART, SR., in his official capacity, etc., et al.,<br>　　　　　　　　Defendants. | Case No. 3:15-CV-738-BAJ-EWD<br><br>**Plaintiffs' Post-Hearing Memorandum of Law in Support of Motion for Preliminary Injunction** |

Louisiana's H.B. 153 (Act 187 of the Laws of 2015, codified at La. Stat. Ann. § 14:91.14) (the "Act"), violates the First, Fifth, and Fourteenth Amendments to the U.S. Constitution. In addition to demonstrating a strong likelihood of success on the merits, Plaintiffs have satisfied the requirements for a preliminary injunction because Plaintiffs' loss of First Amendment freedoms is irreparable, because an injunction to preserve those constitutional rights is in the public interest, and because Defendants have demonstrated that the inability to enforce the Act pending a final determination on the merits will cause *no* harm to the State. For these reasons, this Court should grant Plaintiffs' motion for a preliminary injunction.

**A. The possibility of a limiting construction does not negate Plaintiffs' likelihood of success on the merits—especially because, absent an injunction, Defendants would be able to enforce the Act to its full breadth during the pendency of this action.**

When one follows, step-by-step, Defendants' argument that Plaintiffs are not likely to succeed on the merits, it becomes readily apparent that Plaintiffs are likely to succeed, and that absent a preliminary injunction, there will be a continuing threat of unconstitutional prosecutions. Defendants maintain that the Act is constitutional in its full breadth, as written—so

1

that it requires age-attestation screens to shield material harmful for younger minors even though it is suitable for older minors ("Older Minors Material"). Defendants' Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction, Doc. # 25-1 ("Def. Op.") at 4-6. Defendants thus maintain that, during the pendency of this action, they should be permitted to bring prosecutions based on the full breadth of the Act as written—which would include prosecutions against any person in Louisiana who publishes Older Minors Material without age attestation. To support that argument, Defendants should be prepared to argue that Plaintiffs are not likely to succeed on their claim that the Act in its full breadth, as written, is unconstitutional. Defendants do not even attempt to make that argument. Instead, Defendants claim that if this Court concludes that the Act in its full breadth is unconstitutionally overbroad, instead of enjoining the Act, this Court will likely adopt a narrowing construction—such that Older Minors Material need not be placed behind an age-attestation screen—that would render the Act constitutional. Defendants state that "[t]he Plaintiffs are not likely to succeed because the State will argue, *in the alternative*, that La. R.S. 14:91.14 is susceptible to a limiting construction that the Plaintiffs agree would be constitutional." Def. Op. at 6 (emphasis added). Defendants' position amounts to arguing that, during the pendency of this action, they should remain free to prosecute persons who publish Older Minors Material, because this Court is likely to conclude that the Act does not apply to Older Minors Material. That makes no sense. Defendants also present, as a foregone conclusion, that if this Court decides that the Act if applied to Older Minors Material is unconstitutional, this Court will narrow the Act. But that is hardly a foregone conclusion. Under Louisiana law, "when the constitutionality of a statute is at issue, and under one construction it can be upheld, while under the other it cannot, a court must adopt the constitutional construction," but only where "that interpretation remains consistent with the

overall purpose behind the legislation." *State v. Interiano*, No. 2003-1760, p. 4 (La. 2/13/14); 868 So.2d 9, 13 (2004). Faced with the identical issue—whether a "harmful to minors" statute must be construed to exclude Older Minors Material to pass constitutional muster—different state supreme courts have reached different conclusions. Both the Tennessee Supreme Court and the Virginia Supreme Court adopted limiting constructions to save statutes from unconstitutionality. *See Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 522 (Tenn. 1993); *Commonwealth v. Am. Booksellers Ass'n*, 372 S.E.2d 618 (Va. 1988).[1] The Arkansas Supreme Court rejected a limiting construction that would exclude Older Minors Material, holding that "the General Assembly did not intend for those younger children to be permitted to access materials that would arguably be 'harmful' to them, even though not 'harmful' to an older child," *Shipley, Inc. v. Long,* 195 S.W.3d 911, 917 (Ark. 2004), thereby leading to a finding of facial unconstitutionality, *Shipley, Inc. v. Long*, 454 F. Supp. 2d 819, 829-31 (E.D. Ark. 2004).

The possibility that this Court may adopt a limiting construction to save the Act from unconstitutionality does not negate Plaintiffs' likelihood of success on the merits—especially because Defendants would be able to enforce the Act during the pendency of this action unbounded by such a limiting construction.[2] And the possibility of a limiting construction cannot cure the Act's other infirmities, including vagueness.

**B. Plaintiffs have demonstrated a likelihood of success on their claim that the Act is unconstitutionally vague.**

The Act is replete with vague terms that "are not clearly defined," *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972), and fail to give notice of what is required to avoid criminal

---

[1] Defendants misleadingly cite the Virginia case to argue that a statute with "nearly identical language" to the Act was upheld. *See* Def. Op. at 5-6. But that case proves the opposite. The statute was upheld only *after* the Virginia Supreme Court issued a binding interpretation that "harmful to minors" material meant material without serious value to seventeen-year-olds. *See Am. Booksellers Ass'n, Inc. v. Virginia*, 882 F.2d 125 (4th Cir. 1989).

[2] Prior to this litigation, Defendants declined to disavow the possibility of prosecutions based on Older Minors Material, by failing to respond to the letter requesting such a disavowal. *See* Pl. Mem. at 7.

liability. Plaintiffs have already discussed several of these vague terms or phrases. *See* Pl. Mem. at 15-17. Defendants' response merely emphasizes the Act's vagueness by proposing interpretations of various terms that are not obvious or supported by the text of the Act.

Defendants assert that the vague term "publish" in the Act "is most *naturally* read as synonymous with the verb—*to upload* onto the Internet." Def. Op. at 15 (first emphasis added). But "publish" is not defined to mean "upload" within the Act, and the Legislature could have done so if that was the intended meaning. Or, if the Legislature meant "upload," it could have used that word, as it has done in other Louisiana statutes. *See, e.g.*, La. Stat. Ann. § 14:73.8 ("Unauthorized use of a wireless router system . . . for the purposes of uploading, downloading, or selling of pornography involving juveniles . . . ."). In fact, there are other "natural[]" readings of the term "publish" that encompass more than simply uploading material. For example, a magazine that maintains a website containing articles by individual authors might be considered the publisher of the articles under the Act, or the individuals might be considered the publishers. In the case of books sold online, is it the bookstore that displays the books for sale that is the publisher, or is it the publishing house which prepares and distributes the books and in common parlance is called the "publisher"? *See*, *e.g.*, *Publish*, Black's Law Dictionary (10th ed. 2014). Defendants' interpretation is that the individual who literally causes the data constituting the material to appear on the Internet (who may be a technical support person) is the one who "publish[es]" it. That interpretation is neither obvious nor sufficiently clear to satisfy due process where a speaker's mistaken interpretation could lead to criminal liability.[3]

---

[3] Notably, if Defendants are correct that "publish" means "upload" as they define it, the Act is even more ineffective than it would otherwise be, because any individual in Louisiana who hosts a website in the state could simply outsource the actual "uploading" of material onto a Louisiana website to an individual physically out-of-state, which would do nothing to protect Louisiana minors from accessing that material.

4

The phrase "taken as a whole" in the Internet context was held to be unconstitutionally vague in *ACLU v. Mukasey*, 534 F.3d 181, 205 (3d Cir. 2008). *See* Pl. Mem. at 15. Defendants' response is that "[i]f there was a question in an individual case regarding whether a single website or whether multiple websites should be considered together," the ambiguity could be resolved through application of the rule of lenity. Def. Op. at 20-21. Defendants therefore acknowledge that Louisiana speakers in fact have no notice of what the relevant context might be, and that they must risk criminal prosecution before any such ambiguity could be clarified.[4] The Due Process Clause does not countenance this result. *Cf. Ashcroft v. ACLU*, 542 U.S. 656, 670-71 (2004) ("*Ashcroft*") (noting that "[w]here a prosecution is a likely possibility . . . speakers may self-censor rather than risk the perils of trial").

Additionally, Defendants' proposed interpretation of the relevant community for purposes of applying "contemporary community standards" is at odds with what federal courts have considered the relevant community when evaluating the same phrase in the Child Online Protection Act ("COPA"). Defendants argue that the community is that where the publisher is physically present, *see* Def. Op. at 19, while the Supreme Court and Third Circuit have presumed it was the community to which the material was disseminated, *see ACLU v. Ashcroft*, 322 F.3d 240, 244 (3d. Cir. 2003) (citing *Reno v. ACLU*, 521 U.S. 844, 877-78 (1997)). These differing interpretations demonstrate the vagueness of this undefined phrase in the Act.

Lastly, the Act defines "[m]aterial harmful to minors" as "descriptions or depictions of illicit sex or sexual immorality," which "*includes*" an enumerated list of conduct. La. Stat. Ann.

---

[4] Defendants provide another example that further muddies the waters. They suggest that, in the context of a single phrase, "[i]f the phrase comes from a book, the entire book must be considered." Def. Op. at 20. But what if, as in the case of the Plaintiff bookstores, some books are displayed for sale containing only their cover images and/or a few pages of sample text? Pl. Mem. at 3. If the entire book is not available on the Internet, should the "entire book" be considered in that case, or should the material that actually appears on the website be considered in isolation, in the context of the entire webpage on which it appears, or in the context of the bookstore's entire website, which may consist of multiple webpages?

§ 14:91.14(B)(1) (emphasis added). The use of the word "includes" renders the Act's prohibitions unconstitutionally vague and runs afoul of the Supreme Court's prescriptions in *Miller v. California*, 413 U.S. 15 (1973), and *Ginsberg v. New York*, 390 U.S. 629 (1968), on the permissible scope of restrictions on material "harmful to minors." *Miller* requires that any regulation of obscenity be "carefully limited" to descriptions or depictions of "conduct . . . *specifically defined by the applicable state law*, as written or authoritatively construed." 413 U.S. at 24 (emphasis added). Subsequent cases have adapted the *Miller* test in determining what material can be regulated as harmful to minors. *See, e.g., Reno*, 521 U.S. at 872-73 (noting the failure of the Communications Decency Act to adhere to the *Miller* requirement "that the proscribed material be 'specifically defined by the applicable state law'"). The Act's use of the word "includes" is inconsistent with the *Miller* requirement that the Act "specifically define" the scope of the regulated material.

### C. Plaintiffs have demonstrated a likelihood of success on their claim that the Act fails strict scrutiny.

This Court need not consider any factual issues raised by Defendants regarding the nature or effectiveness of content filters, *see* Def. Op. at 11, because Plaintiffs have demonstrated a likelihood of success that the Act is unconstitutionally overbroad and vague. But if this Court addresses that issue, the Court should conclude that Plaintiffs are likely to succeed on the merits of their claim that the Act fails strict scrutiny without regard to any factual issues.[5]

Defendants fail in their attempt to minimize the burden that the Act imposes on Plaintiffs. Plaintiff booksellers have demonstrated that, to comply with the Act, they would need either to review the millions of books for sale on their websites, to place their entire websites behind an

---

[5] Strict scrutiny clearly applies, as it did to COPA, which restricted its scope to speech "for commercial purposes." *See Ashcroft*, 542 U.S. 656. Furthermore, Louisiana law does not restrict the phrase "for commercial gain" to commercial speech, because it has been applied to the non-commercial distribution of material where the underlying material was produced for commercial gain. *See State v. Anderson*, 540 So.2d 974, 976 (La. Ct. App. 1989).

6

age-attestation screen, or to limit their inventory drastically so that it can be parsed for "harmful to minors" material in a practical way. Pl. Mem. at 9. Defendants' only response is to state that "creat[ing] a basic attestation screen is the smallest of burdens." Def. Op. at 17. But the problem is not simply creating an age-attestation screen; the problem is reviewing millions of books to apply that screen, or being forced to put the age-attestation screen on the entire website (akin to a bricks-and-mortar bookstore, which carries a broad range of books including children's books, banning all minors from entering the store), or submitting to massive self-censorship.

The Supreme Court has held that filters are *less restrictive* than the age verification required by COPA, because, among other things, "[t]hey impose selective restrictions on speech at the receiving end, not universal restrictions at the source." *Ashcroft*, 542 U.S. at 667. Even though COPA required more onerous age verification than the Act here, the Court held that, "[*a*]*bove all*, promoting the use of filters does not condemn as criminal any category of speech, and so the potential chilling effect is eliminated, or at least much diminished." *Id*. (emphasis added). The same conclusion is compelled here, because there is no doubt that the Act's requirements impose criminal liability on the source of speech, risking chill, and that content filtering can be turned on and off to enable adult control over access to Internet material.

Given that content filtering is a less-restrictive alternative, the remaining inquiry in *Ashcroft* was whether the government could meet its burden of proving filtering was less *effective* than age verification. *Id*. at 668. Defendants cannot make that showing here, because the Act is completely ineffective in its purpose of protecting minors, given that it does not apply to any material published on the Internet outside Louisiana, and that Defendants' proposed construction of "publish" would render it even more ineffective. *See supra* n. 3. The *Ashcroft* Court considered COPA's effectiveness suspect because it did not apply to material originating

7

outside the United States, which was readily available to minors; the Act is thus even more ineffective. *See* 542 U.S. at 667 ("COPA does not prevent minors from having access to . . . foreign harmful materials. That alone makes it possible that filtering software might be more effective . . . .").[6] The Act's ineffectiveness renders it unable to withstand strict scrutiny.

### D. Plaintiffs have standing to raise their claims.

Plaintiffs have standing to raise their claims. In *Virginia v. American Booksellers Association*, the Supreme Court held that, for standing purposes, the plaintiffs had shown the requisite "threatened or actual injury" because the "plaintiffs, . . . *if their interpretation of the statute is correct*, will have to take significant and costly compliance measures or risk criminal prosecution." 484 U.S. 383, 392 (1988) (emphasis added). It is therefore irrelevant whether the Defendants interpret "material harmful to minors" to exclude the materials offered in Plaintiffs' declarations as examples, or the term "publish" to exclude Plaintiffs' activities. *See* Def. Op. at 16, 27-28. Plaintiffs plausibly interpret the Act to cover their activities, and specifically, to cover material suitable for older minors, of which they have provided examples. *See* Pl. Mem. at 2-6. Notably, in *American Booksellers Association*, the plaintiffs had standing even though one of the questions at issue was whether the sixteen example materials offered as exhibits by the plaintiffs were covered by Virginia's "harmful to minors" statute. 484 U.S. at 398.[7] Indeed, no case

---

[6] The Supreme Court specifically noted that filtering software "is not a perfect solution" because it may "block some materials that are not harmful to minors and fail to catch some that are." *Id.* at 668. Nonetheless, it stated that the "Government's burden is not merely to show that a proposed less restrictive alternative has some flaws; its burden is to show that it is less effective." *Id.* at 669. Thus, regardless of any filtering flaws highlighted by Defendants, they cannot satisfy their burden, because filtering cannot be less effective than the completely ineffective Act. Furthermore, on remand in the COPA litigation, the district court issued extensive factual findings that filtering was a less restrictive alternative, in a 2007 decision. *See ACLU v. Gonzales*, 478 F.Supp.2d 775 (E.D. Pa. 2007), *aff'd sub nom*. *ACLU v. Mukasey*, 534 F.3d 181 (3d Cir. 2008), *cert. denied*, 555 U.S. 1137 (2009).

[7] Defendants' argument that the Act only applies to material that has been published after its effective date, Def. Op. at 15, does not negate Plaintiffs' chill-based standing, because it is not necessary that a plaintiff be in current violation of the challenged law. *See, e.g., PSINet, Inc. v. Chapman*, 167 F. Supp. 2d 878, 888 (W.D. Va. 2001) ("The sword of Damocles causes harm because it hangs, not necessarily because it drops."), *aff'd*, 362 F.3d 227 (4th Cir. 2004).

considering an Internet "harmful to minors" law has placed the onus on plaintiffs to anticipate every possible limiting construction offered by the state in litigation in order to have standing to challenge the law. *Cf. Cyberspace, Commc'ns, Inc. v. Engler*, 55 F. Supp. 2d 737, 746-47 (E.D. Mich. 1999) (finding standing where plaintiffs "justifiably fear prosecution" because "[t]hey have stated that they disseminate on the Internet sexually explicit material which arguably could be deemed 'harmful to minors'"), *aff'd* 238 F.3d 420 (6th Cir. 2000) (per curiam) (mem.).

### E. Plaintiffs have demonstrated that they face irreparable harm, and that the balance of hardships is in their favor, meriting a preliminary injunction.

Plaintiffs face irreparable harm from the loss of First Amendment rights. In *Florida Businessmen for Free Enterprise v. City of Hollywood*, the Fifth Circuit found the requirement of irreparable harm satisfied, because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." 648 F.2d 956, 958 (5th Cir. Unit B June 10, 1981) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

The prospect that Plaintiffs—or indeed, third-party speakers—might be chilled from speaking constitutes irreparable harm. In *Ashcroft*, the Supreme Court concluded that "important practical reasons" counseled in favor of the preliminary injunction, including the fact that "there is a potential for extraordinary harm and a serious chill upon protected speech" as well as the possibility that, facing prosecution, "speakers may self-censor rather than risk the perils of trial." 542 U.S. at 670-71.[8] The same risks of chill and self-censorship are present here, not only as to Plaintiffs, but as to all individuals in Louisiana who may use the Internet, including email and social media platforms—whose activities, Defendants acknowledge, Def. Op. at 17-18, 21, are

---

[8] *Ashcroft* makes clear that even though an affirmative defense explicitly existed in COPA, the prospect of having to undergo a prosecution and trial could itself lead to self-censorship by speakers. *Id.* at 670-71. Therefore, contrary to Defendants' suggestion, *see* Def. Op. at 20-21, the irreparable harm to Plaintiffs and other speakers from chill and self-censorship exists regardless of whether the rule of lenity would be applied in individual cases.

9

covered by the Act. Given that the Act reaches a vast number of speakers and targets their protected speech, the requirement of irreparable harm is satisfied.

Furthermore, any balance of hardships favors Plaintiffs. Defendants have alleged no harm to them from a preliminary injunction, and have in fact stated that there are currently no pending or imminent prosecutions under the Act. Doc. # 32; *cf. Ashcroft*, 542 U.S. at 671 ("The harm done from letting the injunction stand . . . will not be extensive. No prosecutions have yet been undertaken . . . so none will be disrupted if the injunction stands."); *Fla. Businessmen*, 648 F.2d at 959 ("[T]he harm to the city from delaying enforcement is slight."). And in cases alleging a violation of First Amendment rights, the public interest favors an injunction. *See Fla. Businessmen*, 648 F.2d at 959 ("The public interest does not support the city's expenditure of time, money, and effort in attempting to enforce an ordinance that may well be held unconstitutional."); *see also Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.").

| | |
|---|---|
| Dated: January 19, 2016 | Respectfully submitted, |
| Michael A. Bamberger* <br> Richard M. Zuckerman* <br> Dentons US LLP <br> 1221 Avenue of the Americas <br> New York, NY 10020 <br> (212) 768-6700 <br> michael.bamberger@dentons.com <br> richard.zuckerman@dentons.com <br><br> Stephen A. Dixon La. No. 18185 <br> ACLU Foundation of Louisiana Cooperating Attorney <br> 1330 Highland Park Dr. <br> Baton Rouge, LA 70808 <br> (225) 588-5407 <br> southla@laaclu.org | */s/ Esha Bhandari* <br> Esha Bhandari * <br> Lee Rowland* <br> American Civil Liberties Union Foundation <br> 125 Broad St, 18th Floor <br> New York, NY 10004 <br> (212) 549-2500 <br> ebhandari@aclu.org <br> lrowland@aclu.org <br><br> */s/ Candice C. Sirmon* <br> Candice C. Sirmon, T.A., La. No. 30728 <br> ACLU Foundation of Louisiana <br> P.O. Box 56157 <br> New Orleans, LA 70156 <br> (504) 522-0628 <br> csirmon@laaclu.org |

* Admitted *pro hac vice*     Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I do hereby certify that on January 19, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants.

/s/ *Esha Bhandari*
Esha Bhandari
American Civil Liberties Union Foundation
125 Broad St, 18th Floor
New York, NY 10004
(212) 549-2500
Fax: (212) 549-2654
ebhandari@aclu.org