## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **GARDEN DISTRICT BOOK SHOP, INC., ET AL.** | **CIVIL ACTION** |
| **VERSUS** | |
| **JAMES E. STEWART, ET AL.** | **NO.:15-00738-BAJ-EWD** |

## RULING AND ORDER

Before the Court is a **Motion for Preliminary Injunction (Doc. 19)**, filed by Garden District Book Shop, Inc., Octavia Books, LLC, Future Crawfish Paper, LLC, American Booksellers Association, and Comic Book Legal Defense Fund (collectively, "Plaintiffs"). Plaintiffs seek an order from this Court enjoining the enforcement of Louisiana's H.B. 153, La. Stat. Ann. § 14:91.14 (hereinafter, "§ 14:91.14"), pending the final resolution of this matter. Defendants, District Attorneys from the forty-two judicial districts of Louisiana[1] (hereinafter, "State"), filed an opposition to Plaintiffs' motion. (Doc. 25). On December 18, 2015, the Court held a

---

[1] Defendants include District Attorneys: Dale Cox, 1st Judicial District; Daniel W. Newell, 2nd Judicial District; John F. Belton, 3rd Judicial District; Jerry L. Jones, 4th Judicial District; John M. "Mack" Lancaster, 5th Judicial District; James E. Paxton, 6th Judicial District; Bradley R. Burget, 7th Judicial District; R. Christopher Nevils, 8th Judicial District; Phillip Terrell, Jr., 9th Judicial District; Van H. Kyzar, 10th Judicial District; Don M. Burkett, 11th Judicial District; Charles A. Riddle III, 12th Judicial District; Trent Brignac, 13th Judicial District; John F. DeRosier, 14th Judicial District; Keith A. Stutes, 15th Judicial District; Martin Bofill Duhe, 16th Judicial District; Camille A. Morvant, II, 17th Judicial District; Richard J. Ward, Jr., 18th Judicial District; Hillar C. Moore III, 19th Judicial District; Samuel C. D'Quilla, 20th Judicial District; Scott M. Perrilloux, 21st Judicial District; Warren Montgomery, 22nd Judicial District; Ricky Babin, 23rd Judicial District; Paul D. Connick, Jr., 24th Judicial District; Charles J. Ballay, 25th Judicial District; John "Schuyler" Marvin, 26th Judicial District; Earl B. Taylor, 27th Judicial District; J. Reed Walters, 28th Judicial District; Joel T. Chaisson II, 29th Judicial District; Asa A. Skinner, 30th Judicial District; Michael C. Cassidy, 31st Judicial District; Joseph L. Waitz, Jr., 32nd Judicial District; H. Todd Nesom, 33rd Judicial District; Perry M. Nicosia, 34th Judicial District; James P. Lemoine, 35th Judicial District; James R. Lestage, 36th Judicial District; Brian Frazier, 37th Judicial District; Jennifer A. Jones, 38th Judicial District; Julie C. Jones, 39th Judicial District; Bridget A. Dinvaut, 40th Judicial District; Leon A. Cannizzaro, Jr., 41st Judicial District; and Gray Evans, 42nd Judicial District.

hearing and ordered the parties to file post-hearing briefs, (Doc. 32), which were subsequently submitted on January 19, 2016, (Docs. 41, 42). For reasons explained herein, Plaintiffs' **Motion for a Preliminary Injunction (Doc. 19) is GRANTED**.

Also before the Court is a **Motion to Dismiss Pursuant to Rule 12(b)(6) (Doc. 43)**, filed by the State. As will be discussed more fully below, the motion improperly seeks an adjudication on the merits of Plaintiffs' claims, and does not seek to dismiss Plaintiffs' Complaint for failure to state a claim. As such, the State's **Motion to Dismiss Pursuant to Rule 12(b)(6) (Doc. 43) is DENIED**.

## I. BACKGROUND

Plaintiffs are two Louisiana bookstores, a Louisiana based magazine, and two national associations representing member booksellers and comic book retailers. Plaintiffs challenge the constitutionality of § 14:91.14, which criminalizes the publication of "material harmful to minors" on the Internet by any person or entity in Louisiana. Plaintiffs aver that § 14:91.14 is a content-based restriction on constitutionally protected speech that violates freedom of speech under the First and Fourteenth Amendments, the Equal Protection Clause and the Due Process Clause of the Fifth and Fourteenth Amendments, and the Commerce Clause. (Doc. 5).

The genesis of § 14:91.14 was H.B. 153, which was introduced in the Louisiana House of Representatives on March 25, 2015. According to the legislative history, H.B. 153 was passed to combat the pervasiveness of internet pornography addiction by minors. *House Committee on Administration of Criminal Justice: Hearing on H.B. 153*, 2015 Leg., 41st Reg. Sess. (La. 2015) (statement of Rep. Tim Burns). Both

2

chambers of the Louisiana State Legislature unanimously passed H.B. 153 and it became effective on August 1, 2015.[2]

> The pertinent parts of § 14:91.14 read as follows:
>
> (A)(1) Any person or entity in Louisiana that publishes material harmful to minors on the Internet shall, prior to permitting access to the material, require any person attempting to access the material to electronically acknowledge and attest that the person seeking to access the material is eighteen years of age or older.
>
> (2) The failure to comply with the provisions of Paragraph (1) of this Subsection shall constitute the unlawful distribution of material harmful to minors through the Internet.
>
> (3) If a person or entity in Louisiana publishes material harmful to minors on the Internet and complies with the provisions of Paragraph (1) of this Subsection, the person or entity shall not be held liable under the provisions of this Section if the person seeking to access the material is under the age of eighteen and falsely acknowledges and attests that he is eighteen years of age or older.
>
> . . .
>
> (B)(2) "Material harmful to minors" is defined as any digital image, photograph, or video which exploits, is devoted to or principally consists of, descriptions or depictions of illicit sex or sexual immorality for commercial gain, and when the trier of fact determines that each of the following applies:
>
>> (a) The material incites or appeals to or is designed to incite or appeal to the prurient, shameful, or morbid interest of minors.
>> (b) The material is offensive to the average adult applying contemporary community standards with respect to what is suitable for minors.
>> (c) The material taken as a whole lacks serious literary, artistic, political, or scientific value for minors.

La. Stat. Ann. § 14:91.14 (A), (B).

---

[2] *See* H.B. 153 Bill Information, Louisiana State Legislature, http://www.legis.la.gov/Legis/BillInfo.aspx?i=226653.

Plaintiffs urge the Court to issue a preliminary injunction enjoining the enforcement of § 14:91.14. Plaintiffs argue that § 14:91.14 is presumptively invalid because it is a content-based prohibition on protected speech that cannot pass strict scrutiny. (*See generally* Doc. 19-1). Plaintiffs further allege that the statute is impermissibly overbroad. (*Id.*). In opposition, the State contends that § 14:91.14 is merely a constitutionally permissible restriction on material harmful to minors. (*See generally* Doc. 25-1). The State further avers that a preliminary injunction is not warranted because the District Attorneys in Louisiana do not intend, at this time, to enforce § 14:91.14. (*Id.*).

## II.   MOTION FOR PRELIMINARY INJUNCTION

### A.   STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (internal citations and quotations omitted); *see also Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989) (preliminary injunctive relief "is an extraordinary remedy and should be granted only if the movant has clearly carried the burden of persuasion with respect to all four factors"); *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985) ("The decision to grant a request for preliminary injunction is to be treated as the exception rather than the rule."). The decision to grant or deny a request for preliminary injunction is within the sound discretion of the Court. *See Allied Mktg. Grp., Inc.*, 878 F.2d at 809.

At all times, the burden of persuasion rests with the plaintiff to establish each of the four elements. Specifically, a plaintiff must establish: (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) the injunction will "not disserve the public interest." *See Barton v. Huerta*, 613 F. App'x 426, 427 (5th Cir. 2015) (citation omitted). If a plaintiff fails to meet its burden regarding any of the necessary elements, the Court need not address the other elements necessary for granting a preliminary injunction. *See Roho, Inc. v. Marquis*, 902 F.2d 356, 261 (5th Cir. 1990) (declining to address the remaining elements necessary to obtain a preliminary injunction after finding that the plaintiff failed to show a substantial likelihood of success on the merits).

**B.    APPLICABLE LAW**

Before applying the preliminary injunction factors to § 14:91.14, the Court finds it prudent to review the United States Supreme Court's decisions in *Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997), *Ashcroft v. American Civil Liberties Union* (*Ashcroft I*), 535 U.S. 564 (2002), and *Ashcroft v. American Civil Liberties Union* (*Ashcroft II*), 542 U.S. 656 (2004) as precedential decisions that inform the issues *sub judice*. Similar to § 14:91.14, the statutes at issue in these prior cases reflect Congress' attempts to regulate the dissemination and availability of Internet content harmful to minors.

1.      *Reno*

The Communications Decency Act of 1996 ("CDA") criminalized the knowing transmission of obscene or indecent messages to persons under the age of eighteen over the Internet. *Reno*, 521 U.S. at 859–60. The CDA provided affirmative defenses to: (1) "those who take 'good faith, reasonable, effective, and appropriate actions' to restrict access by minors to the prohibited communications"; and (2) "those who restrict access to covered material by requiring certain designated forms of age proof, such as a verified credit card or an adult identification number or code." *Id.* at 860–61.

On review, the Supreme Court affirmed the District Court for the Eastern District of Pennsylvania's[3] entry of a preliminary injunction and held that "the CDA lack[ed] the precision that the First Amendment requires when a statute regulates the content of speech . . . [because] the CDA effectively suppress[ed] a large amount of speech that adults ha[d] a constitutional right to receive and to address to one another." *Id.* at 874. The Court found that the breadth of the CDA's coverage was unprecedented as it was "not limited to commercial speech or commercial entities" but applied to "all nonprofit entities and individuals posting indecent messages or displaying them on their own computers in the presence of minors." *Id.* at 877. Additionally, the Court found that the "undefined terms 'indecent' and 'patently offensive' cover[ed] large amounts of nonpornographic material with serious educational or other value." *Id.*

---

[3] The District Court's decision was appealed directly to the Supreme Court pursuant to a special review provision in the CDA.

6

2. *Ashcroft I* and *Ashcroft II*

In response to the Supreme Court's decision in *Reno*, Congress enacted the Child Online Protection Act ("COPA"). In COPA, Congress attempted to address some of the shortcomings of the CDA. COPA criminalized the knowing posting of material that is harmful to minors, for commercial purposes, on the World Wide Web. *Ashcroft II*, 542 U.S. at 661. Similar to the CDA, COPA provided three affirmative defenses to those who restricted access to minors by: (1) requiring the use of a credit card, debit account, adult access code, or adult personal identification number; (2) accepting a digital certificate that verifies age; and (3) employing any other reasonable measures that are feasible under available technology. *Id*. at 662.

In *Ashcroft I*, the Supreme Court reviewed the Court of Appeals for the Third Circuit's decision affirming the entry of a preliminary injunction. The Court's review was limited to the discrete issue of whether COPA's reliance on "community standards" to identify material that is "harmful to minors" rendered the statute substantially overbroad under the First Amendment.[4] The Court held that community standards need not be defined by reference to a precise geographic area and that it is the publisher's responsibility to abide by the standards of the community to which it chooses to send its material. *Ashcroft I*, 535 U.S. at 576, 583. The Court vacated the judgment of the Third Circuit and remanded the case for further preliminary injunction proceedings.

---

[4] The Court of Appeals affirmed the lower court's grant of a preliminary injunction solely on the ground that COPA's use of "community standards" to identify material that is "harmful to minors" rendered the statute substantially overbroad. *See Ashcroft I*, 535 U.S. at 564. Accordingly, the Supreme Court only considered that narrow issue. *Id*. at 566.

7

In *Ashcroft II*, the Court once again considered the constitutionality of COPA after the Third Circuit affirmed the entry of a preliminary injunction on the grounds that COPA likely violated the First Amendment. The Court concluded that COPA was not the least restrictive means to achieve the Government's compelling interest in protecting children from harmful content on the Internet. The Court found that "[b]locking and filtering software is an alternative that is less restrictive than COPA, and, in addition, likely more effective as a means of restricting children's access to materials harmful to them." *Ashcroft II*, 542 U.S. at 666–67. The Court also found, *inter alia*, that COPA did not prevent minors from having access to material published outside of the United States and that COPA's verification system may be subject to evasion and circumvention. *Id.* at 667–68.

**C.     ANALYSIS**

Having set forth the facts and relevant Supreme Court precedent, the Court shall now consider whether Plaintiffs can establish: (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) whether the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) whether the injunction will "not disserve the public interest." *Barton*, 613 F. App'x at 427.

      1.     Likelihood of Success on the Merits

           *a.     Strict Scrutiny*

Content-based restrictions on speech are presumptively unconstitutional and subject to strict scrutiny. *Reed v. Town of Gilbert, Ariz.*, ___ U.S. ___, 135 S. Ct. 2218,

2226 (2015); *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000). "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 643 (1994). The government's purpose is the controlling consideration in discerning content-based regulations from content-neutral regulations. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Content-neutral regulations generally serve the purpose of restricting the time, place, or manner of protected speech, while content-based regulations seek to restrict the message conveyed. *Id*. On the face of § 14:91.14, it is clear that it is a content-based regulation because it draws distinctions based on the content of speech, *i.e.* whether or not the speech is harmful to minors. Therefore, the Court must analyze § 14:91.14 under the strict scrutiny paradigm.[5]

Under the strict scrutiny analysis, the State bears the burden of proving that § 14:91.14 is narrowly tailored to serve a compelling interest. *Reed*, 135 S. Ct. at 2226; *Turner Broad. Sys.*, 512 U.S. at 664–65; *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991). In the context of regulating speech that is harmful to minors, it is well settled that the State has a compelling interest in protecting children from harm sufficient to justify limitations on speech.

---

[5] According to the State, § 14:91.14 is intended to only regulate speech for "for commercial gain," which triggers the intermediate scrutiny analysis afforded to commercial speech. Doc. 25-1 at p. 7. Commercial speech is defined as "speech that does no more than propose a commercial transaction." *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001) (citing *Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976)); *Harris v. Quinn*, __ U.S. __, 134 S. Ct. 2618, 2639 (2014). Here, § 14:91.14 sweeps more broadly than solely purposing a commercial transaction. As one Louisiana court has found, the term "for commercial gain" refers to the "creation or production of the material involved and not to the nature of the transaction." *State v. Anderson*, 540 So. 2d 974, 976 (La. Ct. App.) *writ denied*, 544 So. 2d 398 (La. 1989).

9

*Brown v. Entm't Merchants Ass'n*, ___U.S.___, 131 S. Ct. 2729, 2766 (2011); *Sable Communications of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989).

Nonetheless, to pass strict scrutiny, § 14:91.14 must be narrowly tailored to achieve this purpose. *See, e.g.*, *Williams-Yulee v. Florida Bar*, __ U.S. __, 135 S. Ct. 1656, 1671 (2015). Plaintiffs contend that § 14:91.14 is not narrowly tailored because content-filtering technology installed by parents offers a less restrictive and more effective means to protect children from harmful content. Because the State "bears the burden of proof on the ultimate question of [§ 14:91.14's] constitutionality," it bears the burden of demonstrating that content-filtering technology is not less restrictive or more effective. *Ashcroft II*, 542 U.S. at 666.

In *Ashcroft II*, the Supreme Court made the following findings on filtering technology:

> Filters are less restrictive than COPA. They impose selective restrictions on speech at the receiving end, not universal restrictions at the source. Under a filtering regime, adults without children may gain access to speech they have a right to see without having to identify themselves or provide their credit card information. Even adults with children may obtain access to the same speech on the same terms simply by turning off the filter on their home computers. Above all, promoting the use of filters does not condemn as criminal any category of speech, and so the potential chilling effect is eliminated, or at least much diminished.

*Ashcroft II*, 542 U.S. at 667.

While the age verification requirements under COPA entailed more restrictive means than § 14:91.14, the Supreme Court's rationale is still applicable. Section 14:91.14 may not expressly require a credit card or personal identifying information, but it similarly places the burden of imposing restrictions on speech on the provider

10

and carries the chilling effect of imposing criminal penalties on persons and entities that fail to do so. As the Court will discuss *infra*, § 14:91.14 contains vague and undefined terms that have the potential to lead to self-censorship, especially given the fear of facing criminal penalties. *Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 258 (3d Cir. 2003) *aff'd and remanded*, 542 U.S. 656 (2004).

Content-filtering transfers the burden of imposing restrictions on speech to the end-users, which in this context are the parents. (*See* Doc. 25-2 at 2) (Lee Aff. ¶9 ("Content Filtering Systems [are] designed to serve the end-user and function[] independently from the provider.")). The State contends that content-filtering "assumes . . . that most parents even understand how to turn content filters on (and off) for the various devices present in their homes." (Doc. 25-1 at 14). This contention is unpersuasive. The need for parental cooperation does not automatically disqualify a proposed less restrictive alternative, *Ashcroft II*, 542 U.S. at 669 (citation omitted), and the Court "should not presume parents, given full information, will fail to act," *Playboy Entertainment Group*, 529 U.S. at 824. And while the State has a compelling interest in protecting children, the Court also recognizes the autonomy parents possess over the rearing of their children. *Ginsberg v. State of N. Y.*, 390 U.S. 629, 639 (1968) ("[C]onstitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society.").

The State also challenges the effectiveness of content-filtering technology due to its inability to gauge the literary, artistic, political, or scientific value of any

11

particular work, as well as its inability to categorize everything uploaded onto the Internet in Louisiana.[6] (Doc. 25-1 at pp. 12, 13). It is undisputed that "[f]iltering software . . . is not a perfect solution to the problem of children gaining access to harmful-to-minors materials. It may block some materials that are not harmful to minors and fail to catch some that are." *Ashcroft II*, 542 U.S. at 668. Despite the flaws inherent in content-filtering, the State's burden is "not merely to show that a proposed less restrictive alternative has some flaws; its burden is to show that it is less effective," which the State has failed to do. *Id.* at 669.

Section 14:91.14's effectiveness is further undermined by the fact that it only applies to content published by providers in the State of Louisiana. Even if § 14:91.14 remains in effect, children in Louisiana will still be able to access a vast quantity of harmful material published by providers located outside of Louisiana. *Id.* at 667 ("COPA does not prevent minors from having access to those foreign harmful materials."). The very class of persons that § 14:91.14 seeks to protect will still be able to access national and international websites that are not subject to the statute. Moreover, children can also evade and circumvent § 14:91.14 by lying about their age. *See Ashcroft II*, 542 U.S. at 668 ("[V]erification systems may be subject to evasion and circumvention, for example, by minors who have their own credit cards.").

The effectiveness of § 14:91.14 is also frustrated by the State's contention that the term "publish" means "upload," and that the statute does not apply to materials uploaded onto a Louisiana provider's webpage by a third-party publisher located

---

[6] The State originally advanced this argument as a challenge to the restrictiveness of content-filtering. However, the State's argument is actually a challenge to the effectiveness of content-filtering.

12

outside of Louisiana. (Doc. 25-1 at pp. 15-16). Thus, a Louisiana provider can circumvent the requirements of § 14:91.14 by ensuring that all future content is uploaded onto its webpage by a third-party publisher located outside of Louisiana.

Further, the State contends that § 14:91.14 only applies to material "uploaded" after the statute was enacted. Under the State's proposed construction, minors would be able to access a slew of otherwise prohibited material currently maintained by Louisiana providers but uploaded before the statute was enacted on August 1, 2015.

The Supreme Court held that content-filtering was less restrictive and more effective than COPA and, under the facts presented here, this Court is compelled to reach the same conclusion as to § 14:91.14. The State has only attempted to identify flaws associated with content-filtering, but it has not demonstrated that content-filtering is less effective. Accordingly, the Court finds that Plaintiffs have convincingly demonstrated that they are likely to prevail on the ultimate question of § 14:91.14's constitutionality. *See Ashcroft II*, 542 U.S. at 667.

b.      *Overbreadth and Vagueness*

"The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002). While the vagueness of a statute certainly implicates the Due Process Clause of the Fifth and Fourteenth Amendments, it also implicates the overbreadth doctrine of the First Amendment. *Reno*, 521 U.S. at 870; *Joint Heirs Fellowship Church v. Ashley*, 45 F. Supp. 3d 597, 630 (S.D. Tex. 2014) *aff'd sub nom.*, 2015 WL 6535336 (5th Cir. Oct.

29, 2015) ("In the First Amendment context, the doctrines of vagueness and overbreadth overlap; both are premised on concerns about chilling constitutionally protected speech."). Vagueness in a content-based regulation can result in a chilling effect on free speech. *Reno*, 521 U.S. at 871. When such a regulation is enforced by criminal penalties, it has the "constant potential to be a repressive force in the lives and thoughts of a free people." *Ashcroft II*, 542 U.S. at 660. In the face of vagueness, criminal penalties may cause speakers to remain silent rather than communicate arguably unlawful words, ideas, and images. *Reno*, 521 U.S. at 871–72.

Criminal statutes, such as § 14:91.14, must be defined "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). The ill-defined terms in § 14:91.14 do not adequately notify individuals and businesses in Louisiana of the conduct it prohibits, which creates a chilling effect on free speech. For example, despite the array of definitions in Section (B) of the statute, it does not define "for commercial gain" or "publish."

The State contends that the phrase "for commercial gain," which is embedded in the definition of "material harmful to minors," means the statute applies to material published on the Internet for commercial gain. (Doc. 41 at p. 9). However, under a similar criminal statute, La. Stat. Ann. § 14:91.11,[7] a Louisiana court held

---

[7] The statute criminalized the sale, distribution, or display of material harmful to minors, which included the following: "any paper, magazine, book, newspaper, periodical, pamphlet, composition, publication, photograph, drawing, picture, poster, motion picture film, figure, phonograph record, wire

14

that the term "for commercial gain"—which was similarly embedded in that statute's definition of "material harmful to minors"—refers to the "creation or production of the material involved and not to the nature of the transaction." *State v. Anderson*, 540 So. 2d 974, 976 (La. Ct. App.) *writ denied*, 544 So. 2d 398 (La. 1989) (concluding that loaning a pornographic video tape to a minor was prohibited conduct under the statute because "for commercial gain" does not require a commercial transaction). Thus, the State's proposed definition of the term "for commercial gain" completely ignores a Louisiana court's explicit interpretation of that term.

The State also contends that the word "publish" is synonymous with the word "upload."[8] (Doc. 25-1 at p. 15). The State offers no competent support for this contention. The State only provides a declaration from the Senior Systems Administrator for the Louisiana Department of Justice—who is not a member of the Louisiana Legislature or qualified as an expert—to advise as to his *personal* interpretation of the term.[9] (*See* Doc. 41-1 at 2) (Lee Aff. ¶5). The meaning of "publish," as used in this statute, is vague as written and could include uploading or

---

or tape recording or other similar tangible work." *Anderson*, 540 So. 2d at 975 (quoting La. Stat. Ann. § 14:91.11 (1988)).

[8] During the committee hearings on H.B. 153, former Representative Tim Burns, the author of § 14:91.14, stated that the statute was intended to be restricted to persons and entities that "publish" and "maintain" websites that contain prohibited material. *House Committee on Administration of Criminal Justice: Hearing on H.B. 153*, 2015 Leg., 41st Reg. Sess. (La. 2015) (statement of Rep. Tim Burns). He did not reference "upload," but referenced the ambiguous terms "publish" and "maintain." While the definition of "publish," as contemplated by the legislature, is still unclear, it is apparent that the activities proscribed by the statute are broader than mere uploading.

[9] The State, by offering the opinion of the Senior Systems Administrator, seeks to have an executive-branch employee step into the mind of the legislature to define an ambiguous statutory term. Nothing in the declaration reveals that the declarant had any insight into what the members of the *legislature* intended by the term "publish." Suffice it to say that the declaration only amounts to rank conjecture that the Court must categorically decline to accept.

displaying content that is harmful to minors. Absent an explicit definition in the statute, the Court and the public can only speculate as to its meaning and intended application.

Moreover, the chill on protected speech caused by the vagueness of § 14:91.14 is not lessened by its affirmative defenses. "An affirmative defense applies only after prosecution has begun." *Ashcroft*, 322 F.3d at 260. To avoid the stigma of a criminal prosecution, Plaintiffs, and those similarly situated, will be inclined to either broadly apply the age verification process well beyond what is necessary or refrain from publishing any material that arguably falls within the confines of the statute. A possible consequence of the chill caused by § 14:91.14 is to drive protected speech from the marketplace of ideas on the Internet. *Id*.

Based on the overbreadth of §14:91.14, and its inability to pass strict scrutiny, the Court finds that there is a substantial likelihood that Plaintiffs will prevail on the merits of their First Amendment claim. As such, the Court shall refrain from ruling on the potential merits of Plaintiffs' other constitutional challenges to §14:91.14.

2. Threat of Irreparable Injury

The State argues that there is no threat of irreparable injury if the injunction is not granted because the conduct identified by Plaintiffs would not be prohibited by §14:91.14. (Doc. 25-1 at p. 27). The State addresses the various literary materials identified by Plaintiffs in their declarations, (Docs. 19-2, 19-4, and 19-5), and

concludes that each item would not be covered under §14:91.14 because they do not lack serious artistic, political, or scientific value, (Doc. 25-1 at p. 27).

However, the State's unilateral determination of the quality of the speech in the works identified by Plaintiffs has no bearing on the constitutionality of §14:91.14 or the threat of irreparable harm. The State's argument incorrectly surmises that the works identified by Plaintiffs comprise an exhaustive list. Further, the State does not account for the fact that "the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392–93 (1988).

The Supreme Court has made clear that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Croft v. Governor of Texas*, 562 F.3d 735, 745 (5th Cir. 2009). The "irreparable injury 'stems from the intangible nature of the benefits flowing from the exercise of those rights and the fear that, if these rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future.'" *Entm't Software Ass'n v. Foti*, 451 F. Supp. 2d 823, 836 (M.D. La. 2006) (quoting *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 363 (6th Cir. 1998)). Accordingly, the Court finds that Plaintiffs have adequately demonstrated that they face a substantial threat of irreparable harm if the Court does not issue a preliminary injunction.

3.     Balancing Hardships and Public Interest

The State asserts that §14:91.14 has not been enforced and that the District Attorneys in Louisiana do not plan to enforce the statute. (Prelim. Inj. Hr'g Tr. 51:18-52:2). Even assuming the accuracy of this representation, and accepting, *arguendo*, that the current District Attorneys do not plan to enforce §14:91.14, it is axiomatic that they have no lawful ability to bind their successors.

Furthermore, "[i]njunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 298 (5th Cir. 2012) (quoting *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006); *Ingebretsen ex rel. Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996)). Accordingly, the Court finds that Plaintiffs have adequately demonstrated that the balance of hardships weigh in their favor and a preliminary injunction serves the public interest.

### III.   MOTION TO DISMISS

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint against the legal standard set forth in Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint need not set out "detailed factual allegations," but something

"more than labels and conclusions, and a formulaic recitation of the elements of a cause of action" is required. *Twombly*, 550 U.S. at 555.

The State seeks to dismiss Plaintiffs' Complaint on the grounds that §14:91.14 is constitutional. As this is the gravamen of the State's motion, the Court finds that it is not a challenge to the sufficiency of Plaintiffs' factual allegations, but a challenge to the merits of Plaintiffs' claims. Rule 12(b)(6) is not the proper mechanism within the Federal Rules of Civil Procedure to seek the relief requested by the State. Accordingly, the Court agrees with Plaintiffs' argument that the disputes raised by the State are not to be properly considered on a motion to dismiss.

## IV. CONCLUSION

Based on the foregoing,

**IT IS ORDERED** that Plaintiffs' **Motion for Preliminary Injunction (Doc. 19)** is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendants are preliminarily **ENJOINED** from enforcing La. Stat. Ann. § 14:91.14, until further order of this Court.

**IT IS FURTHER ORDERED** that Defendants' **Motion to Dismiss Pursuant to Rule 12(b)(6) (Doc. 43)** is **DENIED.**

Baton Rouge, Louisiana, this 29th day of April, 2016.

**BRIAN A. JACKSON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**